UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA and THE
COMMONWEALTH OF
MASSACHUSETTS, EX REL JULIO
ESCOBAR and CARMEN CORREA,
ADMINISTRATRIX OF THE ESTATE OF
YARUSHKA RIVERA,

     Plaintiffs

     V.

UNIVERSAL HEALTH SERVICES, INC.
     Defendant

C.A. No. 11-CV-11170-DPW

## SECOND AMENDED COMPLAINT

The *qui tam* relators, Julio Escobar and Carmen Correa, Administratrix of the Estate of

Yarushka Rivera ("Relators"), on behalf of the United States of America and the Commonwealth

of Massachusetts, bring this action against Universal Health Services, Inc. ("UHS"), pursuant to

the Federal False Claims Act, 31 U.S.C. Section 3729 *et seq.,* both pre-amendment and as

amended by the Fraud Enforcement and Recovery Act of 2009, and the Patient Protection and

Affordable Care Act of 2010,  and the Massachusetts False Claims Act, M.G.L. Chapter 12,

Section 5A *et seq.,* to recover all damages, civil penalties and all other recoveries provided for

under the law relating to unlawful health insurance billing practices of UHS.

**INTRODUCTION**

1.  The Massachusetts Medicaid Program, MassHealth, is a means tested government entitlement program, jointly financed by the federal and state governments, that provides healthcare to low-income residents in Massachusetts.

2.  This is an action to recover damages and civil penalties on behalf of the United States of America, and the Commonwealth of Massachusetts, arising from false and fraudulent billing claims submitted to MassHealth by UHS in violation of both the Federal False Claims Act, and the Massachusetts False Claims Act.

3.  Relators Julio Escobar (Mr. Escobar"), and Carmen Correa Administratix of the Estate of Yarushka Rivera ("Mrs. Correa") (collectively, the "Relators"), are residents of Methuen, Massachusetts.

4.  UHS is a for-profit corporation doing business in Massachusetts, with a principal place of business located at 367 South Gulph Road, King of Prussia, PA 19406.

5.  UHS owns and operates for-profit hospitals and health care facilities throughout eastern Massachusetts.

6.  UHS owns and operates Arbour Counseling Services, located at 599 Canal Street, Lawrence, MA 01840 ("Arbour").

7.  Arbour is a Mental Health Center, as that term is defined at 130 CMR 429.402.

8.  In its capacity as a Mental Health Center, Arbour submits billing to Mass.Health for care relating to Mass.Health recipients.

9.   In order to be entitled to reimbursement from Mass.Health, a mental health clinic, such as Arbour, must comply with 130 CMR §429.  These regulations explicitly govern the quality of care that must be afforded Mass.Health recipients before a mental health clinic is entitled to reimbursement by the government.

10. Central to these express pre-conditions to reimbursement are specific rules regarding the supervision of care including:

- **Supervision of Unlicensed Health Care Providers:** All counselors and unlicensed staff must be under the direct and continuous supervision of a fully qualified professional staff member trained in one of the core disciplines.  See 130 CMR §429.424(E).

- **Supervision Policies In Writing and Observed:**  A mental health clinic must have and observe written policies that include supervisory mechanisms for staff.  See 130 CMR §429.437;

- **Board Certified Psychiatrist Responsible for Supervising Patient Care:**  A mental health clinic must employ a board certified, or board eligible, psychiatrist responsible for the (a) evaluation of the physiological, neurological and psychopharmacological status of the center's patients; b) involvement in the diagnostic formulation and development of treatment plans; (c) direct psychotherapy when indicated (d) participate in utilization review or quality assurance activity, and f) supervision of and consultation to other disciplines.  See 130 CMR §429.423(D) and 130 CMR §424.

- **Licensed Psychologist:**  A mental health center participating in Mass.Health must also employ at least one staff psychologist licensed by the Massachusetts Board of Registration of Psychologists.  130 CMR 429.424(B).

11. The reimbursement rates paid to a provider by MassHealth include payment for the costs to supervise staff.  See 130 CMR §429.408.

12. Proper supervision is an express pre-condition that must be satisfied before a health provider such as Arbour can seek reimbursement from Mass.Health.  See 130 CMR §429.439.

3

13. The statute of limitations in this case extends back six years from the original filing of this litigation.  See 31 U.S.C.§3731(b)(1).

## JURISDICTION AND VENUE

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1367, and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

15. Under 31 U.S.C. §3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.  This action is not based upon the public disclosure of any of the allegations or transactions described herein.  The Relators are the original source of the information upon which the False Claims Act allegations in this complaint are based.  The Relators have direct and independent knowledge of the information upon which the False Claims Act allegations herein are based, and voluntarily provided such information to various state agencies, as well as the United States, before this complaint was filed.  The Relators gained direct and independent knowledge of these facts through their personal experiences, research, and communications described herein.

16. As required by 31 U.S.C. §3730(b)(2), the Relators have served the United States Attorney General and the Massachusetts Attorney General with copies of the original and amended complaints in this matter, along with written disclosures of material evidence related to the same.

17. This Court has personal jurisdiction over the defendant, pursuant to 31 U.S.C. §3732(a) because UHS operates health clinics throughout Massachusetts and, accordingly, transacts business in the District of Massachusetts.

18. At all times relevant to this Complaint, UHS regularly conducted substantial business within the District of Massachusetts, maintained employees and offices in Massachusetts, and made significant sales within Massachusetts.  In addition, statutory violations, as alleged herein, occurred in the District of Massachusetts.

19. The below claims arise out of misrepresentations, omissions and inappropriate Mass.Health billing practices of Arbour in regard to treatment provided to Yarushka, and other Mass.Health recipients, who received care at Arbour in the six years prior to the filing of this litigation and extending to date.

## FACTS RELATING TO ARBOUR'S UNLICENSED AND UNSUPERVISED CARE PROVIDERS[1]

20. The Relators, Mrs. Correa and Mr. Escobar, are married and reside in Methuen, Massachusetts.

21. Yarushka Rivera ("Yarushka") is the late daughter of Carmen Correa and the step-daughter of Julio Escobar.

22. At all times relevant to the Complaint, Yarushka was a recipient of Mass.Health insurance benefits.

---

[1] A copy of Yarushka Rivera's medical records documenting her treatment at Arbour is attached at Exhibit 1.

23. Yarushka was first referred for mental health care at Arbour in 2004, after she began experiencing behavioral problems at her middle school.

24. Yarushka subsequently received several sessions of counseling with Anna Cabacoff a Licensed Social Worker employed by Arbour.

25. In 2008, the Relators were again contacted by school officials who informed them that Yarushka was having trouble with other students at school and recommended Yarushka return to counseling.

26. The Relators returned to Arbour and requested that Yarushka be seen again by Ms. Cabacoff.

27. They were then told by Mr. Edward Keohan, the Clinical Director of Arbour, that Yarushka needed to be in group therapy with other children and would be referred to a therapist other than Ms. Cabacoff.

### *Treatment Rendered to Yarushka By Maria Pereyra*

28. Maria Pererya, a counselor at Arbour, was assigned to care for Yarushka.

29. The Relators assumed that Ms. Pereyra was licensed to provide mental health therapy to children like Yarushka.

30. They later learned that she had no professional license whatsoever.

31. After several sessions with Ms. Pereyra, Yarushka complained that she was not benefitting from the counseling.

32. The Relators then met with Mr. Keohan to express their concerns as to Ms. Pereyra.

6

33. Mr. Keohan was Ms. Pereyra's supervisor.

34. Mr. Escobar first began to suspect that Mr. Keohan was not properly supervising Ms. Pereyra when Mr. Keohan did not seem familiar with Ms. Pereyra's treatment of Yarushka.

35. Mr. Keohan advised that the Relators give Ms. Pereyra a chance and that Ms. Pereyra would see Yarushka individually, and not in a group, for counseling.

36. Yarushka and the Relators agreed and Yarushka continued to treat with Ms. Pereyra.

37. Unfortunately, nothing improved and Yarushka continued to feel she was not benefitting from her counseling.

38. Once again, the Relators contacted Mr. Keohan and expressed their concerns as to Ms. Pereyra.

39. Thereafter, Mr. Keohan agreed to transfer Yarushka's care to another counselor.

40. On November 8, 2007, Arbour billed Mass. Health for Ms. Pereyra's initial evaluation of Yarushka under Service Code 90801 and was paid $111.38.[2]

41. Over the next four months, Ms. Pereyra provided counseling services to Yarushka under Service Codes 90853, the treatment code for Group Therapy.

42. On 11/13/2007, Arbour billed Mass.Health under Service Code 90853 and was paid $28.46.

43. On 11/20/2007, Arbour billed Mass.Health under Service Code 90853 and was paid $28.46.

---

[2] Billing records relating to the treatment of Yarushka Rivera at Arbour are attached at Exhibit 2.

