## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA and COMMONWEALTH OF MASSACHUSETTS ex rel. JULIO ESCOBAR and CARMEN CORREA, ADMINISTRATRIX OF THE ESTATE OF YARUSHKA RIVERA<br><br>  Relators-Plaintiffs,<br><br>v.<br><br>UNIVERSAL HEALTH SERVICES, INC., UHS OF DELAWARE, INC., and HRI CLINICS, INC.<br><br>  Defendants. | No. 11-CV-11170-DPW<br>Leave Granted On February 7, 2018 |

## PROPOSED SIXTH AMENDED COMPLAINT

The qui tam relators, Julio Escobar and Carmen Correa,  ("Relators"), on behalf of the United States of America and the Commonwealth of Massachusetts, bring this action against Defendants, Universal Health Services, Inc., UHS of Delaware, Inc., and HRI Clinics, Inc., (together, "UHS"), pursuant to the federal False Claims Act, 31 U.S.C. Section 3729 et seq., and the Massachusetts False Claims Act, M.G.L. Chapter 12, Section 5A et seq., to recover damages and penalties resulting from Defendants' improper billing for mental health services that were ultimately paid for by funds provided by the United States and the Commonwealth of Massachusetts.

.

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................4

PARTIES ...........................................................................................................................5

JURISDICTION AND VENUE...........................................................................................6

THE RELATIONSHIPS BETWEEN UNIVERSAL, UHS OF DELAWARE, INC. AND
HRI, AND THEIR CONTROL OF ARBOUR.....................................................................7

REGULATORY FRAMEWORK........................................................................................11

A. MASSHEALTH REGULATIONS ................................................................................11

B. OTHER MASSACHUSETTS AGENCY REGULATIONS ...............................................17

C. MASSHEALTH AND PAYMENT SYSTEMS FOR MASSHEALTH
BENEFICIARIES ............................................................................................................19

D. PAYMENT OF BEHAVIORAL HEALTH SERVICES FOR MASSHEALTH
BENEFICIARIES THROUGH MBHPS AND MCOS..........................................................22

E. MBHP AND MCOS LICENSING AND SUPERVISION REQUIREMENTS
THROUGH CREDENTIALING .........................................................................................25

F. MASSHEALTH SERVICE CODES AND DESCRIPTIONS.............................................32

G. NATIONAL PROVIDER IDENTIFIER NUMBER/TAXONOMY CODES...................34

H. MASSHEALTH REGULATIONS FOR BEAHVIORAL HEALTH SERVICES APPLY
TO SERVICES ADMINISTERED BY MBHP AND MCOS ..................................................36

FACTUAL ALLEGATIONS .............................................................................................37

STATE INVESTIGATIONS OF THE STAFFING AT ARBOUR CLINICS CONFIRMS
RELATORS' ALLEGATIONS THAT UHS ROUTINELY PRESENTED CLAIMS TO
MASSHEALTH FOR SERVICES PERFORMED BY INELIGIBLE MENTAL HEALTH
CLINICIANS....................................................................................................................45

UHS CAUSED FALSE CLAIMS TO BE PRESENTED TO MASSHEALTH, MBHP, AND
MCOS ...........................................................................................................................52

A. UHS KNOWINGLY PRESENTED FALSE CLAIMS TO MASSHEALTH, MBHP, AND MCOS FOR SERVICES RENDERED BY UNLICENSED SOCIAL WORKERS AND MENTAL HEALTH COUNSELORS WHO WERE NOT PROPERLY SUPERVISED ......52

B. UHS PRESENTED FALSE CLAIMS TO MASSHEALTH, MBHP, AND THE MCOS FOR MEDICATION MANAGEMENT AND PRESCRIPTION MEDICATIONS PRESCRIBED BY PSYCHIATRIC NURSES WHO WERE NOT PROPERLY SUPERVISED BY A QUALIFIED PSYCHIATRIST...............................................................61

C. UHS FALSELY PRESENTED CLAIMS TO MASSHEALTH, MBHP, AND THE MCOS FOR SERVICES RENDERED TO MASSHEALTH PATIENTS THAT WERE PERFORMED BY AN UNLICENSED, UNSUPERVISED, AND UNQUALIFIED PSYCHOLOGIST ...........................................................................................................64

D. UHS FALSELY PRESENTED CLAIMS TO MASSHEALTH, MBHP, AND MCOS FOR SERVICES RENDERED TO MASSHEALTH PATIENTS THAT WERE PERFORMED BY AN UNQUALIFIED AND UNSUPERVISED PSYCHIATRIST ..........67

COUNT ONE 31 U.S.C. § 3729(A)(1)(A) FALSE CLAIMS....................................................68

COUNT TWO MASSACHUSETTS FALSE CLAIMS M.G.L. C. 12 § 5(B)(1) ....................69

CONCLUSION .........................................................................................................................70

## INTRODUCTION

1.     The allegations in this Sixth Amended Complaint arise out of UHS's routine practice of billing for mental health services provided by unlicensed, unqualified, and unsupervised employees.  UHS billed for these services at its Arbour Counseling Services ("Arbour") facility in Lawrence, Massachusetts, an outpatient mental health clinic, in clear violation of several express requirements of MassHealth, the Massachusetts Medicaid program, and the requirements of persons who contracted with MassHealth to administer the payment of mental health benefits for MassHealth beneficiaries:  Massachusetts Behavioral Health Partnership ("MBHP") and various Managed Care Organizations ("MCOs").  UHS had full knowledge of these violations and facilitated them with false statements, yet billed MassHealth, MBHP, and the MCOs as if the services had been provided by qualified and properly supervised mental health professionals in full compliance with MassHealth regulations.  Relators discovered these false and fraudulent billing practices from their own investigation into the death of their daughter, Yarushka Rivera ("Yarushka"), a 17-year-old high school student who received gravely inadequate treatment from UHS's unsupervised and unqualified personnel at the Arbour facility in Lawrence. Relators discovered that UHS's failure to comply with MassHealth licensing and supervision requirements was not limited to the individuals who provided services to their daughter, and that UHS's scheme to improperly bill MassHealth, MBHP and the MCOs was facilitated by false statements.  Moreover, although UHS's knowing disregard of the relevant licensing, qualification and supervision requirements

commenced before UHS began to deliver services to Yarushka in 2007, the policies and practices at UHS that caused the submission of false claims for Yarushka's treatment continued in effect until at least 2013, and to the best of Relators' knowledge, continued well after that time.

<u>**PARTIES**</u>

2.      Plaintiff-Relators, Julio Escobar and Carmen Correa (collectively, the "Relators"), are married and reside in Methuen, Massachusetts.  Yarushka is the late daughter of Carmen Correa and the step-daughter of Julio Escobar.  At all times relevant to the Fifth Amended Complaint, Yarushka was a recipient of MassHealth insurance benefits.

3.      Defendant Universal Health Services, Inc., ("Universal"), is a for-profit Delaware corporation which does business in Massachusetts and has a principal place of business at 367 Gulph Road, King of Prussia, PA 19406.

4.      Defendant UHS of Delaware, Inc., is a for-profit Delaware corporation which does business in the state of Massachusetts, and has a principal place of business at 367 Gulph Road, King of Prussia, PA 19406.  UHS of Delaware, Inc., is a wholly owned subsidiary of Universal.

5.      Defendant HRI Clinics, Inc., ("HRI") is a for-profit Massachusetts corporation doing business in Massachusetts, with a principal place of business located at 367 South Gulph Road, King of Prussia, PA 19406.  HRI is a wholly owned subsidiary of Universal.

6.     As described below, UHS owns, operates and manages counseling facilities throughout eastern Massachusetts including Arbour Counseling Services, Lawrence ("Arbour Lawrence").  Arbour Lawrence is a mental health center, as that term is defined by MassHealth at 130 CMR 429.402.  At all relevant times, Arbour Lawrence was a "satellite" of Arbour Counseling Services Malden ("Arbour Malden").

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1367, and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

8.     To the best of the Relators' knowledge, no public disclosure of the "allegations or transactions" that are the basis of this action occurred prior to the Relators' filing of this action for the purposes of 31 U.S.C. §3730(e)(4).  In any event, the Relators are the original source of the information upon which the False Claims Act allegations in this complaint are based.  Prior to any public disclosure, the Relators voluntarily disclosed to the United States and the Commonwealth of Massachusetts the allegations and transactions at issue and the Relators have knowledge that is independent of any such disclosure and which materially adds to the publicly disclosed allegations or transactions.

9.     This Court has personal jurisdiction over the defendants, pursuant to 31 U.S.C. §3732(a) because UHS operates mental health centers throughout Massachusetts and, accordingly, transacts business in the District of Massachusetts.

10.     At all times relevant to this Fifth Amended Complaint, UHS regularly conducted substantial business within the District of Massachusetts and maintained employees and offices in Massachusetts.  In addition, statutory violations, as alleged herein, occurred in the District of Massachusetts.

## THE RELATIONSHIPS BETWEEN UNIVERSAL, UHS OF DELAWARE, INC. AND HRI, AND THEIR CONTROL OF ARBOUR

11.     Universal is a holding company which owns and operates health care facilities, including behavioral health centers.  At the time Yarushka Rivera was treated by Arbour, Universal owned, controlled, and operated 101 behavioral health centers in 32 states, the District of Columbia and Puerto Rico.  At the time of the filing of this Fifth Amended Complaint it owns, controls and operates at least 216 such centers.

12.     According to Universal's Form 10-K, filed with the United States Securities and Exchange Commission, UHS of Delaware, Inc. is the management company for Universal.  Relators are not certain which responsibilities are lodged in Universal and which are held by UHS of Delaware, Inc., but between the two entities they manage and control all of the operating entities owned by Universal, including the Arbour facilities.  UHS of Delaware, Inc. and Universal are collectively referred to herein as "UHS, Inc."

13.    UHS, Inc. holds all of its behavioral health centers through subsidiaries, such as HRI.  However, notwithstanding the name of the entity which technically holds the license, all behavioral health center operations are managed by UHS, Inc. and all behavioral health centers, including those at the Arbour facilities, report to supervisors who are UHS, Inc. employees.

14.    In fact, all employees of the behavior health centers are hired by UHS, Inc. Persons interested in being employed in any UHS mental health facility, in any capacity—from the most credentialed treating professional to the lowest paid employee—either apply directly through the UHS, Inc., website or through third parties, such as Monster, who identify the employer as UHS, Inc.  The same procedures apply to the Arbour facilities.

15.    Through its control of the human resources and the hiring process, UHS, Inc., sets the qualifications for each of the mental health professionals who treat patients at the behavioral health centers, including the Arbour facilities.  Through its control of human resources, UHS, Inc. also establishes the lines of reporting and supervision at the behavioral health clinics, including the Arbour facilities.

16.    Each of the Arbour facilities identified above operates under a license granted by the Massachusetts Department of Public Health to Arbour Counseling Services.  There is no corporation or other business entity recognized by the Commonwealth (or any other state) with the name Arbour Counseling Services.

17.    Notwithstanding the fact that it does not formally exist, Arbour Counseling Services purports to have a Chief Executive Officer.  That CEO identifies

8

his primary responsibilities to be achieving budget goals through sound cost management.  Those budget goals were set and created by the officers and employees of UHS, Inc.  Indeed, the Treasurer of HRI, Cheryl Ramagano, has certified to federal officials that the CEO of Arbour Counseling Services is an employee of UHS of Delaware, Inc.

18.    HRI asserts that it does business under the name of Arbour Counseling Services.  However, HRI does not comply with the requirements of the Commonwealth of Massachusetts, as set forth in M.G.L c. 110, §§ 5 and 6, for doing business under another name.  To the extent it has any operations, HRI only operates in Massachusetts.  Yet HRI concedes that its principal place of business is in King of Prussia, PA, at the location of UHS, Inc.'s headquarters.

19.    HRI's president is Debra K. Osteen.  She also serves as a Director of HRI. Ms. Osteen is a Senior Vice President of Universal and the President of its Behavioral Health Division.  Ms. Osteen serves as the president of over 50 corporations affiliated with UHS, Inc.  She serves on the board of at least 30 corporations affiliated with UHS, Inc.  To the extent she devotes any time to HRI, it is de minimis.