44. On 12/11/2007, Arbour billed Mass.Health under Service Code 90853 and was paid $28.46.

45. On 12/18/2007, Arbour billed Mass.Health under Service Code 90853 and was paid $28.46.

46. On 1/18/2008, Arbour billed Mass.Health under Service Code 90853 and was paid $28.46.

47. Arbour was paid $81.49 for these treatments.

48. On 1/2/2008, Arbour billed Mass.Health under Service Code 90806 (treatment code for Individual Therapy) and was paid $81.49.

49. On 1/28/2008, Arbour billed Mass.Health under Service Code 90806 and was paid $81.49.

50. At no time relevant to this Complaint did Ms. Pereyra have the requisite qualifications, or requisite supervision, to allow Arbour to bill Mass.Health for services rendered by Ms. Pereyra to Mass.Health recipients.

### Treatment Rendered to Yarushka by Diana Casado

51. In response to the Relators' concerns relating to Ms. Pereyra, Mr. Keohan re-assigned Yarushka's treatment to Diana Casado.

52. The Relators assumed that Ms. Casado was licensed to provide mental health therapy to children like Yarushka.

53. They later learned that Ms. Casado had no professional license whatsoever.

54. Unfortunately, Yarushka did not benefit from her treatment sessions with Ms. Casado.

55. Mr. Keohan was Ms. Casado's supervisor.

56. Mr. Escobar began to suspect that Mr. Keohan was not properly supervising Ms. Casado because he did not seem familiar with Ms. Casado's treatment of Yarushka.

57. Mr. Keohan agreed to try to find someone more experienced to treat Yarushka.

58. On 6/4/2008, Arbour billed Mass.Health under Service Code 90847 for family therapy and was paid $42.06.

59. On 6/23/2008, Arbour billed Mass.Health under Service Code 90806 and was paid $40.75.

60. On 9/8/2008, Arbour billed Mass.Health under Service Code 90806 and was paid $41.97.

61. On 9/15/2008, Arbour billed Mass.Health under Service Code 90806 and was paid $40.75.

62. On 9/24/2008, Arbour billed Mass.Health under Service Code 90847 for family therapy and was paid $43.32.

63. At no time relevant to this Complaint did Ms. Casado have the requisite qualifications, or requisite supervision, to allow Arbour to bill Mass.Health for Ms. Casado's treatment of Mass.Health recipients.

***Treatment Rendered to Yarushka by Anna Fuchu***

64. In February of 2009, Mr. Keohan informed the Relators that he was going to reassign Yarushka's care to Anna Fuchu, who Mr. Keohan represented was a very experienced "doctor."

65. Ms. Fuchu represented herself to Yarushka and the Relators as a "psychologist."

66. Ms. Fuchu stated that she had a PhD and she referred to herself as "Dr. Fuchu."

67. The Relators later learned from their own research that Ms. Fuchu attended an internet college for her PhD in psychology not recognized by the Board of Licensure for the Commonwealth of Massachusetts.

68. They also later learned that Ms. Fuchu had applied for licensure as a psychologist in Massachusetts and had been rejected.

69. Ms. Fuchu, in fact, was not licensed in any capacity to provide mental health services to children such as Yarushka.

70. On February 25, 2009, Ms. Fuchu met with Yarushka and conducted an Initial Clinical Evaluation that lasted approximately fifteen minutes.

71. Based on this evaluation, Ms. Fuchu formally diagnosed Yarushka for the first time as suffering from Bi-Polar Disorder.

72. On 2/25/2009, Arbour billed Mass.Health for Ms. Fuchu's Initial Clinical Evaluation of Yarushka under Service Code 90801 and was paid $281.46.

10

73.   Arbour billed Mass. Health for Individual Therapy rendered to Yarushka by Ms. Fuchu, under Service Code 90806, on 3/16/2009; 3/30/2009; 4/20/2009; 6/29/2009; 7/13/2009; 7/27/2009; 9/08/2009 and 9/24/2009.

74. Arbour was paid $81.49 for each of these sessions.

75. On 5/6/2009; 8/5/2009; 6/15/2009, and 10/26/2009, Arbour billed Mass.Health for family therapy rendered to Yarushka and her family under Service Code 90847.

76. Arbour was paid $84.12 for each of these sessions.

77.  At no time relevant to this Complaint was Ms. Fuchu licensed to provide mental health care nor was she properly supervised.

78. At no time relevant to this Complaint did Ms. Fuchu have the requisite qualifications, or requisite supervision, to allow Arbour to bill Mass.Health for Ms. Fuchu's treatment of Mass.Health recipients.

### *Treatment Rendered To Yarushka By Maribel Ortiz*

79. In May of 2009, the Relators were contacted again by school officials and were informed that Yarushka was having trouble interacting with other students.

80. The school informed the Relators that Yarushka would have to seen by a psychiatrist before she could be readmitted to school.

81. The Relators, in turn, informed Ms. Fuchu that Yarushka needed to be seen by a psychiatrist.

82. Ms. Fuchu informed the Relators that Maribel Ortiz of Arbour could help.

83. Because they had informed Ms. Fuchu that Yarushka needed to be seen by a psychiatrist, and Ms. Fuchu referred Yarushka to Ms. Ortiz, the Relators believed Ms. Ortiz was a doctor and referred to her as "Dr. Ortiz."

84. The Relators later learned that Ms. Ortiz was a nurse and not a psychiatrist.

85. On May 6, 2009, Yarushka was evaluated by Ms. Ortiz.  After noting that Yarushka had been previously diagnosed as being bi-polar by Ms. Fuchu, who was unqualified to make such a diagnosis, Ms. Ortiz prescribed a medication called Trileptal to treat Yarushka's purported mood disorder.

86. The Relators later learned, from their own research that a nurse such as Ms. Ortiz can only prescribe psychiatric medications if they are supervised by a board certified psychiatrist.

87. The Relators later learned, from their own research, that Ms. Ortiz was not a psychiatrist, she was not supervised by anyone, and that the only psychiatrist on staff at Arbour. Maria Gaticales, MD, was not board certified and did not supervise the medical treatment of Arbour's patients, and instead, would only get involved if direct care providers asked for help.

88. On May 7, 2009, after experiencing an adverse reaction to Trileptal, Yarushka contacted Arbour and left a message for Ms. Ortiz.  The message was not returned.

89. On May 8, 2009, Yarushka again left a message for Ms. Ortiz after her reaction worsened.

90. After no response from Arbour, Yarushka decided to discontinue taking the medication.

91. Over the next few days, Yarushka's condition improved.  Still, there was no communication from Arbour.

92. On Wednesday, May 13, 2009, Yarushka suffered a seizure and was hospitalized at Lawrence General Hospital.

93. Yarushka had no prior history of seizure.

94. Unknown to Yarushka and the Relators, Trileptal withdrawal can cause seizures.

95. This risk was never disclosed to Yarushka or the Relators by Ms. Ortiz or any health practitioner at Arbour.

96. On May 16, 2009, Yarushka was released from the hospital.  She was advised that she would have to continue to take seizure medication for the rest of her life.

97. On May 18, 2009, Mr. Escobar contacted Arbour and asked to speak with Ms. Ortiz's supervisor.

98. The unidentified individual who claimed to be Ms. Ortiz's supervisor was not aware of Yarushka's repeated efforts to reach Ms. Ortiz.  Mr. Escobar informed the supervisor of the situation and asked to speak with Ms. Ortiz.

99. At that time, Mr. Escobar believed Ms. Ortiz was actually a psychiatrist so he asked to speak with "Dr. Ortiz."

100.  The supervisor informed Mr. Escobar that Ms. Ortiz was, in fact, not a psychiatrist but a nurse.  Mr. Escobar was told that Ms. Ortiz would contact Yarushka by the next day.

13

101.  When Ms. Ortiz still had not called Yarushka by the next day, Mr. Escobar called Arbour and spoke with Mr. Keohan.

102.  Mr. Escobar began to suspect that no-one at Arbour was supervising Ms. Ortiz when Mr. Keohan claimed to have no knowledge of the Relators repeated efforts to reach Ms. Ortiz, and of Yarushka's recent seizure.

103.  Mr. Escobar voiced his dissatisfaction as to Yarushka's care to Mr. Keohan.

104.  Mr Escobar's experience with Ms. Ortiz led him to suspect that Ms. Ortiz was not properly qualified to prescribe psychiatric medications to children, and was not properly supervised.

105.  Shortly thereafter, Ms. Cabacoff informed Mr. Escobar that after he complained about Yarushka's treatment, Mr. Keohan ordered that Dr. Gaticales supervise Ms. Ortiz.

106.  This conversation confirmed Mr. Escobar's suspicion that, at the time Ms. Ortiz treated Yarushka, Ms. Ortiz was not properly supervised.

107.  As a psychiatric nurse at Arbour, Ms. Ortiz was qualified to prescribe medications only if she was properly supervised by a board certified psychiatrist.