20.    HRI's Treasurer is Cheryl Ramagano.  Ms. Ramagano is the Vice President and Treasurer of Universal.  Ms. Ramagano serves as the Treasurer to over 50 corporations affiliated with UHS, Inc.  To the extent she devotes any time to HRI, it is de minimis.

21.    HRI's Secretary is George Brunner, Jr.  He is a deputy general counsel of UHS, Inc.  Mr. Brunner serves as the secretary to over 20 corporations affiliated with UHS, Inc.  To the extent he devotes any time to HRI, it is de minimis.

22.    HRI's vice presidents are Steve Filton and Laurence Harrod, who are respectively the Senior Vice President and Chief Financial Officer of Universal, and the Vice President of Behavioral Finance of Universal.  Mr. Filton and Mr. Harrod also serve as directors of HRI.  Mr. Filton has served as a corporate officer of at least 100 other corporations affiliated with UHS, Inc. and Mr. Harrod serves as an officer of at least 30 corporations affiliated with UHS, Inc.  They each serve on the board of directors of more than a dozen corporations.  To the extent that either of them devote any time to HRI, it is de minimis.

23.    All of the officers and directors of HRI receive no compensation from HRI and devote all or almost all of their time to other UHS, Inc. entities.  HRI provides no leadership or management of the Arbour facilities.  All such management and control comes from employees of UHS, Inc.

24.    Through its control of HRI, and control over the employees, budgets and decision making at each of the Arbour facilities—including its control of Arbour's personnel, supervision and financial decisions—UHS, Inc. is responsible for presentation of the Arbour claims to the United States and to the Commonwealth of Massachusetts.  To the extent UHS, Inc. did not present the false claims identified below to the United States and the Commonwealth of Massachusetts, UHS, Inc. caused the presentation of such claims.

25.    UHS, Inc. and HRI are jointly responsible for all of the obligations of UHS described herein.

## REGULATORY FRAMEWORK

A.  MassHealth Regulations:

26.    The Medicaid Program is a means tested government entitlement program, jointly financed by the federal and state governments, that provides healthcare to low-income individuals.  Under Massachusetts General Laws Chapter 118E, the Executive Office of Health and Human Services administers the Commonwealth's Medicaid program, known as MassHealth.  The Centers for Medicare & Medicaid Services ("CMS") is the federal agency that, among other duties, partners with the state governments to administer Medicaid to eligible beneficiaries. According to CMS, Medicaid strives to improve the quality of healthcare services delivered to program beneficiaries in a manner which prevents or minimizes harm to patients.  CMS recognizes that communication and coordination between properly qualified healthcare providers is paramount to ensuring that quality health care is delivered safely to Medicaid beneficiaries.

27.    For most MassHealth beneficiaries, MassHealth provides primary health insurance coverage.  Some MassHealth beneficiaries, however, qualify for health insurance benefits under another health insurance plan, such as Medicare or a private insurance plan.   For these beneficiaries, MassHealth is secondary insurance, providing coverage for services not covered under their primary plan, or for those

who qualify, providing co-pay or deductible payments that would otherwise be due under the beneficiaries' primary health plan coverage.

28.   MassHealth promulgates regulations that govern a healthcare provider's interactions with the program.  See generally, 130 CMR §401.401- 130 CMR §650.035. See also 42 U.S.C. §§1396 – 1396v.  The MassHealth regulations that apply to mental health centers are set forth in Chapter 429.000 of MassHealth's provider regulations. It is axiomatic that a mental health center's ability to deliver safe, quality health care to patients depends upon the facility's mental health care professionals obtaining the proper qualifications for their particular profession and providing supervision to other health care providers who administer services to patients.  Section 429.424 sets forth the professional qualification and supervision requirements for psychiatrists, psychologists, social workers, and psychiatric nurses working in a mental health center.  Indeed, having properly qualified and licensed health care professionals who communicate with and supervise staff in administering health care services to patients is so integral to MassHealth's ability to deliver quality care to patients while minimizing patient harm, that the agency conditions a mental health center's ability to receive payment on compliance with these regulations: "[t]he MassHealth agency pays for diagnostic and treatment services only when a professional staff member, as defined by 130 CMR §429.424, personally provides these services to the member or the member's family." §429.441(A).[1]

---

[1] The title of Section 429.424 was amended in 2014 to include the language that that professional staff must meet the qualification requirement to be authorized "to render billable mental health center

29.    The regulations require a mental health center to have at least one psychiatrist who is "currently…certified by the American Board of Psychiatry and Neurology, or the American Osteopathic Board of Neurology and Psychiatry, [or] be eligible and applying for such certification."  §429.424(A)(1).  Any additional psychiatrists employed by the mental health center "must be, at a minimum, licensed physicians in their second year of a psychiatric residency program accredited by the Council on Medical Education of the American Medical Association."  §429.424(A)(2).  Such physicians must be under the supervision of a fully qualified psychiatrist, as articulated in §429.424(A)(1).

30.    The regulations also set forth minimum requirements for psychologists.  Section 429.424(B)(1) requires at least one staff psychologist to be licensed by the Massachusetts Board of Registration of Psychologists and specialize in clinical or counseling psychology, or a closely related specialty.  All staff psychologists are required to have obtained a master's degree (or the equivalent) in clinical or counseling psychology from an accredited institution and either be currently enrolled in or have completed a recognized doctoral program.  130 CMR § 429.424(B)(2).  The regulations further state that "[a]ll services provided by such additional staff [psychologists] must be under the direct and continuing supervision of a psychologist meeting the requirements set forth in 130 CMR 429.424(B)(1)."

---

services.  Before that however, the definitions of the service codes for individual, family and group therapy (90806, 90847 and 90853)  expressly required the service provider to have met the requirements of § 429.424.  The 2014 amendment merely codified the administrative requirement that was already known and in effect.

31.    The credentials and qualifications psychiatric nurses are required to possess before a mental health center may bill for services rendered are also set forth at § 429.424.  The regulations state that "[a]t least one psychiatric nurse must be currently registered by the Massachusetts Board of Registration in Nursing and must have a master's degree in nursing from an accredited National League of Nursing graduate school with two years of full-time supervised clinical experience in multidisciplinary mental-health setting and be eligible for certification as a clinical specialist in psychiatric/mental-health nursing by the American Nursing Association."  §429.424(D).  A psychiatric clinical nurse specialist – a licensed registered nurse authorized to practice in an expanded role – "can perform prescribing duties within their scope of practice."  §429.424(E).  The regulations also state that psychiatric nurses must meet the requirements set forth in 244 CMR 4.05(4), which states that such nurses must be under the direct supervision of a physician.

32.    Regarding social workers, the regulations state that "[a]t least one staff social worker must have received a master's degree in social work from an accredited educational institution and must have had at least two years of full-time supervised clinical experience subsequent to obtaining a master's degree." §429.424(C)(1).  "Any additional social workers on the staff must provide services under the direct and continuous supervision of an independent clinical social worker."  §429.424(C)(2).   All unlicensed counselors "must be under the direct and continuous supervision of a fully qualified professional staff member." §429.424(F)(1).  All counselors must hold a master's degree in counseling education, counseling psychology, or rehabilitation

counseling from an accredited educational institution and must have had two years of

full-time supervised clinical experience in a multidisciplinary mental-health setting

subsequent to obtaining the master's degree.  § 429.424(F)(2).

33.   The composition of a mental health center's professional staff is an

important part of the center's ability to deliver safe, quality care to patients.  The

regulations therefore require a mental health center like UHS's Arbour facility to have

a balanced interdisciplinary staff including professional staff members who meet the

qualifications discussed above.  One of these staff members must be a psychiatrist and

two must be from non-physician disciplines including psychology, social work, or

psychiatric nursing.  §429.422(A).  The regulations state that the staff "must have

specific training and experience to treat the target populations of the center."  For

example, staff members administering services to children "are required to have

specialized training and experience in children's services."  §429.422(B).

34.   To further ensure that quality care is delivered to MassHealth

beneficiaries by professionally supervised staff, the regulations require a mental

health center to appoint a medical director and a clinical director.  Section 429.422(A)

provides that a mental health center must have at least one psychiatrist "who meet[s]

the qualifications outlined in 130 CMR 429.424" as the center's medical director.  The

medical director is "responsible for establishing all medical policies and protocols and

for supervising all medical services provided by the staff."  §429.423 (C).

35.   All mental health centers must also employ a director of clinical services

who is responsible for the direction and control of all professional staff members and

services.  §429.423(B).  The clinical director is "responsible for ensuring compliance of the satellite program with the regulations in 130 CMR 429.000."  §429.439(A)(1). Additionally, the clinical director is responsible for the selection of clinical staff, accountability for adequacy and appropriateness of patient care, the establishment of policies and procedures for patient care, program evaluation, and the establishment of a quality management program.  §429.423(B).  The clinical director must ensure appropriate supervision of staff, §429.423(B)(2)(c), and must retain adequate psychiatric staff.  §429.423(B)(2)(e).  Section 429.439 states that a satellite facility's clinical director must "meet all of the requirements in 130 CMR 429.423(B)."

36.   Section 429.439 expressly provides that satisfaction of the clinical director's responsibilities is a prerequisite to payment under Medicaid: "[s]ervices provided by a satellite program are reimbursable only if the program meets the standards described below [in subsections (A) through (D)]."

37.   Other Chapter 429.000 regulations reiterate the requirement that mental health facilities use qualified and properly supervised staff.  Section 429.421(A)(2) provides that "[all] services must be…delivered by qualified staff in accordance with 130 CMR 429.424."  Section 429.438(E) provides that mental health centers must supervise staff members "within the context of a formalized relationship," that such supervision must be "appropriate to the person's skills and level of professional development" and consistent with applicable professional licensing standards. §429.438(E)(1)-(2).  And §429.408(C) expressly states that Medicaid payment for mental health services includes payment for supervision.

16

38.     All of the regulations discussed above apply to both "parent centers," which are defined as "the central location of the mental health center," and "satellite facilities" like UHS's Arbour clinic, which is "a mental health center program at a different location from the parent center that operates under the license of and falls under the fiscal, administrative, and personal management of the parent center." §429.402.  Satellite facilities are further defined as either "autonomous", those that have "sufficient staff and services to substantially assume [their] own clinical management," or "dependent," satellite facilities that operate "under the direct clinical management of the parent center."  §429.402.

B.   Other Massachusetts Agency Regulations:

39.     Numerous other agencies in the Commonwealth promulgate regulations which stress the importance of having qualified professionals and staff supervision in mental health centers.  Massachusetts' Department of Public Health ("DPH"), which licenses and regulates mental health facilities, emphasizes the critical importance of appropriate staff supervision.  DPH regulations provide that case consultation, psychotherapy, and counseling services provided at such clinics must be supervised "by the mental health professionals identified in 105 CMR 140.530(C)." §140.520(D)(1). Section 140.530(C), in turn, requires that every satellite facility have a board-certified or board-eligible psychiatrist on staff – "[a] satellite clinic must meet, independently of its parent clinic, all the requirements imposed on clinics by 105 CMR 140.000."  The psychiatrist is also responsible for the prescribing, monitoring, and supervising of all prescribed medications, the clinical supervision of appropriate staff,

and the documentation of such supervision.  §140.530(D)(E);  §429.423(D)(2)(f).

Section 140.530(E) further provides that unlicensed staff members must be clinically

supervised on a regular basis by professional staff members as defined in §140.530(E).

40.    Massachusetts regulations relating to the standards of professional

practice and conduct in social work are set forth at 258 CMR §20 et seq.  The

regulations state that it is "unethical or unprofessional conduct" to authorize or

permit "a person to perform functions or services which constitute the practice of

social work…when one knows or has reason to know that said person is not licensed

by the Board and that a license is required" to perform the services rendered.  258

CMR §20.01(5).  Section 20.01(6) further states that it is unethical to allow a licensed

social worker to perform a particular service when one knows, or has reason to know,

that the performance of that service "exceeds the legally permissible scope of practice

for that level of licensure."  The regulations also make it unethical to engage in any

course of conduct which is prohibited by any provisions of the Code of Ethics of the

National Association of Social Workers.  258 CMR §20.01(10).  Section 20.03 also

forbids a social worker from performing any service which "exceeds the legally

permissible scope of practice for his licensure."