108.  At all relevant times. The only psychiatrist employed by Arbour was Maria Celia C. Gaticales, M.D.

109.  Dr. Gaticales is not a board certified psychiatrist.

110.  On May 6, 2009, Arbour billed Mass.Health for services rendered to Yarushka by Ms. Ortiz under Service Code 99404 (preventive medication counseling), and was paid $120.36

14

111.  At the time Arbour billed Mass. Health for services rendered to Yarushka, Ms. Ortiz was not supervised by anyone.

112.  At the time Arbour billed Mass. Health for services rendered to Yarushka, Ms. Ortiz was not supervised by a board certified physician or psychiatrist.

### The Timeline of Relators' Efforts To Investigate Yarushka's Death

113.  Over the summer and into the fall of 2009, Yarushka continued to receive mental health counseling at Arbour.

114.  In October of 2009, Yarushka died of a seizure.

115.  Thereafter, on three occasions following Yarushka's death, Ms. Cabacoff came to the Relators' home seeking to provide counseling to the Relators.

116.  On her last visit, on November 14, 2009, Ms. Cabacoff made a number of statements to the Relators critical of the care provided to Yarushka by Arbour.

117.  Specifically, Ms. Cabacoff told the Relators that she was one of the few employees at Arbour who was actually licensed to provide mental health counseling, and that unlicensed staff were not "well equipped" to treat teenagers such as Yarushka.

118.  These comments by Ms. Cabacoff, combined with the Relators own observations, led the Relators to believe that the individuals assigned to counsel Yarushka were 1) inexperienced, 2) not licensed to provide mental health services, and 3) were not supervised.

119.  Ms. Cabacoff also explicitly informed the Relators that Ms. Ortiz was also not supervised by anyone prior to the time in which Mr. Escobar complained about Ms. Ortiz's failure to respond when Yarushka had an adverse reaction to Trileptal.

120.  Based on the information provided by Ms. Cabacoff, Mr. Escobar confirmed, via state licensing databases, that Ms. Pereyra, Ms. Casado and Ms. Fuchu were not licensed to provide mental health care to patients such as Yarushka.

121.  Mr. Escobar also confirmed that Dr. Gaticales was not board certified and, accordingly, was not qualified to supervise Ms. Ortiz in her prescription of medications to children such as Yarushka.

122.  In December of 2009, the Relators contacted the Commonwealth of Massachusetts Disabled Persons Protection Commission ("DPPC") and filed a complaint via telephone.

123.  In April of 2010, the Relators received a phone call from Mark Wefers, an investigator with the DPPC.

124.  This was the first of many phone conversations that Mr. Escobar had with Mr. Wefers covering many hours.

125.  During these conversations, Mr. Escobar shared with Mr. Wefers everything he knew at that time, or suspected, as to Arbour's deficient care of Yarushka and its violation of applicable laws.

126.  As Mr. Escobar continued to research and learn more as to the variety of ways in which Arbour failed his daughter, would provide Mr. Wefers with this information.

127.  On May 1, 2010, Mr. Escobar submitted a detailed written submission to DPPC documenting the factual circumstances relating to Arbour and its care of Yarushka.[3]

128.  This submission focused primarily on Ms. Ortiz and the fact that she prescribed psychiatric medication to Yarushka although she was not appropriately supervised by a board certified psychiatrist.

129.  Mr. Escobar supplemented this initial submission to DPPC in writing on May 12, 2010.  In this submission, Mr. Escobar provided DPPC with an extensive factual chronology and identified all of Yarushka's health care providers.

130.  At Mr. Wefer's request, Mr. Escobar created written summaries of various conversations the Relators had with Arbour employees.  Mr. Escobar provided these summaries to Mr. Wefers.

131.  During their many conversations, Mr. Escobar shared with Mr. Wefers his belief that Arbour was providing mental health counseling to patients utilizing unlicensed, unqualified and unsupervised counselors.

132.  Mr. Escobar also shared with Mr. Wefers his belief that Ms. Ortiz was prescribing psychiatric medication to children although she was not licensed nor supervised.

133.   Mr. Escobar also shared with Mr. Wefers that Dr. Gaticales, the doctor apparently assigned to supervise Ms. Ortiz, was not a board certified psychiatrist as required by law.

---

[3] Information provided to the DPPC by the Relators is attached at Exhibit 3.

134.  On August 7, 2010, the Relators submitted a written complaint with extensive supplemental documentation to the Massachusetts Department of Public Health relating to the care provided to Yarushka by Arbour and, more specifically, Ms. Ortiz.[4]

135.  In these documents and in their discussions with the DPH, the Relators disclosed to the government their suspicion and concerns that Ms. Ortiz was prescribing psychiatric medications to children without the proper qualifications, licensure or supervision.

136.  The Relators also shared with the DPH documents summarizing their conversations with Ms. Cabacoff relating to the fact that Ms. Ortiz was not qualified to prescribe medications to children, and was not properly supervised.

137.  On October 25, 2010, the Relators submitted a written complaint with extensive supplemental documentation to the Massachusetts Division of Professional Licensure, Office of Investigations ("DPL"), relating to the unlicensed practice of social work by Ms. Pereyra, Ms. Casado and Ms. Fuchu while under the supervision of Mr. Keohan.[5]

138.  In this complaint, Mr. Escobar disclosed that Ms. Pereyra had obtained a National Provider Identification ("NPI") number that misrepresented that she was a licensed social worker.

---

[4] Information provided to the DPH by the Relators in regard to their complaint against Ms. Ortiz is attached at Exhibit 4.
[5] The Relators' original complaint to the DPL in regards to Mr. Keohan's supervision of Ms. Pereyra, Ms. Casado and Ms. Fuchu, and their August 8, 2011, supplemental submission is attached at Exhibit 5.  The voluminous exhibits to the original complaint are not attached.

139.  The Department of Health and Human Services Centers for Medicare & Medicaid Services requires providers to apply for and obtain an NPI number for use in billing the government for health care services rendered to recipients of Medicare and Medicaid.

140.  The NPI number identifies the health practitioner and allows the practitioner to specifically identify their level of expertise.  For example, a licensed social worker is eligible to utilize Taxonomy Code "Social Worker, Clinical – 1041C0700X".

141.  Mr. Escobar disclosed to the DPL that Ms. Pereyra had obtained an NPI that misrepresented that she was a licensed social worker.

142.  On November 3, 2010, the Relators submitted a written complaint with extensive documentation to the DPL relating to Ms. Fuchu.[6]

143.  This complaint alleged that Ms. Fuchu had falsely represented to Yarushka and the Relators that she was a Licensed Psychologist.

144.  The complaint noted that Ms. Fuchu's PhD. was obtained from an on-line school called Southern California University.

145.  The Relators also attached to the DPL complaint a copy of a letter they obtained, dated September 3, 2004, in which the Board or Registration of Psychologist DENIED Ms. Fuchu's application for licensure in Massachusetts as a Licensed Psychologist.

146.  On December 27, 2010, the Relators filed a second complaint with the DPPC which focused on the treatment provided to Yarushka by Ms. Pereyra, Ms. Casado, and Ms. Fuchu.[7]

---

[6]  The Complaint filed with the DPL relating to Ms. Fuchu is attached Exhibit 6.

147.  On January 8, 2011, the Relators submitted a complaint, with extensive supportive documentation, to the DPL relating to Ms. Pereyra's practice of social work without a license.[8]

148.  On February 7, 2011, the Relators submitted a complaint, with extensive supportive documentation, to the DPH seeking to revoke Arbour's license.[9]

149.  In February or March of 2011, Mr. Escobar created a document entitled "Violations Pertaining To Arbour Counseling Services and Its License."[10]

150.  Mr. Escobar created this document based on his own research and based on facts learned from his own experience and observations relating to Yarushka's care.

151.  This submission, which was provided to DPH in February or March of 2011, explicitly informed DPH of Mr. Escobar's belief that Arbour was in violation of the following laws relating to the licensure of mental health clinics:

> o  105 CMR 140.310: This law required Arbour to designate a person to administer their clinic and to ensure compliance with applicable rules and regulations;
>
> o  105 CMR 140.313: This law required Arbour to designate a physician to supervise the provision of all services involving the practice of medicine, and to be present at Arbour whenever medical services were being provided;
>
> o  105 CMR 140.347: This law required Arbour to prescribe drugs to patients only via appropriately licensed personnel.

---

[7]  The Relators' second complaint to the DPPC is attached at Exhibit 7.
[8]  The Relators' original complaint to the DPL as to Ms. Pereyra, and their supplemental submission dated May 28, 2011, are attached at Exhibit 8.  Exhibits to the complaint are not attached.
[9] Relators' original complaint to the DPH relating to supervision, licensing and core staff issues at Arbour is attached at Exhibit 9.
[10]  A copy of this document which details the various DPH regulations the Relators claimed Arbour was in violation of is attached at Exhibit 10.