41.    Regulations propounded by the Board of Registration in Medicine

regarding licensing and the practice of medicine are set forth at 243 CMR §2.00.  The

purpose of the regulations is to set standards which promote public health and safety

in the practice of medicine.  These regulations discuss the appropriate supervision of

nurses prescribing medication at 243 CMR §2.10(3), requiring a board certified or

board eligible psychiatrist with admitting privileges to supervise a psychiatric nurse who is prescribing medication.  The supervising physician shall also review the nurse's prescribing practice and provide ongoing direction regarding that practice. 243 CMR §2.10(4).  The Board of Registration in Nursing regulations are set forth at 244 CMR 4.00 and also set forth the requirements for a physician supervising a psychiatric clinical nurse.

42.    Regulations of the Department of Public Health, governing the management and operation of a Mental Health Center regardless of payment source, provide that all care providers must be clinically supervised on a regular basis by professional staff members and that the documentation of supervision must be available for review.  See 105 CMR §140.530(E).  Irrespective of whether a mental health center is "dependent" on a parent or "autonomous" of the parent, however, appropriate supervision is an express material pre-condition that must be satisfied before a Mental Health Center can seek reimbursement from MassHealth.  See 130 CMR §429.439.

C.  MassHealth and Payment Systems for MassHealth Beneficiaries

43.    Under MassHealth regulations, all beneficiaries who receive primary health insurance coverage from MassHealth must enroll in some type of managed care program, either in the Managed Care Organization ("MCO") Plan or MassHealth's Primary Care Clinician ("PCC") Plan.  Both the MCO Plan and the PCC Plan provide mental health benefits to MassHealth beneficiaries.

44.    MassHealth beneficiaries enrolled in the MCO Plan must enroll in one of the MCOs approved by MassHealth.  The MCO chosen by the MassHealth beneficiary is responsible for delivering and paying for the members' health care services.  Once the beneficiary selects an MCO, the beneficiary must receive all healthcare from the providers within that MCO's network.  Each MCO has contracts with the medical and behavioral health services providers within its network, and all claims for the services provided to the MCO's MassHealth beneficiaries are presented to, and paid by, the MCOs.  The MCOs pay these claims with funds provided by MassHeath, pursuant to each MCO's contract with MassHealth.  MassHealth, in turn, receives its funding from Medicaid program funds it receives from the United States and the Commonwealth of Massachusetts.   Approximately 35%-50% of MassHealth beneficiaries were enrolled with a private MCO Plan during times relevant to this Complaint. Through MCO Plans, MassHealth pays for medical and behavioral health services on a capitated basis (a fixed monthly fee per beneficiary), and the MCOs ensure payment for beneficiaries' services.

45.    The PCC Plan administers non-behavioral health care on a fee-for-service basis. For behavioral healthcare services, however, the PCC Plan contracted with an MCO that specializes in the administration of mental health services, MBHP.  At the times relevant to this Complaint, approximately 20%-35% of MassHealth beneficiaries were enrolled in the PCC Plan.

46.    Some MassHealth beneficiaries are not required to join a managed health program.  See 130 CMR 508.002.   These beneficiaries are frequently referred to as

"fee-for-service" ("FFS") beneficiaries, and have their services paid for directly by the

MassHealth on a FFS basis.  FFS beneficiaries include new MassHealth members who

have not yet enrolled in a managed care plan, members who have Medicare (which

covers 80% of health care costs), members with other primary health insurance

coverage (e.g., employer-sponsored insurance), members who live in an institution,

members who receive hospice care, and undocumented non-citizens, who are

provided emergency medical services only.  Id.

47.    Approximately 30% of MassHealth beneficiaries are not enrolled in the

PCC Plan or an MCO Plan.  However, because MassHealth does not provide primary

health insurance coverage for most of these beneficiaries (or because their benefit s are

statutorily curtailed), MassHealth spends significantly less than 30% of the amounts it

pays for medical or mental healthcare services of this group of MassHealth

beneficiaries.  For example, in 2015 MassHealth spent less than 5% of its annual

budget on outpatient medical and behavioral health services for FFS beneficiaries.

MassHealth's spending for outpatient medical and behavioral health services for FFS

beneficiaries remained at this low level for the relevant time period of this action.

48.    Massachusetts regulations do not distinguish between beneficiaries that

receive benefits via MassHealth fee-for-service, or through contracting entities, such

as MBHP and the various MCOs—all beneficiaries are considered MassHealth

members.  130 CMR § 450.101.  Thus, all claims submitted on behalf of any

MassHealth beneficiary must comply with State Medicaid regulations.

D.  Payment of Behavioral Health Services for MassHealth Beneficiaries Through
MBHP and MCOs

49.  Since 1992, the Commonwealth has operated MassHealth under a section
1115 Demonstration waiver.  Section 1115 of the Social Security Act gives the Secretary
of Health and Human Services authority to approve experimental, pilot, or
demonstration projects that promote the objectives of the Medicaid program.  The
1992 waiver authorized a behavioral health care carve-out program for MassHealth
recipients.

50.  Under this arrangement, which has been in effect for more than twenty
years, behavioral health care services for MassHealth members are administered by an
MCO.  For MassHealth beneficiaries enrolled in the PPC Plan, mental health care
claims are paid for and administered by a private contractor who enters into a written
agreement with MassHealth.  Since 1996, MBHP, a subsidiary of ValueOptions Inc.,
has served as the behavioral health vendor for MassHealth's PPC members.[2]
ValueOptions Inc. merged with Beacon Health Holdings in December 2014.  Both
entities are independently operated subsidiaries of Beacon Health Options ("Beacon").

51.  MassHealth pays MBHP for each PCC member on a capitated basis from
Medicaid program funds which MassHealth receives from the United States and the
Commonwealth of Massachusetts.

---

[2] Most recently, in July 2017, the Executive Office of Health and Human Services and MBHP signed a
new five-year contract to provide behavioral health service to MassHealth PCC members.

52.   For MassHealth members enrolled in the MCO Plan, MassHealth has entered into a written contract with six MCOs for the provision of medical and mental health care services: Boston Medical Center HealthNet Plan, Neighborhood Health Plan, Tufts—Network Health, Fallon Community Health Plan, Health New England, and CeltiCare.[3]

53.   In practice, the vast majority of MassHealth beneficiaries who receive primary coverage from MassHealth have their behavioral health services paid for by MBHP or its affiliate, Beacon. Just as MassHealth has contracted with MBHP to provide and administer mental health care services for PCC Plan members, most of the MCOs have contracted with MBHP's affiliate, Beacon, on a capitated basis to provide behavioral health care services to MCO Plan members.[4]  Thus, because all PPC Plan and nearly all MCO Plan beneficiaries have their behavioral health care services paid for by Beacon or MBHP, MBHP and its affiliates administer and pay for the behavioral health care services of at least 60%-70% of MassHealth beneficiaries.

54.   For outpatient mental health clinics, such as the Arbour facilities, the percentage of MassHealth claims paid by MBHP, Beacon and its affiliates is much higher. With no inpatient or chronic behavioral health facilities, the only services the

---

[3] In addition to these six MCOs, during the relevant time period UHS contracted and submitted behavioral health claims to five other MCOs (along with their affiliates) serving MassHealth members: Commonwealth Care Alliance, CCA One Care, Senior Whole Health, Tufts Health Plan, and Evercare (United Health Care).  These plans serve discrete groups of beneficiaries, such as persons with disabilities, seniors, and individuals eligible for expanded Medicaid coverage under the Affordable Care Act.

[4] On information and belief, during all times relevant to this complaint, only two of the MCOs, Tufts—Network Health and CeltiCare, do *not* contract with MBHP or Beacon for the payment of behavioral health care services of its covered beneficiaries.

23

Arbour Clinics provided to MassHealth members that would be reimbursed on a FFS basis were services for those members enrolled in Medicare or otherwise had MassHealth as secondary coverage.  Accordingly, the vast majority of behavioral health services of provided to MassHealth members at the Arbour clinics, including the Arbour Lawrence facility, were reimbursed by MCOs, including MBHP.

55.     Mental health care providers such as UHS contract with MBHP and the various MCOs, and are compensated by those entities for the mental health services they provide to MassHealth members.  MBHP and the MCOs pay these providers with funds that have been provided to them by the United States and the Commonwealth through the Massachusetts Medicaid Program.  Consequently, any request for payment made to MBHP or an MCO on account of any services provided to a MassHealth member is a "claim" for the purpose of 31 U.S.C §§ 3729 and 3730 and M.G.L. c. 12, §§ 5B and 5C.  Any presentation of a false or fraudulent request or demand for payment to these entities is a "false claim" as defined by those statutes. Any reference to any of the Defendants presenting claims or causing claims to be presented to MassHealth shall include the presentation of claims and the causing of claims to be presented to MBHP or to an MCO that has contracted with MassHealth.

56.     Pursuant to all provider agreements between MBHP (or the various MCOs) and mental health care providers, including the agreements with all UHS entities, the provider must comply with all state and federal regulatory requirements. All conditions of payment under MassHealth regulations, policies and practices are conditions of payment under any provider contracts with MBHP or with an MCO.

24

Similarly any healthcare provider seeking payment directly from MassHealth on a fee

for service basis is required to sign a provider agreement affirming that it will comply

with all of the state and federal laws and regulations applicable to the Medicaid

program.  See 130 C.M.R. §450.223(A) & (C)(1).

E.  MBHP and MCOs Licensing and Supervision Requirements Through

    Credentialing

57.    Although MassHealth establishes qualifications, licensing and supervision

requirements for professional staff at mental health centers, such as the Arbour

facilities, it does not conduct individual reviews of each and every staff member to

ensure they have met the requirements of Section 429.424.  MassHealth places the

responsibility on the mental health centers to ensure that their staff members who

provide billable services meet the requirements, and in particular, the regulations

place this responsibility on the mental health center's Director of Clinical Services, see

130 C.M.R. §429.423(B)(2).

58.    MBHP and the MCOs take a more pro-active approach in ensuring that all

practitioners who provide billable mental health services to MassHealth members are

qualified, licensed, and properly supervised.  They require the mental health centers

to actively investigate whether their staff has the minimum qualifications for

providing mental health services and to make explicit certifications for each and every

practitioner that the relevant qualification requirements have been met.  Only if the

mental health facility makes the appropriate certifications—which must be reaffirmed

every three years—will MBHP and the MCOs accept claims based for services

provided by the practitioner.  If, in fact, MBHP and the MCOs pays claims for services provided by a practitioner who does not meet the requirements of §429.424 (or the other licensure, qualification or supervision requirements) it is only because the mental health clinic has either made a deliberate false statement or because it has provided certifications in reckless disregard of the truth or falsity of its statements.

59.   Similar to MassHealth, MBHP will not pay claims presented by a provider who is not qualified to participate in the MassHealth program.   Many mental health service claims, however, are submitted by mental health centers, which are usually corporate entities.  In these cases, the named provider does not actually perform the service—the reimbursable service is performed by a mental healthcare professional who is an employee or a contractor.  MBHP has a formal credentialing process to make sure that the individuals who actually perform the billable work are qualified to provide such services.

60.   As part of this credentialing process, Arbour and other mental health center providers make attestations to MBHP that the individuals who actually perform the billable services are able to perform essential functions of their position or operational status. Arbour and other providers make attestations to MBHP that individual practitioners:

- Are able to practice independently in his/her specialty, with clinical privileges in good standing at the institution designated as the primary admitting facility;

- Graduated from an accredited professional school and/or highest training program applicable to the academic degree, discipline or licensure;

- Meet the minimum hours of clinical experience as defined by the state licensing board, and, if applicable, meet the minimum supervision requirements of MassHealth under an approved supervisor;

- Have appropriate work history for the practitioner's specialty, specialty board certification, if indicated, and current specialized training for certain levels of specialty care; and

- Are not excluded or sanctioned by government-sponsored health benefit programs, such as MassHealth.