○ 105 CMR 140.520:  This law detailed the Treatment Services required to be provided by Arbour and explicitly stated that such services were to be supervised by mental health professionals.

○ 105 CMR 140.530: This law required Arbour to have a board certified psychiatrist on staff.  This law also required the staff psychiatrist to be responsible for the supervision of all medical services at Arbour.  Finally, this law stated that all unlicensed care providers must be clinically supervised on a regular basis by professional staff members and that the documentation of supervision must be available for review.

152.  After filing his complaint with the DPH, Mr. Escobar had a number of follow up conversations with Ms. Sunde and Joel Teeven of DPH in which he specifically alleged that Arbour was allowing unlicensed and unsupervised practitioners to provide mental health services to children, that Ms. Ortiz was prescribing medications without supervision, and that Arbour was in violation of core staff requirements.

153.  During the spring and into the early summer of 2011, and suspecting that licensing issues at Arbour went well beyond the clinicians who treated Yarushka, Mr. Escobar went further in his research and obtained a list of the names of individuals employed by Arbour based upon their NPI numbers.

154.  Mr. Escobar then took the list of NPI Numbers used by Arbour employees and conducted research to verify whether such employees were, in fact, licensed at the level represented to the government when they obtained their NPI numbers.

155.  Mr. Escobar confirmed that many Arbour employees had obtained NPI numbers identifying themselves as licensed Social Workers or licensed Mental Health Counselors, although none were so licensed by the Commonwealth.

21

156.  These individuals included:

- Beda Polanco
- Nora Fonseca
- Steven Addison
- Andres Nino
- Carmen Guzman
- Magaly Mercedes
- Alissa Dillon
- Laurence Towler
- Jose Rigueiro
- Yakaira Rigueiro
- Carly Souza
- Reinaldo Betances
- Joseline Gonzalez
- Viridania Valdez
- Hendry Matta
- Shakira Hernandez
- Rosario Paulino
- Natlie Mersha
- Marilyn Raices-Queliz
- Alisha Rousselle
- Meghan Kathryn Knight
- Elizabeth Loomis

157.  Mr. Escobar shared his NPI research with both the DPH and the DPPC.

158.  Mr. Escobar disclosed to DPH his belief that practitioners at Arbour, including but not limited to those clinicians who treated Yarushka, were providing mental health treatment to patients without the requisite licensure or supervision.

159.  The concerns brought to the attention of the DPH by the Relators were not limited to the clinicians who treated Yarushka.

160.  On May 5, 2011, the DPPC issued its first report responding to the Relators first complaint relating to Ms. Ortiz and Dr. Gaticales ("First DPPC Report").[11]

161.  Prior to the issuance of the First DPPC Report, the Relators had already informed the DPH that Arbour was utilizing unlicensed and unsupervised clinicians to care for Mass.Health recipients; that Arbour did not employ a board certified psychiatrist or psychologist as required by law; and that nurse practitioners at Arbour were not properly supervised in their prescription of medications.

162.  The First DPPC Report was never disclosed to the public.  It was stamped "CONFIDENTIAL NOT A PUBLIC RECORD" and was given to the Relators because they initiated the Complaint.

163.  The First DPPC Report confirmed the Relators' allegation that Ms. Ortiz was not properly supervised by Dr. Gaticales.

164.  The First DPPC Report did not relate to whether Arbour clinicians other than Ms. Ortiz and Dr. Gaticales were practicing without proper licensure or supervision.

165.  The scope of the First DPPC Report was limited to whether Ms. Ortiz or Dr. Gaticales caused "abuse" to Yarushka.

166.  The First DPPC Report did not concern whether practitioners at Arbour, other than Ms. Ortiz, were properly licensed or supervised.

---

[11] A copy of the First DPCC Report is attached at Exhibit 11.

23

167.  None of the allegations made by the Relators in this case were based on the First DPPC Report.

168.  The First DPPC Report merely confirmed that the Relators' suspicions that Ms. Ortiz was not properly supervised, and that Dr. Gaticales was not properly qualified, were in fact true.

169.  In November of 2011, the DPPC issued its second report responding to the Relators second complaint.  This report was supplemented on November 3, 2011 ("Second DPCC Report").[12]

170.  The Second DPPC Report was never disclosed to the public.  It was stamped "CONFIDENTIAL NOT A PUBLIC RECORD" and was given to the Relators only because the Relators initiated the Complaint.

171.  The Second DPPC Report ultimately found insufficient evidence of abuse and noted that other issues raised by the Relators were more appropriate for resolution by other agencies

172.  None of the allegations made by the Relators in this case were based on the Second DPPC Report.

173.  The Second DPPC Report did not relate to whether Arbour's clinicians were practicing without proper supervision.

---

[12] A copy of the Second DPPC Report is attached at Exhibit 12.

174.  The scope of the Second DPPC Report was limited to whether Ms. Pereyra, Ms. Casado or Ms. Fuchu caused "abuse" to Yarushka.

175.  On April 2, 2012, the DPL and Mr. Keohan entered into a Consent Decree to resolve the Relators' complaint against Mr. Keohan relating to his supervision of Yarushka's care providers.[13]

176.  Mr. Keohan agreed to a two year period of supervised probation for allowing an unlicensed clinician to practice social work under his supervision.

177.  Mr. Keohan was required, at his own cost, to hire a licensed social worker to serve as his supervisor during the two year probation period.

178.  On October 5, 2012, the DPL similarly informed the Relators that Ms. Fuchu had agreed to pay a civil administrative penalty of $1,000 and to enter into a Consent Agreement with the DPL for practicing psychology without a license.[14]

179.  On July 2, 2012, the DPH concluded its investigation into the Relators' allegations relating to inappropriate licensure, supervision, and core staff compliance issues at Arbour, and issued a report (the "DPH Report").[15]

180.   Mr. Escobar is the "complainant" as referred to in the DPH Report.

181.  Under "Issues for Investigation" the DPH Report explicitly acknowledged that Mr. Escobar had alleged (a) that Arbour's counselors were not credentialed to provide mental health

---

[13] A copy of the Consent Decree entered into between Mr. Keohan and the DPL is attached at Exhibit 13.

[14] A copy of the Consent Decree entered into between Ms. Fuchu and the DPL is attached at Exhibit 14.

[15] A copy of the DPH Report is attached at Exhibit 14.

therapy and were not supervised; (b) that nurse practitioners at Arbour were not properly

supervised by a board certified psychiatrist; (c) that Ms. Fuchu was not licensed to practice as a

psychologist; (d) that Dr. Gaticales was not qualified to supervise patient care at Arbour.

182.  The DPH Report confirmed all of the Relator's allegations were in fact true.

183.  The DPH confirmed that the Relators' licensing and supervision allegations were

not limited to the practitioners who treated Yarushka and extended to other practitioners

employed by Arbour.

184.  In fact, the DPH Report found that **_none_** of the twenty-three unlicensed mental

health clinicians employed at Arbour, and providing mental health services to patients, had any

professional supervision whatsoever.

185.  The DPH Report also confirmed that Dr. Gaticales was not qualified to supervise

nurse practitioners prescribing psychiatric medication at Arbour because she was not board

certified in psychiatry.

186.  The DPH Report confirmed the Relators' allegation that Arbour did not have a

qualified psychiatrist on staff as required by law.

187.  In its report, the DPH issued a "finding" that Arbour was in violation of 105 CMR

140.530(c)(1)(a) "Staffing-Personnel Qualifications" because its multidisciplinary team did not

include a psychiatrist who was board certified, as required."

188.  In its report, the DPH noted that:

- The only physician who works at the satellite clinic said that she reviews
  the medical history of clients, but does not attend the interdisciplinary

26

team meetings.  The physician said she reviews client records when asked by the clinic staff, but the physician could not provide written documentation of the record reviews.

- Review of the satellite clinic physician's personnel file and credentials, indicated that the physician was not board certified as a psychiatrist, but has an active physician's license.  On 4/11/12 at 3:55 p.m., the physician said she took the examination to become a board certified psychiatrist 20 years ago; however, she said she did not pass the examination.

- On 4/11/12 at 4:00 p.m., the Clinic Director of the satellite said the clinic's physician did not participate in the interdisciplinary team case reviews, as required.  However, the Clinic Director said the physician was available when requested by staff.

189.  The DPH Report further found that the failure of Arbour's staff psychiatrist to participate in interdisciplinary team case reviews, was in violation of 105 CMR 140.530(D)(3)(c).

190.  As to the supervision of staff personnel at Arbour, the DPH Report noted that 105 CMR 140.530(C) requires that staff members, without certain licensure or qualifications, must be "supervised on a regular basis by professional staff members."

191.  In its report, the DPH noted that twenty three clinical staff personnel at Arbour were providing services to patients that required regular supervision.

192.  DPH's review of the files of these twenty-three clinical staff personnel noted that only three of the files contained any documentation whatsoever of supervision- and these individuals did not receive clinical supervision on a regular basis.