61.   MBHP performs a re-credentialing process with all providers, including Arbour, at least as frequently as every three years. The attestations referenced in the preceding paragraph must be reaffirmed for each and every practitioner in every re-credentialing process.

62.   MBHP requires providers, such as Arbour, to update MBHP within no more than 10 days if there are "material" changes in credentialing or re-credentialing applications, expressly including "any action against licenses, certifications, registrations, and/or accreditation status." MBHP will terminate network participation for failing to comply with its credentialing update requirements.

63.   For entities the size of UHS, MBHP assigns credentialing and re-credentialing responsibilities to the organizational provider.  MBHP requires all credentialed professionals to meet all applicable laws, rules and regulations (state and

federal), all accreditation standards, and all client and/or government program-specific requirements, including MassHealth regulations.

64.   Organizational providers such as Arbour must ensure that employees and contractors serving MassHealth beneficiaries not only meet MassHealth's supervision, licensure and qualifications requirements, but relevant MBHP and MCO credentialing criteria, which are stricter.  To be credentialed to provide services in a particular profession, MBHP and MCOs generally require that individual practitioners have current, valid, unrestricted licenses to practice in the profession that require licensure in the Commonwealth of Massachusetts.

65.   MBHP provides a very limited exception to its licensing requirements to three types of providers, psychology interns, social work interns and mental health counselor interns.  MBHP's intern licensing exceptions only apply to interns who are supervised by eligible, licensed individuals, and who receive a minimum of two hours a week of direct supervision (one hour face to face, individual supervision, and one hour of either individual or group supervision).  Such supervision must be documented in files accessible for review by MBHP.  Psychology interns must be supervised by a licensed psychologist; social work interns must be supervised by a Licensed Independent Clinical Social Worker; and mental health counselor interns must be supervised by a Licensed Mental Health Counselor, a Licensed Independent Clinical Social Worker, a licensed, psychologist, a licensed, master's-level clinical nurse specialist, or a licensed psychiatrist.  MBHP also strictly defines who is an "intern" for the purpose of its licensing exception.  A psychologist, social worker or

mental health counselor who is unable to pass, or unwilling to take, the professional

licensing exam for his or her specialty is not considered an "intern" and consequently

cannot bill MBHP for services.

66.    MBHP's credentialing requirements also mandate that if a MassHealth

beneficiary's case is assigned to an intern, the beneficiary must be informed of the

intern's status and that the beneficiary can request and receive, without prejudice, a

reassignment to a clinician who is not an intern. Failure to inform a beneficiary that

their clinician is an intern may result in termination.

67.    MBHP may also credential unlicensed master's-level mental health

counselors so they may provide services to MassHealth beneficiaries in an

organizational setting.  To be eligible to provide reimbursable behavioral health

services unlicensed master's-level mental health counselors must have a master's

degree from an accredited college or university, be supervised by a licensed clinician

meeting MBHP's credentialing criteria, and must be in the process of completing their

24 month post-master's training required to attain licensure.  A master's-level mental

health counselor who is unwilling to take the professional licensing exam, or is unable

to pass the licensing exam within 24 months cannot bill MBHP for services.

68.    In its contracts with MBHP (and its contract with the MCOs), Arbour has

agreed that MBHP (and the MCOs) may impose sanctions (including suspension and

termination of network participation) for credentialing/re-credentialing failures, and

for professional competency and/or conduct issues; quality of care concerns/issues;

and for violations of state or federal laws, rules, or regulations.

29

69.   The credentialing requirements described above apply to claims made on behalf of PPC Plan members, whose mental health benefits MBHP manages. However, virtually the same credentialing requirements apply to claims made on behalf of almost all MassHealth beneficiaries enrolled in the MCO Plan because MBHP and Beacon have nearly identical credentialing criteria.  As discussed above, both MBHP and Beacon are subsidiaries of Beacon Health Holdings,[5]  and, with the exception of Tufts-Network Health Plan and CeltiCare,[6]  all of the MCOs contract out the management of their behavioral healthcare services to Beacon.

70.   Beacon, like MBHP, has a credentialing process for all mental health care practitioners.  UHS can only receive reimbursement for services provided to MCO beneficiaries if the practitioner who provided the services meets Beacon's credentialing criteria.  All providers, including Arbour, make attestations to Beacon that individual practitioners graduated from an accredited professional school, are licensed (or eligible to receive a license),  are not excluded or sanctioned by government-sponsored health benefit program, and have documented clinical supervision under an approved supervisor as defined by MassHealth regulations.

71.   As with MBHP, Beacon, on behalf of the MCOs, requires a re-credentialing process by all providers, including UHS, at least as frequently as every

_____

[5] Even before MBHP's parent corporation merged with Beacon, the credentialing standards employed by MBHP and the Beacon entities were substantially similar.  Both organizations employed a credentialing model widely adopted within the industry which was the industry standard. When the organizations merged, their credentialing models did not change significantly.

[6] Although Tufts – Network Health and CeltiCare do not utilize Beacon as a contractor for its behavioral healthcare services, its credentialing criteria is nearly identical to that used by Beacon.

three years.  The necessary attestations referenced in the proceeding paragraphs must

be reaffirmed for each and every practitioner in every re-credentialing process.  As

with MBHP, Beacon, on behalf of the MCOs, requires all practitioners to be

independently licensed in their professions, with limited exceptions for certain types

of interns.  Beacon's credentialing process, like MBHP's, allows unlicensed master's-

level mental health counselors to provide services to MassHealth beneficiaries in an

organizational setting.  To provide behavioral health services unlicensed master's-

level mental health counselors must have a master's degree from an accredited

college, and be supervised by a licensed clinician meeting Beacon's credentialing

criteria.  Not all mental health care practitioners who are allowed to bill MassHealth

are qualified to receive reimbursement under MBHP's or the MCOs' credentialing

requirements.  However, no one who does not meet the minimum MassHealth

licensing, qualifications or supervision requirements for submitting bills is qualified to

perform services that will be reimbursed by MBHP or the MCOs.

72.    The credentialing process established by MBHP and the MCOs ensures

that providers are meeting government regulations and standards of behavioral

health service.  It also establishes that compliance with MassHealth's minimum

qualifications, licensure and supervision requirements is material to MBHP's and the

MCOs' payment decisions.  MBHP and the MCOs would not have established and

enforced the elaborate credentials requirement if they did not intend to enforce the

requirement that MassHealth funds will only be used to pay for services performed

by a qualified practitioner.  If the provider performs the credentialing process in good

31

faith, mental health practitioners who do not meet MassHealth's minimum

qualifications will be identified, and neither MBHP nor the MCOs will knowingly pay

for claims for those practitioners' services.

F.   MassHealth Service Codes and Descriptions:

73.   The Current Procedural Terminology ("CPT") coding system, developed

by the American Medical Association, is designed to provide information about

services provided for financial and administrative purposes.   CPT codes play an

important part in the billing process as they identify for the insurance payer the

services for which the healthcare provider seeks reimbursement.   MassHealth uses the

CPT coding system for health services performed by mental health clinicians or other

qualified health care practitioners, however, at the relevant times, MassHealth

adopted definitions for service codes that were unique to the Commonwealth.

74.   Section 601 of the Mental Health Center Manual sets forth CPT codes

which correspond to particular mental health services.   Each mental health service is

described and the assigned code is used by providers to bill MassHealth for the

service.   Section 601 is clear that reimbursement is contingent on compliance with the

MassHealth regulations discussed above as the Section states:   "MassHealth pays for

services represented by the codes listed in Subchapter 6 in effect at the time of service,

subject to all conditions and limitations in MassHealth regulations at 130 CMR 429.000

and 450.000."   .

75.   Claims submitted to MBHP and to the MCOs must also include diagnosis

and procedure codes, including CPT codes.   For the submission of claims to MBHP

and MCOs, Arbour specifically agreed by contract that supervising clinicians should

not submit claims in their name, and that no participating provider should submit

claims in their name for services that were provided by another individual provider.

76.    The claims UHS submitted to MassHealth, MBHP, and the MCOs

contained the CPT codes which identified the services for which UHS sought

reimbursement.  MassHealth's definitions of the relevant CPT codes not only identify

which services UHS represented it had provided, but also define what MassHealth

expected to receive in exchange for reimbursement.  The majority of the relevant

claims UHS submitted to MassHealth bore CPT codes 90806, 90847, 90853, 90801, and

90804 which corresponded to the provision of individual therapy, family therapy,

group therapy, psychiatric diagnostic interview examination, and individual

psychotherapy respectively.  The definition of these codes also underscores the

importance MassHealth placed on compliance with the requirements of § 429.424.  At

the relevant time, Section 601 of the MassHealth Mental Health Center Manual

defined these codes as follows:

**90806:**    Individual psychotherapy, insight oriented, behavior modifying and/or supportive, in an office or outpatient facility, approximately 45 to 50 minutes face-to-face with the patient (by professional staff member as defined in 130 CMR 492.424).

**90847:**     Family psychotherapy (conjoint psychotherapy) (with patient present) (by professional staff member as defined in 130 CMR 429.424).

**90853:**    Group psychotherapy (other than of a multiple-family group) (by professional staff member as defined in130 CMR 429.424).

**90801:**    Psychiatric Diagnostic Interview Exam.

**90804:**     Individual psychotherapy, insight oriented, behavior modifying and/or supportive, in an office or outpatient facility, approximately 20 to 30 minutes face to face with the patient.

G.  National Provider Identifier Number/Taxonomy Codes:

77.   MassHealth requires health care providers to include their National Provider Identifier ("NPI") on all claims billed to the agency.  An NPI is a unique 10-digit identification number which is issued to health care providers in the United States by the Centers for Medicare and Medicaid Services ("CMS").  The NPI is used to identify health-care providers for billing purposes in all HIPAA transactions, and, as of May 23, 2007, all paper and electronic claims submitted to MassHealth must contain an NPI.  Claims billed without an NPI will be denied by MassHealth and providers are responsible for making sure their NPI information is on file with MassHealth.

78.   The NPI number does not carry individual information such as the state where a health care provider practices or what area or specialization the individual practices in.  That information is contained in a Taxonomy code – which categorizes health care providers by type, classification, and specialization.  When applying for an NPI number, a health care provider must select the Taxonomy code that most closely describes the health care provider's specialty and report that code in the NPI application.  Obtaining an NPI number will not ensure that an individual is licensed or credentialed and neither CMS, nor any other agency, verifies with a provider that the Taxonomy code selected by the provider when applying for an NPI is accurate.

79.   By contract with Arbour, MBHP and the MCOs required certain data from

Arbour for every claim for payment for a MassHealth member, including:

- Data about the facility, including address;

- Data about the type of bill to be submitted (including

inpatient/outpatient, type of facility, type of care, and sequence of the bill for a specific

episode of care);

- Data about the patient, including name, address, date of birth, and sex;

- Data about the service provided, including admission and discharge date

and hour, priority (type) of visit, source of referral, discharge status;

- Total charges for the service(s) provided;

- For the service provider, name and one form of identifier, either an NPI

number or a non-NPI number (as explained below), which may include a state license

number or a type of commercial number; and

80.   Individual claims do not necessarily bear the NPI numbers of individual

practitioners; instead, MBHP and parent company Beacon assign providers unique six

digit numbers.   Such numbers are assigned after MBHP and Beacon review the

credentialing information provided for each practitioner and has verified that the

practitioner meets the qualifications and credentialing requirements.   MBHP and

MCOs rely on the credentialing information submitted by providers like Arbour in

processing subsequent claims for payment submitted on behalf of these providers.

Neither MBHP nor the MCOs will knowingly provide a unique identifying number to

a practitioner who does not meet MassHealth's minimum licensure, qualification or supervision requirements.

H.  MassHealth regulations for provision of Behavioral Health Services Apply to Services Administered by MBHP and MCOs

81.    Mental health care providers such as UHS contract with MBHP and the various MCOs, and are compensated by those entities for the mental health services they provide to MassHealth members.  MBHP and the MCOs pay these providers with funds that have been provided to them by the United States and the Commonwealth through the Massachusetts Medicaid Program.  Consequently, any request for payment made to MBHP or an MCO on account of any services provided to a MassHealth member is a "claim" for the purpose of 31 U.S.C §§ 3729 and 3730 and M.G.L. c. 12, §§ 5B and 5C.  Any presentation of a false or fraudulent request or demand for payment to these entities is a "false claim" as defined by those statutes. Any reference to any of the Defendants presenting claims or causing claims to be presented to MassHealth shall include the presentation of claims and the causing of claims to be presented to MBHP or to an MCO that has contracted with MassHealth.