193.  The files of the remaining twenty clinical staff personnel failed to contain any documentation whatsoever relating to supervision.

194.  On March 6, 2012, Arbour's Clinic Director, Edward Keohan, was interviewed by DPH and admitted that, until recently, he was "unaware that supervision was required to be provided on a regular and ongoing basis, or that the supervision meetings needed to be documented."

195.  In response to the findings of the DPH Report, Arbour submitted a remediation plan that included the names of all unlicensed clinicians practicing at Arbour, and listed the names of their new supervisors.[16]

196.  Thirteen of these individuals, who Arbour acknowledged were either unlicensed, or were licensed but not permitted to treat independently, Maria Pereyra, Nora Fonseca, Steven Addison, Andres Nino, Carmen Guzman, Laurence Towler, Joseline Gonzalez, Hendry Matta, Natlie Mersha, Jose Rigueiro, Yakaira Rigueiro, Carly Souza, and Reinaldo Betances, were the same individuals previously identified by Mr. Escobar as obtaining NPI numbers that misrepresented their level of professional licensure.

197.  The Relators were the only source, and the original source, of information that led to the DPH investigation and the issuance of the DPH report.

### COUNT I:
### VIOLATION OF FEDERAL FALSE CLAIMS ACT
### BY UNIVERSAL HEALTH SERVICES, INC.
### FOR FRAUDULENT BILLING RELATING TO
### MARIA PEREYRA

198.  The Relators, incorporate by reference all prior paragraphs.

---

[16]   Excerpts from the Arbour remediation plan listing the names of its unlicensed clinicians is attached at Exhibit 16.

199.  Over the course of the six years prior to the filing of this litigation, Arbour billed Mass. Health for counseling services rendered by Ms. Pereyra.

200.  At no time relevant to this Complaint did Ms. Pereyra have the requisite qualifications, or requisite supervision, to bill for services rendered to Mass.Health recipients.

201.  In submitting to Mass.Health bills for services rendered by Ms. Pereyra, Arbour represented to Mass.Health that Ms. Pereyra was properly certified to render such services and was properly supervised as required by law.

202.  Arbour's supervision of its unlicensed clinicians was an express condition precedent to reimbursement by Mass.Health.  See 130 CMR §429.439.

203.  Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

204.  The reimbursement rates paid to a provider by MassHealth include payment for the costs to supervise staff.  See 130 CMR §429.408.

205.   Each time Arbour submitted a bill to Mass.Health for treatment rendered to Mass.Health recipients by Ms.Pereyra, it represented to the government that the treatment had been provided, that the treatment provider was properly supervised, and that overall patient care and quality control at Arbour was supervised by a medical professional.

206.  Each time Arbour submitted a bill to Mass.Health when, in fact, its treatment providers were not properly supervised, it committed fraud.

29

207.  In submitting to Mass.Health bills for services rendered by Ms. Pereyra, Arbour acted in deliberate ignorance or in reckless disregard for the fact that Ms. Pereyra was unqualified to provide care to Mass.Health patients, and was not properly supervised.

208.  All bills submitted to Mass.Health by Arbour for any services rendered to any Mass.Health recipient by Ms. Pereyra, while she was unlicensed and unsupervised, were materially false and fraudulent.

209.  Had Mass.Health known that Ms. Pereyra was unlicensed and unsupervised, it would not have reimbursed Arbour for services rendered by Ms. Pereyra to any Mass.Heatlh recipient.

**COUNT II:**
**VIOLATION OF FEDERAL FALSE CLAIMS ACT**
**BY UNIVERSAL HEALTH SERVICES, INC. FOR**
**FRAUDULENT BILLING RELATING TO**
**DIANE CASADO**

210.  The Relators, incorporate by reference all prior paragraphs.

211.  Over the course of the six years prior to the filing of this litigation, Arbour billed Mass.Health for counseling services rendered to Mass.Health recipients by Ms. Casado.

212.  At no time relevant to this Complaint did Ms. Casado have the requisite license or requisite supervision to bill for services rendered to Mass.Health recipients.

213.  In submitting to Mass.Health bills for services rendered by Ms. Casado, Arbour represented to Mass.Health that Ms. Casado was properly licensed to render such services or was properly supervised as required by law.

214.   Arbour's supervision of its unlicensed clinicians was an express condition precedent to reimbursement by Mass.Health.

215.   Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

216.   Each time Arbour submitted a bill to Mass.Health for treatment rendered to Mass.Health recipients by Ms.Casado, it represented to the government that the treatment had been provided, that the treatment provider was properly supervised, and that overall patient care and quality control at Arbour was supervised by a medical professional.

217.   Each time Arbour submitted a bill to Mass.Health when, in fact, its treatment providers were not properly supervised, it committed fraud.

218.   In submitting to Mass.Health bills for services rendered by Ms. Casado, Arbour acted in deliberate ignorance or in reckless disregard for the fact that Ms. Casado was unqualified to provide care to Mass.Health patients, and was not properly supervised.

219.   Arbour's supervision of its unlicensed clinicians was an express condition precedent to reimbursement by Mass.Health.  See 130 CMR §429.439.

220.   Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

221.   The reimbursement rates paid to a provider by MassHealth include payment for the costs to supervise staff.  See 130 CMR §429.408.

222.  All bills submitted to Mass.Health by Arbour for any services rendered to any patient by Ms. Casado, while she was unlicensed and unsupervised, were materially false and fraudulent.

223.  Had Mass.Health known that Ms. Casado was unlicensed and unsupervised, it would not have reimbursed Arbour for services rendered by Ms. Casado to any Mass.Health recipient.

**COUNT III**
**VIOLATION OF FEDERAL FALSE CLAIMS ACT**
**BY UNIVERSAL HEALTH SERVICES, INC. FOR**
**FRAUDULENT BILLING RELATING TO**
**ANNA FUCHU**

224.  The Commonwealth and the United States, through the Relators, incorporate by reference all prior paragraphs.

225.  Over the course of the six years prior to the filing of this litigation, Arbour fraudulently billed Mass. Health for services rendered by Ms. Fuchu.

226.  At no time relevant to this Complaint did Ms. Fuchu have the requisite license or requisite supervision to bill for services rendered to Mass.Health recipients.

227.  In submitting to Mass.Health bills for services rendered by Ms. Fuchu, Arbour represented to Mass.Health that Ms. Fuchu was properly licensed to render such services and was properly supervised as required by law.

228.  Arbour's supervision of its unlicensed clinicians was an express condition precedent to reimbursement by Mass.Health.

229.  Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

230.  Each time Arbour submitted a bill to Mass.Health for treatment rendered to Mass.Health recipients by Ms.Fuchu, it represented to the government that the treatment had been provided, that the treatment provider was properly supervised, and that overall patient care and quality control at Arbour was supervised by a medical professional.

231.  Each time Arbour submitted a bill to Mass.Health when, in fact, its treatment providers were not properly supervised, it committed fraud.

232.  In submitting to Mass.Health bills for services rendered by Ms. Fuchu, Arbour acted in deliberate ignorance or in reckless disregard for the fact that Ms. Fuchu was unqualified to provide care to Mass.Health patients, and was not properly supervised.

233.   Arbour's supervision of its unlicensed clinicians was an express condition precedent to reimbursement by Mass.Health.  See 130 CMR §429.439.

234.  Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

235.  The reimbursement rates paid to a provider by MassHealth include payment for the costs to supervise staff.  See 130 CMR §429.408.

236.  All bills submitted to Mass.Health by Arbour for any services rendered to any patient by Ms. Fuchu, while she was unlicensed and unsupervised, were materially false and fraudulent.

237.  Had Mass.Health known that Ms. Fuchu was unlicensed and unsupervised, it would not have reimbursed Arbour for services rendered by Ms. Fuchu to any Mass.Health recipient.

**COUNT IV**
**VIOLATION OF FEDERAL FALSE CLAIMS ACT**
**BY UNIVERSAL HEALTH SERVICES, INC. FOR**
**FRAUDULENT BILLING RELATING TO**
**MARIBEL ORTIZ**

238.  The Commonwealth and the United States, through the Relators, incorporate by reference all prior paragraphs.

239.  Over the course of the six years prior to the filing of this litigation, Arbour fraudulently billed Mass.Health for services rendered by Maribel Ortiz.

240.  At no time relevant to this Complaint did Ms. Oritz have the requisite license or requisite supervision to bill for medication prescription services rendered to Mass.Health recipients.

241.   A nurse practitioner, such as Ms. Ortiz, can only prescribe medication to patients if they are supervised by a board certified physician.

242.  At no time relevant to this Complaint was Mr. Ortiz supervised by a board certified physician.

243.  In submitting to Mass.Health bills for services rendered by Ms. Ortiz in this regard, Arbour represented to Mass.Health that Ms. Ortiz was properly licensed to render such services and was properly supervised as required by law.