82.    Pursuant to all provider agreements between MBHP (or the various MCOs) and mental health care providers, including the agreements with all UHS entities, the provider must comply with all state and federal regulatory requirements. See 130 C.M.R. §450.223 (C)(1);  42 CFR § 438.214.   All conditions of payment under MassHealth regulations, policies and practices are conditions of payment under any provider contracts with MBHP or with an MCO.

36

83.     Moreover, Arbour's contracts with MBHP and the MCOs expressly provided that Arbour was required to comply "with all applicable state and/or federal laws, rules, and/or regulations," including those requiring licensure and supervision related to the provision of mental health services.  In those contracts Arbour agreed that it was responsible for complying with the "professional and legal requirements" within Massachusetts, and that Arbour would be in compliance with "all applicable statutes, regulations, rules, and directives of federal, state, and other governmental regulatory bodies having jurisdiction over it or the provisions of services," as required for MassHealth members.

84.     The general credentialing requirements of MBHP and MCOs expressly condition providers' eligibility for participation in its network on conforming to "all applicable licensing, certification, or other professional standards as set forth in applicable state and federal laws and regulations."  See also 130 CMR §450.223(C)(1).  Through credentialing, MBHP and MCOs ensure that MassHealth beneficiaries receive safe and adequate mental healthcare services performed by qualified and licensed clinicians.

### FACTUAL ALLEGATIONS[7]

85.     UHS is America's largest psychiatric chain and operates more than 200 psychiatric facilities across the country.  UHS treated nearly 450,000 patients last year alone and more than a third of the company's yearly revenue, which totals in the

---

[7] A copy of Yarushka Rivera's medical records documenting her treatment at Arbour Lawrence are attached at Exhibit 1.

billions of dollars, is generated from Medicare and Medicaid patients.  UHS, however,

has embraced a corporate culture that puts profits ahead of patients.  Numerous

reports have surfaced in at least a dozen states that UHS has engaged in a pattern of

healthcare fraud that has placed patients in harm's way.

86.    During the relevant period, all of the Arbour Clinics treated MassHealth

members and a high proportion of each clinic's patient visits (and each clinic's

revenue) was due to treatment of MassHealth members.  According to the

Commonwealth between 2005 through 2013, Arbour Lawrence received over 10

million dollars for the treatment of MassHealth beneficiaries from funds provided by

the Commonwealth and the United States.  In total, during this period, the Arbour

clinics presented claims (and received payments) in excess of $94,000,000 for

providing counseling and medication management to MassHealth members through

MassHealth, MBHP, and other MCOs serving MassHealth beneficiaries.

87.    Relators became aware of UHS's fraudulent activities in Massachusetts as

a result of treatment their daughter Yarushka received at UHS's Arbour Lawrence

clinic.  Yarushka, a recipient of MassHealth insurance benefits, was first referred for

mental health care at Arbour Lawrence in 2004, after she began experiencing

behavioral problems at her middle school.  Yarushka received counseling at Arbour

Lawrence with Anna Cabacoff, a licensed social worker.

88.    In late 2007, however, Relators were informed by Edward Keohan, Arbour

Lawrence's clinical director, that Yarushka needed to be in group therapy with other

children and he transferred her care to Maria Pereyra, who referred to herself as a

"social worker."  In November 2007, Yarushka began receiving "Group Therapy"
counseling with Pereyra.  After several group therapy sessions with Pereyra, and
approximately fifteen other patients, Yarushka complained that she was not
benefiting from the counseling.

89.     Relators met with Keohan, Pereyra's supervisor, and informed him that
they were concerned about the care Yarushka was receiving from Pereyra.  Keohan
told the Relators that they should give Pereyra some more time working with
Yarushka and that Pereyra would provide individual counseling for Yarushka rather
than treating her as part of a group.  Relators and Yarushka agreed with Keohan's
recommendation and Yarushka continued to be treated by Pereyra, but on an
individual basis.

90.     Unfortunately, Yarushka did not improve.  Relators again contacted
Keohan and expressed their concerns regarding Pereyra's treatment of Yarushka and
stated that they would like Yarushka's care to be transferred.  At Relators' request,
Keohan transferred Yarushka's care to Diana Casado.  Like Pereyra, Casado also
referred to herself as a social worker.  She treated Yarushka both in group therapy and
on an individual basis from June 2008 through September 2008.

91.     Unbeknownst to Relators, neither Pereyra nor Casado were social workers
as they had claimed to be.  Furthermore, neither had any professional licensure that
would allow them to provide mental health counseling to children such as Yarushka,
without appropriate supervision.  Neither Keohan, nor any other licensed social

worker, provided any supervision of Pereyra or Casado which was required, given their unlicensed status.

92.    By February 2009, it was clear to Relators that neither Pereyra nor Casado had benefited Yarushka, and Relators asked Keohan to transfer Yarushka's care. Keohan informed Relators that he was going to reassign Yarushka's care to Anna Fuchu, who Keohan represented was a very experienced "doctor" who could help Yarushka.  Fuchu told Yarushka and the Relators that she was a "psychologist," had obtained a Ph.D., and referred to herself as "Dr. Fuchu."  On February 25, 2009, Fuchu met with Yarushka and conducted an Initial Clinical Evaluation that lasted approximately fifteen minutes.  Based on this evaluation, Fuchu formally diagnosed Yarushka as suffering from bipolar disorder, the first time Yarushka had been so diagnosed.

93.    Fuchu provided individual therapy to Yarushka as well as family therapy to Yarushka and her family throughout 2009.  Relators would later learn, however, that Fuchu was not a psychologist and that her application for licensure as such had been denied by the Massachusetts Board of Registration for Psychologists.  Relators would also learn that Fuchu was not supervised by a certified psychologist and that the Arbour clinic did not even employee a certified psychologist who was qualified to supervise.

94.    In May of 2009, Relators were again contacted by school officials and were informed that Yarushka was having trouble interacting with other students at school and would need to be seen by a psychiatrist before she could be readmitted.  Relators

told Fuchu of the school's recommendation and Fuchu referred Yarushka to Maribel

Ortiz of Arbour Lawrence.  Because they had specifically informed Fuchu that

Yarushka needed to be seen by a psychiatrist, and Fuchu referred Yarushka to Ortiz,

Relators believed Ortiz was in fact a psychiatrist and referred to her as "Dr. Ortiz."

95.    On May 6, 2009, Yarushka was evaluated by Ortiz.  After noting that

Fuchu had previously diagnosed Yarushka as suffering from bipolar disorder, Ortiz

prescribed a medication called Trileptal to treat Yarushka's purported bipolar

disorder.  The label on the medication bottle of Trileptal disclosed the name of the

practitioner prescribing the medication as "Dr. Ortiz."[8]  The fact that the prescription

label identified Ortiz as "Dr. Ortiz" reaffirmed Relators' belief that Ortiz was, in fact, a

psychiatrist qualified to prescribe medication.

96.    On May 7, 2009, only one day after beginning Trileptal, Yarushka

experienced significant side effects including headaches, dizziness, and swelling in

her eyes.  Yarushka called Ortiz repeatedly, and left her voicemails describing the

symptoms she was experiencing.  Ortiz never returned Yarushka's messages,

believing that she was merely suffering from "a case of the red eyes."  Due to the

severity of the side effects Yarushka stopped taking the medication.  Ortiz had never

informed Yarushka that suddenly stopping Trileptal was known to cause a significant

risk of experiencing a seizure.  In fact, the FDA has never approved Trileptal to treat

bipolar disorder.

---

[8] A copy of the prescription label is attached at Exhibit 2.

97.    On Wednesday, May 13, 2009, Yarushka, who had no prior history of seizures, suffered a massive seizure and was hospitalized at Lawrence General Hospital.  Yarushka was released from the hospital three days later, and was told that she would have to take anti-seizure medication for the rest of her life.

98.    On May 18, 2009, Relator Escobar called Arbour Lawrence and spoke with an employee who reported to be Ortiz's supervisor.  This employee told Escobar that Ortiz was a nurse, not a psychiatrist.  The following day, Escobar spoke with Keohan and complained about Ortiz's treatment of Yarushka.  Keohan said that he was not aware of the prior repeated phone calls regarding Yarushka's reaction to the Trileptal. He told Escobar that Ortiz was not a psychiatrist but a nurse, who was very young, inexperienced, and "still trying to get her feet wet."

99.    Yarushka continued receiving counseling with Fuchu, whom Relators still believed was a certified and licensed psychologist, over the summer and into the fall of 2009.  In October 2009, Yarushka suffered a fatal seizure while she was alone in her bedroom.

100.    On three separate occasions following Yarushka's death, Cabacoff came to Relators' home to provide counseling to the Relators.  On her final visit, on November 14, 2009, Cabacoff was very critical of the care provided to Yarushka by Arbour Lawrence.  Specifically, Cabacoff told Relators that she was one of the few employees at Arbour Lawrence who was actually licensed to provide mental health counseling, and that unlicensed staff were not "well equipped" to treat teenagers such as

Yarushka.  Cabacoff also informed Relators that Ortiz was not receiving the required supervision during the period of time she treated Yarushka.

101.  Cabacoff's comments only strengthened Relators' suspicions that the Arbour staff that provided treatment to Yarushka were not properly licensed or supervised.  Relators researched state licensing databases and confirmed that Pereyra, Casado, and Fuchu were not licensed to provide mental health care to patients such as Yarushka.  Escobar also confirmed that Dr. Gaticales was not board certified and, accordingly, was not qualified to supervise Ortiz in her prescription of medications to children such as Yarushka.

102.  By 2011 Escobar suspected that the licensing issues at Arbour Lawrence stretched well beyond the clinicians who treated Yarushka.  Escobar delved deeper into his research and obtained a list of Arbour Lawrence employees who were identified both by name and NPI number.  Escobar then took the list of NPI Numbers used by Arbour Lawrence employees and conducted research to verify whether such employees were, in fact, licensed at the level represented to the government when they obtained their NPI numbers.  Escobar confirmed that many Arbour Lawrence employees had obtained NPI numbers identifying themselves as licensed social workers or licensed Mental Health Counselors, although none were in fact licensed by the Commonwealth.

103.  These individuals included:

- Beda Polanco

- Nora Fonseca

- Steven Addison

- Andres Nino

- Carmen Guzman

- Magaly Mercedes

- Alissa Dillon

- Laurence Towler

- Jose Rigueiro

- Yakaira Rigueiro

- Carly Souza

- Reinaldo Betances

- Joseline Gonzalez

- Viridania Valdez

- Hendry Matta

- Shakira Hernandez

- Rosario Paulino

- Natalie Mersha

- Marilyn Raices-Queliz

- Alisha Rousselle

- Meghan Kathryn Knight

- Elizabeth Loomis

**STATE INVESTIGATIONS OF THE STAFFING AT ARBOUR CLINICS
CONFIRMS RELATORS' ALLEGATIONS THAT UHS ROUTINELY PRESENTED
CLAIMS TO MASSHEALTH, MBHP, AND THE MCOS FOR SERVICES
PERFORMED BY INELIGIBLE MENTAL HEALTH CLINICIANS**

104.   Following Yarushka's death, the Massachusetts Division of Professional

Licensure, Office of Investigations ("DPL") and the Massachusetts Department of

Public Health ("DPH") conducted several investigations into the staffing at Arbour's

Lawrence facility and other mental health clinics operated by Arbour.  The findings

made by the various state agencies support Relators' allegations that UHS routinely

provided mental health services to patients by "therapists" who were not licensed, not

properly qualified, and not properly supervised.  Mental health services provided by

these clinicians were not eligible for reimbursement by MassHealth, MBHP, or the

MCOs.