244.  Arbour's supervision of its clinicians was an express condition precedent to reimbursement by Mass.Health.  See 130 CMR §429.439.

245.  Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

246.  The reimbursement rates paid to a provider by MassHealth include payment for the costs to supervise staff.  See 130 CMR §429.408.

247.  Each time Arbour submitted a bill to Mass.Health for treatment rendered to Mass.Health recipients by Ms. Ortiz, it represented to the government that the treatment had been provided, that the treatment provider was properly supervised, and that overall patient care and quality control at Arbour was supervised by a medical professional.

248.  Each time Arbour submitted a bill to Mass.Health when, in fact, its treatment providers were not properly supervised, it committed fraud.

249.  In submitting to Mass.Health bills for such services rendered by Ms. Ortiz, Arbour acted in deliberate ignorance or in reckless disregard for the fact that Ms. Ortiz was not licensed to provide such services to Mass.Health recipients, and was not properly supervised.

250.  All bills submitted to Mass.Health by Arbour for any prescription services rendered to any patient by Ms. Ortiz, while she was not properly licensed and unsupervised, were materially false and fraudulent.

251.  Had Mass.Health known that Ms. Ortiz was unsupervised, it would not have reimbursed Arbour for prescription services rendered by Ms. Ortiz to any Mass.Health recipient.

35

**COUNT V**
**VIOLATION OF FEDERAL FALSE CLAIMS ACTS**
**BY UNIVERSAL HEALTH SERVICES, INC. FOR**
**FRAUDULENT BILLING RELATING TO**
**OTHER UNSUPERVISED CLINICAL STAFF**

252.  The Commonwealth and the United States, through the Relators, incorporate by reference all prior paragraphs.

253.  Over the course of six years prior to the filing of this litigation, Arbour billed Mass.Health for services rendered to Mass.Health recipients for mental health care provided by clinicians who were unlicensed and unsupervised.

254.  The specific identity of the names of all of these clinicians is well known to Arbour, as these clinicians can be easily identified in Arbour's billing records.

255.  In submitting to Mass.Health bills for services rendered by unlicensed and unsupervised clinicians, Arbour represented to Mass.Health that its clinicians were properly licensed to render services and were properly supervised as required by law.

256.  Arbour's supervision of its unlicensed clinicians was an express condition precedent to reimbursement by Mass.Health.  See 130 CMR §429.439.

257.  Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

258.  The reimbursement rates paid to a provider by MassHealth include payment for the costs to supervise staff.  See 130 CMR §429.408.

36

259.   Each time Arbour submitted a bill to Mass.Health for treatment rendered to Mass.Health recipients by unlicensed clinicians it represented to the government that the treatment had been provided, that the treatment provider was properly supervised, and that overall patient care and quality control at Arbour was supervised by a medical professional.

260.  Each time Arbour submitted a bill to Mass.Health when, in fact, its treatment providers were not properly supervised, it committed fraud.

261.  In submitting to Mass.Health bills for services rendered by unlicensed and unsupervised clinicians, Arbour acted in deliberate ignorance or in reckless disregard for the truth.

262.  All bills submitted to Mass.Health by Arbour for any services rendered to any patient by unlicensed and unsupervised clinicians were materially false and fraudulent.

263.  Had Mass.Health known that Arbour was using unlicensed and unsupervised clinicians to provide treatment to Mass.Health recipients, it would not have reimbursed Arbour for such services.

**COUNT VI**
**VIOLATION OF FEDERAL FALSE CLAIMS ACTS**
**BY UNIVERSAL HEALTH SERVICES, INC. FOR**
**FRAUDULENT BILLING RELATING TO**
**OTHER UNSUPERVISED NURSE PRACTITIONERS**

264.  The Commonwealth, through the Relators, incorporate by reference all prior paragraphs.

265.  Over the course of the six years prior to the filing of this litigation, Arbour billed Mass.Health for services rendered to Mass.Health recipients for nurse practitioners who were unsupervised.

266.  The specific identity of the names of these nurse practitioners is currently unknown to the Relators but is well known to Arbour.

267.  In submitting to Mass.Health bills for services rendered by unsupervised nurse practitioners, Arbour represented to Mass.Health that its nurse practitioners were properly supervised as required by law.

268.  Arbour's supervision of its clinicians was an express condition precedent to reimbursement by Mass.Health.  See 130 CMR §429.439.

269.  Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

270.  The reimbursement rates paid to a provider by MassHealth include payment for the costs to supervise staff.  See 130 CMR §429.408.

271.  Each time Arbour submitted a bill to Mass.Health for treatment rendered to Mass.Health recipients by nurse practitioners, it represented to the government that the treatment had been provided, that the treatment provider was properly supervised, and that overall patient care and quality control at Arbour was supervised by a medical professional.

272.  Each time Arbour submitted a bill to Mass.Health when, in fact, its treatment providers were not properly supervised, it committed fraud.

38

273.  In submitting to Mass.Health bills for services rendered in this regard by unsupervised nurse practitioners, Arbour acted in deliberate ignorance or in reckless disregard for the truth.

274.  All bills submitted to Mass.Health by Arbour for services rendered to any patient by unsupervised nurse practitioners were materially false and fraudulent.

275.  Had Mass.Health known that Arbour was using unsupervised nurse practitioners to treat Mass.Health recipients, it would not have reimbursed Arbour for such services.

**COUNT VII**
**VIOLATION OF FEDERAL FALSE CLAIMS ACTS**
**FOR FRAUDULENT BILLING BY UHS DURING PERIOD OF**
**NON-COMPLIANCE WITH CORE STAFF AND SUPERVISION REQUIREMENTS**

276.  The Relators, incorporate by reference all prior paragraphs.

277.  At all times relevant to this Complaint, Arbour was required to comply with The Code of Massachusetts Regulations at 130 CMR 429.422 , relating to "Staff Composition Requirements" as an express condition for reimbursement by Mass.Health.

278.  A licensed Mental Health Center participating in Mass.Health must employ at least one staff psychiatrist board certified, or board eligible, in psychiatry.  130 CMR 429.424(A).

279.  Such psychiatrist is responsible for the (a) evaluation of the physiological, neurological and psychopharmacological status of the center's patients; b) involvement in the diagnostic formulation and development of treatment plans; (c) direct psychotherapy when indicated (d) participate in utilization review or quality assurance activity, and f) supervision of and consultation to other disciplines.  See 130 CMR §429.423(D) and 130 CMR §424;

280.  At all times relevant to this Complaint, the only psychiatrist employed by Arbour was Maria Gaticales, M.D, who was not board certified in psychiatry or board eligible.

281.  At all times relevant to this Complaint, Dr. Gaticales did not (a) evaluate the physiological, neurological and psychopharmacological status of Arbour's center's patients; b) was not involved in the diagnostic formulation and development of treatment plans; (c) did not direct psychotherapy when indicated (d) did not participate in utilization review or quality assurance activity, and f) did not supervise and consult with other disciplines at Arbour.

282.  A Mental Health Center participating in Mass.Health must also employ at least one staff psychologist licensed by the Massachusetts Board of Registration of Psychologists.  130 CMR 429.424(B).

283.  At all times relevant to this Complaint, Arbour did not employ anyone licensed by the Massachusetts Board of Registration of Psychologists.

284.  Accordingly, at all times relevant to this Complaint, Arbour was in violation of the regulations relating to staff composition requirements.

285.  Each time Arbour submitted a bill to Mass.Health it represented to the government that the treatment had been provided, that the treatment provider was properly supervised, and that overall patient care and quality control at Arbour was supervised by a medical professional.

286.  Each time Arbour submitted a bill to Mass.Health when, in fact, its treatment providers were not properly supervised, it committed fraud.

287.  In submitting bills to Mass.Health, for services rendered to patients seeking care at Arbour's facility, Arbour fraudulent represented to Mass.Health that it was in compliance with all staff composition and supervision requirements required by law.

288.  In submitting to Mass.Health bills for services rendered to patients seeking care at Arbour's facility, Arbour acted in deliberate ignorance or in reckless disregard for the fact that Arbour did not have the requisite core staff as required by law and that patient care at Arbour was not being appropriately supervised by a physician.

289.  All bills submitted to Mass.Health by Arbour for all services rendered to patients while Arbour was not in compliance with staff composition and supervision requirements were materially false and fraudulent.

290.  Arbour's supervision of clinicians was an express condition precedent to reimbursement by Mass.Health.

291.  Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

292.  Had Mass.Health known that Arbour was not in compliance with staff composition and supervision requirements, it would not have reimbursed Arbour for services rendered during any period of time in which patient care at Arbour was not appropriately supervised by appropriate professionals.

**COUNT VIII:**
**VIOLATION OF MASSACHUSETTS FALSE CLAIMS ACT**
**BY UNIVERSAL HEALTH SERVICES, INC.**
**FOR FRAUDULENT BILLING RELATING TO**
**MARIA PEREYRA**

293.   The Relators, incorporate by reference all prior paragraphs.

294.   Over the course of the six years prior to the filing of this litgation, Arbour billed Mass. Health for counseling services rendered by Ms. Pereyra.