105.   DPL's investigation confirmed Relators' allegations that the Arbour

employees who provided services to Yarushka did so without the proper licensure or

proper supervision.  The Board of Registration of Social Workers entered into a

Consent Decree with Maria Pereyra pursuant to which Pereyra admitted that she had

engaged in the practice of social work at Arbour Lawrence without being licensed to

do so.  The Consent Decree makes clear that Pereyra performed services as a social

worker for Arbour Lawrence patients, including Yarushka, even though she had

failed the licensure examination twice - in 2007 and in 2008.  As part of the Consent

Decree Pereyra agreed to refrain from engaging in the practice of social work until she was properly licensed to do so.[9]

106.   The DPL conducted an investigation into clinical director Edward Keohan relating to his lack of supervision of Pereyra.  Keohan admitted to the Board of Registration of Social Workers that he allowed Pereyra, an unlicensed clinician, to practice social work while he served in a supervisory role at Arbour Lawrence. Keohan agreed to a two year period of supervised probation.[10]

107.   DPL conducted an investigation into Anna Fuchu which revealed that Fuchu had misrepresented that she was in fact a psychologist despite the fact that she was not licensed by the Board of Registration of Psychologists.  The investigation confirmed that Fuchu's application for licensure as a psychologist in Massachusetts had been rejected because the internet college Fuchu attended for her Ph.D. in psychology was not recognized by the Board.[11]  Fuchu ultimately admitted that she practiced psychology without a license and that she represented that she was a psychologist when she was not licensed as such.  Fuchu agreed to refrain from using the title "psychologist" and holding herself out as a psychologist unless she obtained a license.[12]

108.   The DPH's Division of Health Professions Licensure conducted an investigation into Maribel Ortiz's treatment of Yarushka.  On August 17, 2011, Ortiz

---

[9] A copy of the Consent Decree entered into between Pereyra and the DPL is attached as Exhibit 3.
[10] A copy of the Consent Decree entered into between Keohan and the DPL is attached at Exhibit 4.
[11] A copy of the DPL letter rejecting Fuchu's application to practice as a licensed Psychologist in Massachusetts is attached at Exhibit 5.
[12] A copy of the Consent Decree entered into between Fuchu and the DPL is attached at Exhibit 6.

received a letter from DPH's Division of Health Professions Licensure informing her that Dr. Gaticales was not qualified to supervise nurse practitioners prescribing psychiatric medication at Arbour Lawrence because Gaticales was not board certified in psychiatry.[13] Ortiz was ordered to either provide written notice within thirty days that she had secured a new supervising physician or to cease her prescribing practice.

109. On July 2, 2012, after conducting an investigation into Relators' allegations relating to inappropriate licensure, supervision, and core staff compliance issues at Arbour Lawrence and its parent Arbour Malden, DPH issued a report of its findings (the "DPH Report").[14] The DPH Report confirmed Relators' belief that the lack of appropriately licensed and supervised employees extended to other practitioners employed by Arbour Lawrence and Arbour Malden, not just those who provided services to Yarushka.

110. In the course of the investigation, DPH reviewed a case history and documentation of seven unlicensed clinical therapists at Arbour Malden. DPH found that five of the seven sampled therapists did not receive ongoing and documented clinical supervision, as required by both clinic policy and by MassHealth.

111. At Arbour Lawrence, DPH found that all twenty-three of the unlicensed clinicians were not receiving supervision despite the fact that all twenty-three of the clinicians were providing services to patients that required regular supervision. Only three of the twenty-three clinical staff personnel files reviewed by DPH contained any

---

[13] A copy of the Letter to Ortiz is attached as Exhibit 7.
[14] A copy of the DPH Report is attached as Exhibit 8.

documentation evidencing supervision - and these three individuals did not receive clinical supervision on a regular basis as required.  There was no supervision documentation at all for the remaining twenty clinical staff.

112.  As part of its investigation, DPH conducted an interview of Arbour Lawrence's Clinic Director, Edward Keohan.  Keohan admitted that he was "unaware that supervision was required to be provided on a regular and ongoing basis, or that the supervision meetings needed to be documented."  Keohan further admitted that Arbour Lawrence did not have any documentation evidencing any clinical supervision provided to twenty clinical therapists working at Arbour Lawrence prior to January, 2012.

113.  The DPH investigation also confirmed that Arbour Lawrence did not have a board certified psychiatrist on staff, as required.  DPH reviewed Arbour Lawrence's physician's personnel file and credentials which revealed that Dr. Gaticales, the only physician employed by Arbour Lawrence, was not board certified as a psychiatrist.  Gaticales admitted to DPH that she had taken the examination to become a board certified psychiatrist twenty years earlier, but had failed the examination.  When asked if she could produce written documentation of client record reviews, Gaticales was unable to do so.

114.     In response to DPH's findings, Arbour Lawrence submitted a remediation plan that outlines how the clinic intended on remedying the violations

found by the agency.[15]  With respect to supervision of staff, the plan states, "all other clinicians not licensed for independent practice are now set up with individual supervision plans," and that "consistent documented supervision" would be established.  The plan also states that the Office Manager would ensure that "supervision is taking place on a weekly basis when supervisors submit billing/notes."  In addition, the remediation plan calls for the parent Center Director, Andrew Stephens, to "formally evaluate clinicians' supervision plans" and further states that the "Clinical Director will meet with the Supervisors twice a month to monitor the Supervision program."  During these meetings, "supervisors will be required to present documentation of supervision for review."

115.  The remediation plan includes the names of all unlicensed clinicians practicing at Arbour Lawrence, and lists the names of their new supervisors.  Thirteen of these individuals, who UHS acknowledges were all unlicensed, Maria Pereyra, Nora Fonseca, Steven Addison, Andres Nino, Carmen Guzman, Laurence Towler, Joseline Gonzalez, Hendry Matta, Natlie Mersha, Jose Rigueiro, Yakaira Rigueiro, Carly Souza, and Reinaldo Betances, were the same individuals previously identified by Relators as obtaining NPI numbers misrepresenting their level of professional licensure.  Relators were the only source, and the original source, of information that led to the DPH investigation and the issuance of the DPH report.

---

[15] A copy of the Remediation Plan is attached as Exhibit 9.

116.  On August 1, 2013, DPH conducted a follow-up survey to its investigation into Arbour's failure to comply with the supervision requirements.[16]  Despite Arbour's assurances, articulated in the remediation plan, that it would institute internal protocols to ensure compliance with supervision requirements, DPH found otherwise.  The agency reviewed documentation and interviewed staff and found that, well over a year after the initial investigation, Arbour still fell woefully short of the regulatory mark.

117.  DPH interviewed Andrew Stephens, the Clinical Director of Arbour Malden regarding Arbour's supervision policy.  Stephens confirmed that it was the clinic's policy to "provide regular supervision to its clinical staff."  He also stated that unlicensed clinical therapists where to be supervised and that these meetings "were to be documented by supervisors."  DPH reviewed the clinic's supervision records which demonstrated that Arbour Malden was not supervising its unlicensed workers as it had stated in the remediation plan as numerous unlicensed clinicians continued to provide services to patients without appropriate supervision.  For example, DPH found that three out of the seven sampled unlicensed clinical therapists were not supervised as required.

118.  DPH found that Arbour Lawrence's failure to properly supervise its employees was even more egregious.  DPH interviewed Arbour Lawrence's new Clinical Director who stated that she too was aware that supervision was required to be provided on a regular and ongoing basis, and that supervision meetings needed to

---

[16] A copy of the DPH August 1, 2013 survey is attached as Exhibit 10.

be documented.  DPH found that ten clinical therapists at Arbour Lawrence were not receiving the required supervision.  For example, an unlicensed clinical therapist hired on July 25, 2011, required biweekly supervision but had not received any supervision at all since November 15, 2012, a failure to provide any supervision for more than eight months.  Another unlicensed clinical therapist, hired on March 11, 2013, had not received any supervision at all despite requiring weekly supervision.  A third unlicensed clinical therapist hired in August 2011 required weekly supervision but had not received any supervision during the 2013 year.

119.  In 2012, both Arbour's Malden and Lawrence facilities promised to institute an aggressive remediation plan which called for consistent, weekly supervision that would be extensively documented.  The remediation plan promised that all unlicensed clinicians were set up with individual supervision plans and that Arbour Malden's clinical director would personally oversee the supervision process. In the nearly eighteen month period between DPH's initial investigation and its survey conducted in August 2013, both Arbour facilities had completely failed to institute the remedial measures regarding supervision.  Had either facility made any effort at all to institute a compliance review program to ensure that proper supervision was taking place, it would have been readily apparent that the two Arbour facilities were failing to comply with both MassHealth supervision regulations and the remediation plan.  Until DPH conducted its follow up investigation, DPH and all other Massachusetts agencies had no knowledge that Arbour failed to comply with

its own remediation plan and that UHS had no corporate controls in place to insure

that compliance with supervision requirements for unlicensed mental health workers.

120.  Following Arbour's continuing failures, Arbour's CEO, John D. Fletcher, a

licensed psychologist, entered into a Consent Agreement with the Board of

Registration of Psychologists.  On January 27, 2016, Fletcher admitted to sufficient

facts as to a violation of Standard 2.05(2) of the Ethical Principles of Psychologists and

Code of Conduct, a standard which states in relevant part that psychologists who

delegate work to employees, or supervisees "authorize only those responsibilities that

such persons can be expected to perform competently on the basis of their education,

training or experience, either independently or with the level of supervision being

provided."  By admitting to violating this standard, Fletcher acknowledged that he

personally, in his capacity as CEO of Arbour, delegated responsibility for patient care

to individuals who could not be expected to perform competently on the basis of their

education, training or experience.  In short, Fletcher admitted that under his watch

Arbour had allowed unqualified and improperly supervised "therapists" to treat

Arbour's patients.[17]

**UHS CAUSED FALSE CLAIMS TO BE PRESENTED TO MASSHEALTH, MBHP, AND THE MCOs**

**A.     UHS Knowingly Presented False Claims to MassHealth, MBHPs, and MCOs for Services Rendered by Unlicensed Social Workers and Mental Health Counselors who were not Properly Supervised**

---

[17] A copy of the Consent Decree entered into between Fletcher and the DPL is attached as Exhibit 11.

121.  MassHealth, MBHP, and other MCOs serving MassHealth beneficiaries

will not pay claims for mental health services rendered by unlicensed social workers[18]

or mental health counselors who were not properly supervised.  Indeed, the

MassHealth regulations expressly state that only unlicensed social workers who

"provide services under the direct and continuous supervision of an independent

clinical social worker" are qualified to provide mental health services to MassHealth

members.  See § 429.424(C)(2).  Similarly "all unlicensed counselors…must be under

the direct and continuous supervision of a fully qualified professional staff member,"

§429.424(F)(1) in order to provide services to MassHealth members.  The qualifications

and supervision requirements are express conditions of payment, and all MCOs,

including MBHP, must adhere to these qualification and supervision requirements.

*See* 130 CMR §429.441(A). Only through compliance with the qualifications and

supervision requirements could MassHealth be assured that its members were

receiving mental health services delivered by qualified practitioners as opposed to

charlatans.

122.  It is, in fact, easy for a professional mental health organization to

determine if its billing therapists require and are receiving the necessary supervision

before submitting claims on their behalf.  Whether the mental health workers have the

necessary licenses is a matter of public record and can be discerned by a simple web

search.  Whether the worker has received the necessary supervision can be discerned

---

[18] The term "unlicensed social worker" includes all unlicensed clinical therapists and counselors who worked at the Arbour clinics.

by checking the supervision records the organization is required to keep.  If, in fact, a

mental health clinic submits claims on behalf of persons who are not properly licensed

or supervised it is only because the clinic is deliberately violating MassHealth's

qualifications and supervision requirements, or because the organization is

intentionally ignorant or is recklessly disregarding the truth or falsity of the claims it

is submitting.