295.   At no time relevant to this Complaint did Ms. Pereyra have the requisite qualifications, or requisite supervision, to bill for services rendered to Mass.Health recipients.

296.   In submitting to Mass.Health bills for services rendered by Ms. Pereyra, Arbour represented to Mass.Health that Ms. Pereyra was properly certified to render such services and was properly supervised as required by law.

297.   Arbour's supervision of its unlicensed clinicians was an express condition precedent to reimbursement by Mass.Health.  See 130 CMR §429.439.

298.   Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

299.   The reimbursement rates paid to a provider by MassHealth include payment for the costs to supervise staff.  See 130 CMR §429.408.

300.   Each time Arbour submitted a bill to Mass.Health for treatment rendered to Mass.Health recipients by Ms.Pereyra, it represented to the government that the treatment had

been provided, that the treatment provider was properly supervised, and that overall patient care and quality control at Arbour was supervised by a medical professional.

301.  Each time Arbour submitted a bill to Mass.Health when, in fact, its treatment providers were not properly supervised, it committed fraud.

302.  Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

303.  In submitting to Mass.Health bills for services rendered by Ms. Pereyra, Arbour acted in deliberate ignorance or in reckless disregard for the fact that Ms. Pereyra was unqualified to provide care to Mass.Health patients, and was not properly supervised.

304.  All bills submitted to Mass.Health by Arbour for any services rendered to any patient by Ms. Pereyra, while she was un-credentialed and unsupervised, were materially false and fraudulent.

305.  Had Mass.Health known that Ms. Pereyra was unlicensed and unsupervised, it would not have reimbursed Arbour for services rendered by Ms. Pereyra to any Mass.Heatlh recipient.

**COUNT IX:**
**VIOLATION OF MASSACHUSETTS FALSE CLAIMS ACT**
**BY UNIVERSAL HEALTH SERVICES, INC. FOR**
**FRAUDULENT BILLING RELATING TO**
**DIANE CASADO**

306. The Relators, incorporate by reference all prior paragraphs.

307.   Over the course of the six years prior to the filing of this litgation, Arbour billed Mass.Health for counseling services rendered to Mass.Health recipients by Ms. Casado.

308.   At no time relevant to this Complaint did Ms. Casado have the requisite license or requisite supervision to bill for services rendered to Mass.Health recipients.

309.   In submitting to Mass.Health bills for services rendered by Ms. Casado, Arbour represented to Mass.Health that Ms. Casado was properly licensed to render such services and was properly supervised as required by law.

310.   Arbour's supervision of its unlicensed clinicians was an express condition precedent to reimbursement by Mass.Health.  See 130 CMR §429.439.

311.   Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

312.   The reimbursement rates paid to a provider by MassHealth include payment for the costs to supervise staff.  See 130 CMR §429.408.

313.   Each time Arbour submitted a bill to Mass.Health for treatment rendered to Mass.Health recipients by Ms. Casado, it represented to the government that the treatment had been provided, that the treatment provider was properly supervised, and that overall patient care and quality control at Arbour was supervised by a medical professional.

314.   Each time Arbour submitted a bill to Mass.Health when, in fact, its treatment providers were not properly supervised, it committed fraud.

44

315.  Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

316.  In submitting to Mass.Health bills for services rendered by Ms. Casado, Arbour acted in deliberate ignorance or in reckless disregard for the fact that Ms. Casado was unqualified to provide care to Mass.Health patients, and was not properly supervised.

317.  All bills submitted to Mass.Health by Arbour for any services rendered to any patient by Ms. Casado, while she was unlicensed and unsupervised, were materially false and fraudulent.

318.  Had Mass.Health known that Ms. Casado was unlicensed and unsupervised, it would not have reimbursed Arbour for any services rendered by Ms. Casado to any Mass.Health recipient.

**COUNT X**
**VIOLATION OF MASSACHUSETTS FALSE CLAIMS ACT**
**BY UNIVERSAL HEALTH SERVICES, INC. FOR**
**FRAUDULENT BILLING RELATING TO**
**ANNA FUCHU**

319.  The Commonwealth and the United States, through the Relators, incorporate by reference all prior paragraphs.

320. Over the course of the six years prior to the filing of this litgation, Arbour fraudulently billed Mass. Health for services rendered by Ms. Fuchu.

321.  At no time relevant to this Complaint did Ms. Fuchu have the requisite license or requisite supervision to bill for services rendered to Mass.Health recipients.

322.  In submitting to Mass.Health bills for services rendered by Ms. Fuchu, Arbour represented to Mass.Health that Ms. Fuchu was properly licensed to render such services and was properly supervised as required by law.

323.   Arbour's supervision of its unlicensed clinicians was an express condition precedent to reimbursement by Mass.Health.  See 130 CMR §429.439.

324.  Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

325.  The reimbursement rates paid to a provider by MassHealth include payment for the costs to supervise staff.  See 130 CMR §429.408.

326.  Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

327.  Each time Arbour submitted a bill to Mass.Health for treatment rendered to Mass.Health recipients by Ms.Fuchu, it represented to the government that the treatment had been provided, that the treatment provider was properly supervised, and that overall patient care and quality control at Arbour was supervised by a medical professional.

328.  Each time Arbour submitted a bill to Mass.Health when, in fact, its treatment providers were not properly supervised, it committed fraud.

329.   In submitting to Mass.Health bills for services rendered by Ms. Fuchu, Arbour acted in deliberate ignorance or in reckless disregard for the fact that Ms. Fuchu was unqualified to provide care to Mass.Health patients, and was not properly supervised.

46

330.  All bills submitted to Mass.Health by Arbour for any services rendered to any patient by Ms. Fuchu, while she was unlicensed and unsupervised, were materially false and fraudulent.

331.  Had Mass.Health known that Ms. Fuchu was unlicensed and unsupervised, it would not have reimbursed Arbour for services rendered by Ms. Fuchu to any Mass.Health recipient.

**COUNT XI**
**VIOLATION OF MASSACHUSETTS FALSE CLAIMS ACT**
**BY UNIVERSAL HEALTH SERVICES, INC. FOR**
**FRAUDULENT BILLING RELATING TO**
**MARIBEL ORTIZ**

332.  The Commonwealth and the United States, through the Relators, incorporate by reference all prior paragraphs.

333. Over the course of the six years prior to the filing of this litgation, Arbour fraudulently billed Mass.Health for services rendered by Maribel Ortiz.

334.  At no time relevant to this Complaint did Ms. Ortiz have the requisite license or requisite supervision to bill for medication prescription services rendered to Mass.Health recipients.

335.   A nurse practitioner, such as Ms. Ortiz, can only prescribe medication to patients if they are supervised by a board certified physician.

336.  At no time relevant to this Complaint was Mr. Ortiz supervised by a board certified physician.

337.  Arbour's supervision of its clinicians was an express condition precedent to reimbursement by Mass.Health.   See 130 CMR §429.439.

338.  Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

339.  The reimbursement rates paid to a provider by MassHealth include payment for the costs to supervise staff.  See 130 CMR §429.408.

340.  Each time Arbour submitted a bill to Mass.Health for treatment rendered to Mass.Health recipients by Ms.Ortiz, it represented to the government that the treatment had been provided, that the treatment provider was properly supervised, and that overall patient care and quality control at Arbour was supervised by a medical professional.

341.  In submitting to Mass.Health bills for such services rendered by Ms. Ortiz, Arbour acted in deliberate ignorance or in reckless disregard for the fact that Ms. Ortiz was not properly supervised.

342.  All bills submitted to Mass.Health by Arbour for services rendered to any patient by Ms. Ortiz, while she was not properly supervised, were materially false and fraudulent.

343.  Had Mass.Health known that Ms. Ortiz was unsupervised, it would not have reimbursed Arbour for services rendered by Ms. Ortiz to any Mass.Health recipient.

**COUNT XII**
**VIOLATION OF MASSCHUSETTS FALSE CLAIMS ACTS**
**BY UNIVERSAL HEALTH SERVICES, INC. FOR**
**FRAUDULENT BILLING RELATING TO**
**OTHER UNSUPERVISED CLINICAL STAFF**

344.  The Commonwealth and the United States, through the Relators, incorporate by reference all prior paragraphs.

345.  Over the course of the six years prior to the filing of this litgation, Arbour billed Mass.Health for services rendered to Mass.Health recipients for mental health care provided by clinicians who were unlicensed and unsupervised.

346.  The specific identity of the names of these clinicians is currently unknown to the Relators but is well known to Arbour as these clinicians were all identified to Arbour in the course of the DPH investigation..

347.  In submitting to Mass.Health bills for services rendered by unlicensed and unsupervised clinicians, Arbour represented to Mass.Health that its clinicians were properly licensed to render services and were properly supervised as required by law.