123.    UHS hires dozens of unlicensed social workers and mental health

counselors to staff its Arbour clinics and readily admits that each of these staff

members should have received direct and continuous supervision and the supervision

should have been documented.  In practice, however, Arbour pays so little attention

to MassHealth's supervision and qualifications requirements that Edward Keohan,

Arbour Lawrence's clinical director, admitted that he was not even aware he was

required to provide such supervision.  Had UHS made even a minimal effort to

comply with MassHealth's qualifications and supervision requirements, its clinical

directors would have at least been aware of the supervision requirements, if not

actually enforcing those requirements.  Keohan's admitted ignorance of the

supervision requirements establishes that as a matter of corporate management, UHS

is wholly indifferent to whether the clinicians at its Arbour clinics have the proper

qualifications or are adequately supervised.

124.  Keohan's obliviousness to the supervision requirements is exemplary of

UHS's corporate attitude towards qualifications and supervision of unlicensed

workers.  The results of the numerous investigations conducted by Massachusetts

state agencies demonstrate that Arbour's practice of permitting unlicensed, unqualified and unsupervised mental health works to treat MassHealth members and then bill for ineligible services went far beyond the employees who treated Yarushka.

125.  The claims UHS presented to MassHealth (through MBHP) for services performed by unlicensed and unsupervised workers Pereyra and Casado are representative. Such claims included the following:

- On November 8, 2007, UHS billed MBHP for Pereyra's initial evaluation of Yarushka under CPT Code 90801 and was paid $111.38.19

- Over the next several months, Pereyra provided counseling services to Yarushka under CPT Codes 90853, the treatment code for Group Therapy.  Each Group Therapy session involved approximately fifteen other patients.

- On November 13, 2007, UHS billed MBHP, for treatment provided to Yarushka by Pereyra, under CPT Code 90853 and was paid $28.46.

- On November 20, 2007, UHS billed MBHP for treatment provided to Yarushka by Pereyra, under CPT Code 90853 and was paid $28.46.

- On December 11, 2007, UHS billed MBHP for treatment provided to Yarushka by Pereyra, under CPT Code 90853 and was paid $28.46.

- On December 18, 2007, UHS billed MBHP for treatment provided to Yarushka by Pereyra, under CPT Code 90853 and was paid $28.46.

---

[19] Billing records relating to the treatment of Yarushka Rivera at Arbour Lawrence are attached at Exhibit 12.

- On January 18, 2008, UHS billed MBHP for treatment provided to Yarushka by Pereyra, under CPT Code 90853 and was paid $28.46.

- On January 2, 2008, UHS billed MBHP for treatment provided to Yarushka by Pereyra, under CPT Code 90806 (treatment code for Individual Therapy) and was paid $81.49.

- On January, 28, 2008, UHS billed MBHP for treatment provided to Yarushka by Pereyra, under CPT Code 90806 and was paid $81.49.

- On June 4, 2008, UHS billed MBHP for treatment provided to Yarushka by Casado, under CPT Code 90847 for family therapy and was paid $42.06.

- On June 23, 2008, UHS billed MBHP for treatment provided to Yarushka by Casado, under CPT Code 90806 for individual therapy and was paid $40.75.

- On September 8, 2008, UHS billed MBHP for treatment provided to Yarushka by Casado under CPT Code 90806 for individual therapy and was paid $41.97.

- On September 15, 2008, UHS billed MBHP for treatment provided to Yarushka by Casado under CPT Code 90806 for individual therapy and was paid $40.75.

- On September 24, 2008, UHS billed MBHP for treatment provided to Yarushka by Casado under CPT Code 90847 for family therapy and was paid $43.32.

126.  Below is a list of current and former UHS employees who provided mental health services to MassHealth members at the Arbour Lawrence Clinic.  UHS subsequently presented claims to MassHealth, MBHP, and other MCOs for these employees' services.  None of the persons identified below were licensed and none of

them were properly supervised by UHS.  All claims UHS presented to MassHealth,

MBHP, and other MCOs for these employees' services were false claims.

| Arbour Facility | Employee's Name | Employment Status | Stated Position | Licensure Status |
|---|---|---|---|---|
| Lawrence | Stephen Addison | Current employee | Mental Health Counselor | Not licensed |
| Lawrence | Reinaldo Betances | Current employee | Mental Health Counselor | Not licensed |
| Lawrence | Eileen Casto | Former employee<br><br>Dates of employment: 5/1/2006-2/1/2011 | Mental Health Counselor | Licensed as of 7/6/2010[20]<br>MA License No.:  7428 |
| Lawrence | Nicolas Cruz | Current employee | Mental Health Counselor | Not licensed |
| Lawrence | Lisa Dinuccio | Former employee<br><br>Dates of employment: 9/21/2007-7/26/2012 | Addiction Counselor | Not licensed |
| Lawrence | Juana Espinosa | Current employee | Mental Health Counselor | Not licensed |
| Lawrence | Nora Fonseca-Zabriskie | Current employee | Mental Health Counselor | Not licensed |
| Lawrence | Carmen Fortuna | Current employee | Mental Health Counselor | Not licensed |
| Lawrence | Joseline Gonzalez | Current employee | Mental Health Counselor | Not licensed |
| Lawrence | Maria Gonzalez | Former employee | Mental Health Counselor | Not licensed |

---

[20] Claims submitted for unsupervised services provided by Ms. Casto prior to her licensure date of July 6, 2010 are false because they violated conditions of payment.

| | | Dates of employment: 8/20/2008-8/17/2012 | | |
|---|---|---|---|---|
| Lawrence | Carmen Guzman | Current employee | Clinical Social Worker | Not licensed |
| Lawrence | Shakira Hernandez-Lara | Former employee<br><br>Dates of employment: 8/1/2009-4/15/2012 | Mental Health Counselor | Not licensed |
| Lawrence | Evelyn Hidalgo | Current employee | Mental Health Counselor | Not licensed |
| Lawrence | Gary Johnson | Former employee<br><br>Dates of employment: 8/3/2009-3/2013 | Mental Health Counselor | Not licensed |
| Lawrence | Meghan Knight | Current employee | Mental Health Counselor | Not licensed |
| Lawrence | Elizabeth Loomis | Former employee<br><br>Dates of employment: 1/2009-9/2012 | Mental Health Counselor | Not licensed |
| Lawrence | Bibiana Lopez | Former employee<br><br>Dates of employment: 2/1998-8/2013 | Senior Outpatient Clinician / Clinical Supervisor | Licensed as a mental health counselor as of 7/16/2009[21] MA License No.: 7104 |
| Lawrence | Maritza Lopez | Current employee | Mental Health Counselor | Not licensed |
| Lawrence | Junice Nunez | Former | Mental Health | Licensed as a |

---

[21] Claims submitted for unsupervised services provided by Ms. Lopez prior to her licensure date of July 16, 2009 are false because they violated conditions of payment.

| | | employee<br><br>Dates of employment: 3/23/2011-8/29/2012 | Counselor | mental health counselor as of 9/30/2014[22] MA License No.:  9109 |
|---|---|---|---|---|
| Lawrence | Norma Ortega | Current employee | Mental Health Counselor | Not licensed |
| Lawrence | Yakaira Rigueiro | Current employee | Mental Health Counselor | Not licensed |
| Lawrence | Jose Rigueiro | Current employee | Mental Health Counselor | Not licensed |
| Lawrence | Jose Rodriguez | Current employee | Mental Health Counselor | Not licensed |
| Lawrence | Alisha Rousselle | Current employee | Mental Health Counselor | Not licensed |
| Lawrence | Carly Souza | Former employee<br><br>Dates of employment: 9/2011-5/2012 | Mental Health Counselor | Received conditional Maine clinical social worker license in 2013[23] ME License No.: MC 13999 |
| Lawrence | Laurence Towler | Current employee | Mental Health Counselor / Clinical Social Worker | Not licensed |

127.  The Arbour Lawrence clinic knowingly employed people who were not qualified to provide services independently.  UHS was required to obtain information about each potential therapist's qualifications during the hiring process, and for those who were not qualified to provide services independently, UHS was obligated to

---

[22] Claims submitted for unsupervised services provided by Ms. Nunez during her UHS employment from 2011 through 2012 are false because she was not licensed or supervised at that time.

[23] Claims submitted for unsupervised services provided by Ms. Souza during her UHS employment from 2011 through 2012 are false because she was not licensed or supervised at that time.

provide direct and continuous supervision.  Having no policies in place to provide

such supervision and not even informing its clinical directors of the supervision

requirements, UHS knowingly failed to comply with a condition precedent to

presenting claims to MassHealth, MBHP, and MCOs for payment for its clinicians'

services.

128.  Even after DPH issued statements of deficiencies to several Arbour

Counseling centers for noncompliance with staffing and supervision regulations,

Arbour Counseling continued to violate those regulations.

129.   As a result of the pervasive culture of noncompliance, UHS, through the

Arbour Counseling centers, deliberately submitted false claims to MassHealth, MBHP,

and MCOs for reimbursement, or at least recklessly disregarded the truth or falsity of

the claims it presented.

130.  At no time relevant to this action was MassHealth aware of the deficient

conduct of the UHS entities. DPH, DPL, and DPPC did not provide MassHealth with

information about the violations they had discovered at any of the named centers, nor

would it have been consistent with ordinary practice for them to do so.  The

Commonwealth informs us that each agency independently conducts inspections and

issues reports in furtherance of its own mandate, but they do not routinely share

results of particular violations or enforcement actions with MassHealth, MBHP, or

MCOs.

131.  MBHP reimbursed UHS for services provided to Yarushka because

Arbour attested that her treating social workers and mental health counselors were

properly credentialed.  If MBHP had known that unlicensed social workers and

mental health counselors were not qualified to provide services and not properly

credentialed, it would not have authorized payment for services provided by these

clinicians.

132.  If not for UHS's false statements in their credentialing and recertification

reports for social workers and mental health counselors MBHP would not have

reimbursed claims provided by unlicensed and unqualified clinicians for Yarushka

and all other MassHealth beneficiaries.

133.  Had UHS provided truthful information about the licensure,

qualifications and supervision of the persons who provided the services being billed

for MassHealth, MBHP, and MCOs would not have paid the claims; the claims would

have been disqualified by the payors' internal systems.

**B.    UHS Presented False Claims to MassHealth, MBHP, and the MCOs for Medication Management and Prescription Medications Prescribed by Psychiatric Nurses who were not properly Supervised by a Qualified Psychiatrist**

134.  MassHealth, MBHP, and the MCOs will not pay for prescriptions written

by a person who is not authorized to issue prescriptions under Massachusetts law.

Although some psychiatric nurses are eligible to write prescriptions, they may not do

so unless they are supervised by a psychiatrist who meets all of the requirements of a

"supervising physician" under 243 CMR 2.10(3), including having "completed

training in psychiatry approved by the ACGME or the RCPSC, or be Board

certified in psychiatry."  By knowingly failing to employ a properly credentialed

psychiatrist to adequately supervise psychiatric nurses, UHS failed to comply with this condition of reimbursement.  Further, because Arbour Lawrence's clinical director failed to employ adequate psychiatric staff to meet the psychopharmacological needs of Arbour Lawrence's patients, UHS failed to comply with an express condition of payment for services provided by a satellite facility.  *See* 130 CMR 429.439(C) and 130 CMR 429.423(B).

135.  The only psychiatrist employed by Arbour Lawrence at the relevant time, and the only psychiatrist charged with supervising staff and patient care, was Dr. Gaticales.  Dr. Gaticales was not a board certified psychiatrist, at no relevant time was applying for certification, and did not otherwise meet the requirements to be a qualified "supervising physician" under Massachusetts law.  In August 2010 she admitted to investigators from the Massachusetts Disabled Persons Protection Commission that she did not meet the requirements of being a "supervising physician" under Massachusetts law.  Moreover, Dr. Gaticales has also admitted that she failed to provide direct supervision to Maribel Ortiz or any other psychiatric nurse at Arbour Lawrence who prescribed medications to MassHealth patients.

136.  Whether a psychiatrist has the credentials to lawfully supervise prescribing psychiatric nurses is a matter that can easily be determined by the most rudimentary mental health clinic, much less a clinic owned and operated by a company with the resources of UHS.  This type of credentials check is routine for any health care organization that retains physicians and licensed medical professionals.  Whether a psychiatrist is board certified is a matter of public record and can be

62

verified by a quick web search.  If, in fact, a mental health clinic allow psychiatric

nurses to be supervised by an unqualified psychiatrist, it is only because the clinic is

deliberately violating Massachusetts law, or because the clinic is either deliberately

ignorant of the requirements for psychiatric nurse supervision or recklessly disregards

those requirements.