348.   Arbour's supervision of its unlicensed clinicians was an express condition precedent to reimbursement by Mass.Health.  See 130 CMR §429.439.

349.  Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

350.  The reimbursement rates paid to a provider by MassHealth include payment for the costs to supervise staff.  See 130 CMR §429.408.

49

351.  Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

352.  In submitting to Mass.Health bills for services rendered by unlicensed and unsupervised clinicians, Arbour acted in deliberate ignorance or in reckless disregard for the truth.

353.  All bills submitted to Mass.Health by Arbour for any services rendered to any patient by unlicensed and unsupervised clinicians were materially false and fraudulent.

354.  Had Mass.Health known that Arbour was using unlicensed and unsupervised clinicians to provide treatment to Mass.Health recipients, it would not have reimbursed Arbour for such services.

## COUNT XIII
## VIOLATION OF MASSACHUSETTS FALSE CLAIMS ACTS
## BY UNIVERSAL HEALTH SERVICES, INC. FOR
## FRAUDULENT BILLING RELATING TO
## OTHER UNSUPERVISED NURSE PRACTITIONERS

355.  The Commonwealth, through the Relators, incorporate by reference all prior paragraphs.

356.  Over the course of the six years prior to the filing of this litgation, Arbour billed Mass.Health for services rendered to Mass.Health recipients for mental health care provided by clinicians who were unlicensed and unsupervised.

357.  In submitting to Mass.Health bills for medication services rendered by unsupervised nurse practitioners, Arbour represented to Mass.Health that its nurse practitioners prescribing medication to Mass.Health recipients were properly supervised as required by law.

358.   Arbour's supervision of its unlicensed clinicians was an express condition precedent to reimbursement by Mass.Health.  See 130 CMR §429.439.

359.  Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

360.  The reimbursement rates paid to a provider by MassHealth include payment for the costs to supervise staff.  See 130 CMR §429.408.

361.  In submitting to Mass.Health bills for services rendered in this regard by unsupervised nurse practitioners, Arbour acted in deliberate ignorance or in reckless disregard for the truth.

362.  All bills submitted to Mass.Health by Arbour for any medication services rendered to any patient by unsupervised nurse practitioners were materially false and fraudulent.

363.  Had Mass.Health known that Arbour was using unsupervised nurse practitioners to provide medication to Mass.Health recipients, it would not have reimbursed Arbour for such services.

### COUNT XIV
### VIOLATION OF MASSACHUSETTS FALSE CLAIMS ACTS
### FOR FRAUDULENT BILLING BY UHS DURING PERIOD OF
### NON-COMPLIANCE WITH CORE STAFF AND SUPERVISION REQUIREMENTS

364.  The Relators, incorporate by reference all prior paragraphs.

365.  At all times relevant to this Complaint, UHS operated multiple counseling centers, throughout the Commonwealth, all participating in Mass.Health and all required to comply with The Code of Massachusetts Regulations at 130 CMR 429.422 , as to "Staff Composition Requirements."

366.  A licensed Mental Health Center participating in Mass.Health must employ at least one staff psychiatrist board certified, or board eligible, in psychiatry.  130 CMR 429.424(A).

367.  Such psychiatrist is responsible for the (a) evaluation of the physiological, neurological and psychopharmacological status of the center's patients; b) involvement in the diagnostic formulation and development of treatment plans; (c) direct psychotherapy when indicated (d) participate in utilization review or quality assurance activity, and f) supervision of and consultation to other disciplines.  See 130 CMR §429.423(D) and 130 CMR §424.

368.  At all times relevant to this Complaint, the only psychiatrist employed by Arbour was Maria Gaticales, M.D, was not board certified in psychiatry or board eligible.

369. At all times relevant to this Complaint, Dr. Gaticales did not (a) evaluate the physiological, neurological and psychopharmacological status of Arbour's center's patients; b) was not involved in the diagnostic formulation and development of treatment plans; (c) did not direct psychotherapy when indicated (d) did not participate in utilization review or quality assurance activity, and f) did not supervise and consult with other disciplines at Arbour.

370.  A mental health center participating in Mass.Health must also employ at least one staff psychologist licensed by the Massachusetts Board of Registration of Psychologists.  130 CMR 429.424(B).

371.  At all times relevant to this Complaint, Arbour did not employ a licensed psychologist.

372. Accordingly, at all times relevant to this Complaint, Arbour was in violation of the regulation relating to staff composition and supervision requirements.

373.  Arbour's supervision of its clinicians was an express condition precedent to reimbursement by Mass.Health.

374.  Each bill submitted to Mass.Health by Arbour included the costs of supervision and administration.

375.  In submitting bills to Mass.Health, for services rendered to patients seeking care at Arbour's facility, Arbour fraudulent represented to Mass.Health that it was in compliance with all staff composition and supervision requirements required by DPH and Mass.Health.

376.  In submitting to Mass.Health bills for services rendered to patients seeking care at Arbour's facility, Arbour acted in deliberate ignorance or in reckless disregard for the fact that Arbour did not have the requisite core staff as required by law and that patient care at Arbour was not being appropriately supervised by a physician.

377.  All bills submitted to Mass.Health by Arbour for all services rendered to patients while Arbour was not in compliance with staff composition and supervision requirements were materially false and fraudulent.

378.  Had Mass.Health known that Arbour was not in compliance with staff composition and supervision requirements, it would not have reimbursed Arbour for services rendered during any period of time in which patient care at Arbour was not appropriately supervised by appropriate professionals.

## **PRAYER FOR RELIEF**

WHEREFORE, for the reasons stated above, the Commonwealth of Massachusetts, and the United States of America, through the Relator, prays for the following relief:

1. That UHS be forced to disgorge all payments received from Mass. Health for services rendered by Ms. Pereyra during the period of time in which Ms. Pereyra was not qualified to provide such services, and was not properly supervised, plus pay all penalties, fines, fees or expenses.

2. That UHS be forced to disgorge all payments received from Mass. Health for services rendered by Ms. Casado during the period of time in which Ms. Casado was not qualified to provide such services, and was not properly supervised, plus pay all penalties, fines, fees or expenses.

3. That UHS be forced to disgorge all payments received from Mass. Health for services rendered by Ms. Fuchu during the period of time in which Ms. Fuchu was not qualified to provide such services, and was not properly supervised, plus pay all penalties, fines, fees or expenses.

4. That UHS be forced to disgorge all payments received from Mass.Health for services rendered by any unlicensed and unsupervised clinician, plus pay all penalties, fines, fees or expenses.

54

5. That UHS be forced to disgorge all payments received from Mass. Health for medication services rendered by Ms. Ortiz during the period of time in which Ms. Ortiz was not qualified to provide such services, and was not properly supervised, plus pay all penalties, fines, fees or expenses.

6. That UHS be forced to disgorge all payments received from Mass. Health for medication services rendered by other Arbour nurse practitioners during the period of time in which they were not qualified to provide such services, and were not properly supervised, plus pay all penalties, fines, fees or expenses.

7. That UHS be forced to disgorge all payments made by Mass. Health for any services rendered by Arbour, for the entire period of time in which Arbour was not in compliance with staff composition requirements and patient care and supervision requirements, plus pay all applicable penalties, fines or expenses.

8. That UHS be ordered to pay an amount equal to three times the amount of damages sustained by the government, plus a civil penalty of not less than $5,500 and not more than $11,000 for each action in violation of 31 U.S.C. 3729, both pre-FERA and as amended, and the costs and expenses of this action, with interest.

9. That an audit be performed on all charges made to Mass.Health by UHS and that UHS disgorge all payments inappropriately billed to Mass.Health, plus pay all penalties, fines, fees or expenses.

10. That the Relators be awarded appropriate compensation for being the original source of the above factual information as to Arbour's inappropriate patient care and billing practices;

11. That the Relators be awarded attorneys' fees and costs.

12. For all other appropriate relief this Court deem just.

COMMONWEALTH OF MASSACHUSETTS and
THE UNITED STATES OF AMERICA,
THROUGH RELATOR, JULIO ESCOBAR and
CARMEN CORREA, ADMINISTRATRIX OF
THE ESTATE OF YARUSHKA RIVERA

By their attorney,


___/s/ Matthew P. McCue_____
Matthew P. McCue, Esq.
 BBO# 565319
Law Office of Matthew P. McCue
1 South Ave, Third Floor
Natick, MA 01760
(508) 655-1415
e-mail: mmccue@massattorneys.net

**THE RELATORS REQUEST A TRIAL BY JURY AS TO ALL CLAIMS SO TRIABLE**

**<u>Certificate of Service</u>**

I, Matthew P. McCue, does hereby certify that this document filed through the ECF system on February 25, 2013, which will be sent electronically to the registered participants as identified on the Notice Electronic Filing (NEF).

*/s/ Matthew P., McCue_____*
Matthew P. McCue


Dated: February 25, 2013

56