137.  At the time UHS billed MBHP for prescription medication services

rendered to Yarushka, Maribel Ortiz was not supervised by a board certified or board

eligible psychiatrist and was therefore ineligible to bill MassHealth for the services she

provided.

138.  A representative false claim for prescription counseling presented by UHS

is the May 6, 2009 claim to MassHealth (through MBHP) for services rendered to

Yarushka by Ortiz under CPT Code 99404 (preventive medication counseling).  MBHP

paid UHS $120.36 on account of that claim.  This claim for payment and all of UHS's

claims for reimbursement to MBHP for Ortiz's provision of medication counseling at

Arbour Lawrence were false claims.

139.  Ortiz was not the only UHS nurse who did not receive proper

supervision.  Teresa Ferris, a psychiatric nurse practitioner at Arbour Lawrence and

Ellen Peterson, a Nurse Practitioner at Arbour Lawrence also wrote prescriptions and

UHS submitted claims medication management claims (CPT code 90862) for their

services.  Ferris and Peterson were also supposed to be supervised by Dr. Gaticales,

and any claims submitted to MassHealth, MBHP, or the MCOs during this period in

connection with these nurses prescribing to MassHealth members were also false.

Indeed, any claims for medication management by any Arbour Lawrence psychiatric nurse during this period were false claims.

C.   **UHS Falsely Presented Claims to MassHealth, MBHP, and the MCOs for Services Rendered to MassHealth Patients that were Performed by an Unlicensed, Unsupervised, and Unqualified Psychologist**

140.   MassHealth, MBHP, and the MCOs will not pay for services rendered by a psychologist who is not licensed, unless she is acting under the direct and continuing supervision of a psychologist who has the proper qualifications.  130 CMR §429.424(B)(1);  §429.441.  Arbour Lawrence violated this express condition of payment because the facility did not employ a single psychologist who met MassHealth's licensing requirements.  Ana Fuchu was the only psychologist employed as Arbour Lawrence.   She did not have the required licensure and there was no properly licensed psychologist to supervise her.

141.   A mental health center can easily and quickly determine whether a psychologist is licensed.  This is a matter of public record and can be readily discerned by a quick search of the Commonwealth's licensing web site.  Organizations that make the slightest effort at checking qualifications and licenses perform such a check at the time they hire the psychologist and this type of credentials check is routine.  If, in fact, a mental health clinic billed MassHealth, MBHP, or the MCOs for the services of an unlicensed psychologist, it can only be because the clinic is deliberating violating MassHealth's licensing, qualifications and supervision requirement, or because the clinic is either deliberately ignorant of the licensing and supervision requirements for psychologists or recklessly disregards those requirements.

64

142.   MassHealth, MBHP, and the MCOs would only have paid for the services Fuchu rendered if Fuchu was either appropriately licensed or appropriately supervised by a licensed psychologist who was.  She was neither.  The resulting claims UHS submitted to MassHealth for services rendered to Yarushka by Fuchu were therefore false claims.

143.   Representative bills UHS presented to MassHealth (through MBHP) for the therapy sessions Fuchu provided, and payments UHS received on account of those false claims include

- On February 25, 2009, UHS billed MBHP for Fuchu's Initial Clinical Evaluation of Yarushka under CPT Code 90801 and was paid $281.46.

- On March 16, 2009 UHS billed MBHP for Individual Therapy rendered to Yarushka by Fuchu, under CPT Code 90806.  UHS was paid $81.49 for this session.

- On March 30, 2009 UHS billed MBHP for Individual Therapy rendered to Yarushka by Fuchu, under CPT Code 90806.  UHS was paid $81.49 for this session.

- On April 20, 2009, UHS billed MBHP for Individual Therapy rendered to Yarushka by Fuchu, under CPT Code 90806.  UHS was paid $81.49 for this session.

- On June 29, 2009, UHS billed MBHP for Individual Therapy rendered to Yarushka by Fuchu, under CPT Code 90806.  UHS was paid $81.49 for this session.

- On July 13, 2009, UHS billed MBHP for Individual Therapy rendered to Yarushka by Fuchu, under CPT Code 90806.  UHS was paid $81.49 for this session.

- On July 27, 2009, UHS billed MBHP for Individual Therapy rendered to Yarushka by Fuchu, under CPT Code 90806.  UHS was paid $81.49 for this session.

- On September 8, 2009, UHS billed MBHP for Individual Therapy rendered to Yarushka by Fuchu, under CPT Code 90806.  UHS was paid $81.49 for this session.

- On September 24, 2009, UHS billed MBHP for Individual Therapy rendered to Yarushka by Fuchu, under CPT Code 90806.  UHS was paid $81.49 for this session.

- On May 6, 2009, UHS billed MBHP for family therapy rendered to Yarushka and her family under CPT Code 90847.  UHS was paid $84.12 for this session.

- On August 5, 2009, UHS billed MBHP for family therapy rendered to Yarushka and her family under CPT Code 90847.  UHS was paid $84.12 for this session.

- On June 15, 2009, UHS billed MBHP for family therapy rendered to Yarushka and her family under CPT Code 90847.  UHS was paid $84.12 for this session.

- On October 26, 2009, UHS billed MBHP for family therapy rendered to Yarushka and her family under CPT Code 90847.  UHS was paid $84.12 for this session.

144.  Fuchu was not the only UHS psychologist to bill MassHealth, MBHP, or MCOs for services without the required supervision or licensure.  Andrew Nino, a

psychologist/clinical social worker at Arbour Lawrence, and Dulce Fiore, a

psychologist/mental health counselor at Arbour Lawrence, both provided

psychological services to patients despite the fact that they were not licensed or

supervised as required by § 429.424 (B)(2)(c).  All claims UHS presented to

MassHealth, MBHP, or the MCOs for the mental health services provided by these

two clinicians were also false claims.

D.    **UHS Falsely Presented Claims to MassHealth, MBHP, and the MCOs for Services Rendered to MassHealth Patients that were Performed by an Unqualified and  Unsupervised Psychiatrist**

145.  MassHealth, MBHP, and the MCOs will only pay for mental health

services provided by a psychiatrist when that clinician meets the qualifications of 130

CMR §429.424(A)(1), or is directly supervised by a psychiatrist who has such

qualifications.  MassHealth's qualifications and supervision requirements are express

conditions of payment, and all MCOs, including MBHP, must adhere to these

qualification and supervision requirements.  *See* 130 CMR §429.441(A).

146.  Whether a psychiatrist meets MassHealth's qualifications requirements

can be easily ascertained by mental health clinic that makes the slightest effort to

comply with the regulatory requirements.  Whether a psychiatrist is board certified is

a matter of public record and is ordinarily ascertained immediately upon hiring.

Whether a non-board certified psychiatrist is receiving direct supervision should be

easily ascertainable from the supervision records a mental health facility is required to

keep.  Where, however, a psychiatrist is not board certified and the mental health

clinic has no other psychiatrists on staff, it is readily apparent that the single

psychiatrist employed by the mental health clinic is not qualified, and bills for his or her services cannot be submitted to MassHealth.  A mental health clinic which presents bills to MassHealth, MBHP, or the MCOs for its unqualified and unsupervised psychiatrist is either deliberately submitting false claims, or is deliberately ignorant of, or has recklessly disregarded, the truth or falsity of the claims it has presented.

147.  At Arbour Lawrence Dr. Gaticales was the only psychiatrist on staff during the relevant period.  As described above, she was not board certified or otherwise qualified under §429.424(A).  As she was the only psychiatrist at these clinics, she was also not supervised by a fully qualified psychiatrist.  Gaticales also provided services at Arbour Malden.  Upon information and belief, however, her work at Arbour Malden was not supervised by a qualified psychiatrist.

148.  Upon information and belief, UHS presented claims to MassHealth, MBHP, and the MCOs for psychiatric services Gaticales provided to MassHealth members at Arbour Lawrence.  All of those claims were false claims because UHS could not lawfully bill for unsupervised mental health services provided by Gaticales.

### COUNT ONE
### 31 U.S.C. § 3729(a)(1)(A)
### False Claims

149.  Relators incorporate each of the preceding paragraphs by reference as if set forth herein.

150.  Either with actual knowledge or in deliberate ignorance or reckless disregard of the truth, Defendants presented or caused to be presented false claims to

the United States for payment from MassHealth, MBHP, and the MCOs in violation of

31 U.S.C. § 3729(a)(1)(A).  These claims were false claims because they were for mental

health services which were ineligible for reimbursement because the Defendants

misrepresented compliance with MassHealth regulations which are conditions of

payment.

151.  These claims, therefore, were ineligible for payment by MassHealth,

MBHP or the MCOs.  These misrepresentations were material as that term is defined

in the False Claims Act and interpreted by the courts.  See, e.g., Universal Health

Servs., Inc. v. United States, 136 S. Ct. 1989, 2002-04 (2016); United States ex rel.

Escobar v. Universal Health Servs., Inc., 842 F.3d 103, 111 (1st Cir. 2016).

152.  As a result of the Defendants' misconduct the United States has incurred

damages through payment of false claims, including payment for mental health

services by unsupervised and unlicensed UHS employees.

153.  The Defendants are jointly and severally liable to the United States under

the False Claims Act for treble damages, in an amount to be determined at trial, plus a

civil penalty of $5,500 to $10,000 for each false claim they presented and caused to be

presented for payment.

### COUNT TWO
### Massachusetts False Claims
### M.G.L. c. 12 § 5(B)(1)

154.  Relators incorporate each of the preceding paragraphs by reference as if

set forth herein.

155.  Either with actual knowledge or in deliberate ignorance or reckless disregard of the truth, Defendants presented or caused to be presented false claims to the Commonwealth of Massachusetts for payment from MassHealth, MBHP, and the MCOs in violation of M.G.L. c. 12 § 5(B)(1).  These claims were false claims because they were for mental health services which were ineligible for reimbursement because the Defendants misrepresented compliance with MassHealth regulations which are conditions of payment.

156.  As a result of the Defendants' misconduct the Commonwealth has incurred damages through payment of false claims, including payment for mental health services by unsupervised and unlicensed UHS employees.

157.  Pursuant to M.G.L. c. 12 § 5B(9), the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim presented or caused to be presented by the Defendants.

## CONCLUSION

158.  WHEREFORE, the Relators, on behalf of the United States and the Commonwealth of Massachusetts hereby prays that after a trial, this Court:

1.  Enter judgment holding UHS liable for a civil penalty of $11,000 for each violation of the False Claims Act committed by UHS;

2.  Enter a judgment against UHS for three times the amount of damages sustained by the United States because of the acts of UHS;

3. Enter judgment holding UHS liable for the maximum civil penalties permitted
   for each violation of the Massachusetts False Claims act as pled herein;

4. Enter judgment against UHS for the damages sustained by the Commonwealth
   of Massachusetts because of the acts of UHS described herein, multiplied, as
   permitted under the Massachusetts False Claims Act;

5. Award the Relators a percentage of the proceeds of the action in accordance with
   31 U.S.C. § 3730;

6. Award the Relators a percentage of the proceeds of recoveries under the
   Massachusetts False Claims Act;

7. Award the Relators their costs and reasonable attorneys' fees for prosecuting this
   action; and

8. Enter such other relief which the Court finds just and equitable.


**PLAINTIFFS/RELATORS DEMAND A TRIAL BY JURY ON ALL COUNTS**


Dated: February 21, 2018          /s/ *Thomas M. Greene*
                                  Thomas M. Greene (BBO #210020)
                                  tgreene@greenellp.com
                                  Michael Tabb (BBO #491310)
                                  matabb@greenellp.com
                                  Tucker D. Greene (BBO #682943)
                                  tucker.greene@greenellp.com
                                  **GREENELLP**
                                  One Liberty Square, Suite 1200
                                  Boston, MA 02109
                                  (617) 261-0040

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 21, 2018 this document (filed through the ECF system) was sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated: February 21, 2018                                      */s/ Thomas M. Greene*
                                                              Thomas M. Greene