# CODING CONTINUUM, INC.

### Expert Report
### Prepared By Christina Melnykovych, BS, RHIA, CFE, AHFI
### November 8, 2018

**Re:** *United States of America and Commonwealth of Massachusetts ex rel. Julio Escobar and Carmen Correa, Administratrix of the Estate of Yarushka Rivera v. Universal Health Services, Inc., UHS of Delaware, Inc., and HRI Clinics, Inc.* **11-CV-11170-DPW**

## I.    Introduction and Professional Background

In August 2018, McDermott Will & Emery LLP ("Counsel") retained the services of Christina Melnykovych of Coding Continuum, Inc. ("CCI"), to conduct an independent assessment in the aforementioned matter.  The purpose of CCI's engagement was to review regulatory language and other documents in response to Plaintiffs' Sixth Amended Complaint and the Complaint in Intervention of the Commonwealth of Massachusetts, and to formulate opinions as more fully set forth below on the following four issues:

1. Whether supervision of unlicensed [clinical] staff at the Arbour Lawrence clinic was consistent with regulatory standards.
2. The extent to which the supervision of the Arbour Lawrence clinic's unlicensed [clinical] staff was a factor in payment decisions of the relevant payers, if at all.
3. If the trier of fact were to find a violation of the supervision requirements, the extent to which the lack of supervision impacted the value of the services provided, if at all.
4. Whether the Arbour Lawrence clinic was required to have a designated on-site Medical Director.

This report summarizes my findings and offers my expert opinions.  Documents that I considered to formulate my opinions include date-sensitive regulatory language, deposition transcripts, exhibits, and other documents provided by Counsel.  A list of documents relied upon by me are attached hereto as Appendix A.

CCI is a nationally recognized consulting firm based in Tucson, Arizona.  Founded in 2000, CCI provides a variety of services, all of which are directly related to the management of health information and revenue cycle functions.  They include vulnerability assessments, detailed medical coding and billing compliance reviews/audits, operational assessments, internal investigations, documentation reviews, and other client-requested services pertaining to the management of health information and revenue cycle operations.  CCI also conducts self-disclosure audits for providers/practitioners who identify problems resulting in potential overbilling to Federal health benefit programs.  Providers/practitioners voluntarily disclose information to the Health and Human Services ("HHS") Office of Inspector General ("OIG"), including the estimated amount of overpayments that must be returned.

In addition to its work for the provider community, CCI provides litigation support services to both plaintiffs and defendants.  It provides expert testimony and consulting services to parties in matters pertaining to allegations of improper medical coding and/or billing.  Its experts have been qualified in both civil and criminal cases.  CCI clients include the U.S. Department of Justice ("DOJ"), including offices of the United States Attorney and Federal Bureau of Investigation ("FBI"), state Attorneys General ("AG"), some of the largest insurance carriers/health plans in the United States, and nationally-recognized law firms.  In addition to its expansive work for the DOJ, CCI also functions as an Independent Review Organization ("IRO"), conducting independent reviews for a number of clients who are operating under Corporate Integrity Agreements ("CIAs") pursuant to settlements with HHS-OIG.

CCI's coding/auditing consultants have extensive experience evaluating the accuracy of ICD-9-CM/ICD-10-CM/PCS, CPT® (including Evaluation and Management ["E/M"] codes), HCPCS, and modifier use.  They are well acquainted with coding rules and conventions as well as guidelines regarding proper use of specific nomenclatures, reimbursement methodologies such as MS-DRGs, APCs, CMGs, RUGs, and Federal/State claims submission requirements.  Most are dually-credentialed by the American Health Information Management Association ("AHIMA") and the American Academy of Professional Coders ("AAPC").  CCI consultants have diverse backgrounds that include healthcare fraud examination and investigation, compliance, clinical practice, education, healthcare administration, health information management, clinical documentation improvement, revenue cycle operations, contracting, reimbursement analysis, and cost report preparation.

CCI's work for the provider community (including forensic audits and investigations, as well as operational assessments) includes engagements with large academic medical centers, community hospitals, large and small practice groups, and individual providers.  Engagements frequently include baseline and compliance audits, education, vulnerability assessments, ongoing monitoring, and comprehensive pre- and post-payment reviews.  CCI's services are customarily associated with compliance program initiatives, defense audits and litigation support for both plaintiffs and defendants.  CCI has also conducted educational programs for its clients whose express purpose has been to provide general and individualized education on coding principles and applications, guidelines, regulatory requirements, medical necessity, and appropriate use of electronic health records ("EHRs").

## II.      Project Manager

### Christina Melnykovych, BS, RHIA, CFE, AHFI

I am the President and CEO of CCI.  I am a health information management professional, having received my Bachelor of Science degree in Health Information Management from the University of Kansas in 1982.  I passed the AHIMA Registered Health Information Management ("RHIA") examination and was credentialed as an RHIA.  I have maintained my AHIMA membership and credentialed status since 1982.  I am also a member of the AAPC, the Health Care Compliance Association ("HCCA"), the Association of Certified Fraud Examiners ("ACFE"), and the National Health Care Anti-Fraud Association ("NHCAA").  I am also a Certified Fraud Examiner ("CFE") and Accredited Health Care Fraud Investigator ("AHFI").

I have managed health information management, patient financial services, quality improvement, case and utilization management, social work, and disease management departments in quaternary, tertiary and community hospital settings.  Since 1983, my responsibilities have included revenue cycle department operations at large teaching facilities and community hospitals, including hospital-owned practice locations.  I served as the primary point of contact for contracted review organizations both prior to and after the inception of Medicare's Payment Error Prevention Program (Hospital Payment Monitoring Program).  While employed in the provider community, I served on Corporate Compliance Committees and was the primary point of contact for outside counsel on matters pertaining to organizational compliance.

In my capacity working for the Veteran's Administration ("V.A.") and Valley Medical Center in Washington State, as the Medicare Part B contract administrator for the State of Washington, the Director of Health Information and Outcomes Management in Arizona, and the President and CEO of Coding Continuum, Inc., I have had extensive experience with regulatory compliance issues, both at the Federal and State level.  At the inception of my career as an RHIA, it was imperative that I understand Medicare's new Diagnosis Related Group ("DRG") prospective payment system model and its associated regulatory language.  I provided physician education on the topic and was the primary point of contact for ongoing reviews performed by the local Peer Review Organization ("PRO") that conducted routine audits of clinical records at St. Luke's Hospital in Kansas City, Missouri, where I worked as the DRG Control Manager.

My role as the Section Chief of Medical Information Services in Seattle required that I fully understand and apply policy language unique to the V.A., as well as Joint Commission accreditation standards. As the Acting Chief of Ward Administration and Chief of Medical Information Services, I was directly involved in administering and assuring adherence to policies addressing responsibilities of ancillary staff on patient care units and those that pertained to operations of both sections.  I also conducted reviews of Soldiers' Homes operated by the V.A. that were located outside of the Seattle metropolitan area.  The V.A. operated a Mental Hygiene Clinic as well as inpatient psychiatric units.  It was incumbent on me to ensure that policies related to documentation and management of health information for mental health and substance abuse were strictly adhered to.

As the Director of Medical Records and Patient Accounts at Valley Medical Center, I was directly responsible for on-site surveys, particularly those associated with health record and billing reviews by the Washington State Department of Social and Health Services ("DSHS") and the PRO.  Any on-site visits in association with complaints necessitating access to clinical records were coordinated and managed by me.  I was required to understand billing and payment policies for Federal, State and commercial payers and to respond to issues arising from the submission of claims to those entities.

As Vice President, Medicare Part B, for the State of Washington, I administered the Medicare Part B contract.  My responsibilities included claims processing, appeals, fair hearings, program integrity (*i.e.* fraud and abuse), medical and utilization review, coverage, Medicare secondary payer, Medicare IT, and provider relations.  I was the principal point of contact for communications with the Seattle Regional Office of the HHS OIG for purposes of case referrals

for further investigative follow-up.  During my tenure with Medicare, I was responsible for implementation of Physician Payment Reform and the education of 20,000 providers in Washington State regarding changes to payment policy.  I was also required by CMS (at that time the Health Care Financing Administration or "HCFA") to address its requirements for shared systems use by its contractors.  This resulted in the company being accorded a contract to convert State of Montana Part B operations to our IT system, including all claims processing functions.

At University Medical Center ("UMC") in Tucson, AZ, I was responsible for directing administrative, financial and clinical activities.  Arizona's Health Care Cost Containment System ("AHCCCS") is considered to be one of the most innovative and progressive Medicaid systems in the United States.  In addition to fee-for-service payment, AHCCCS contracts with numerous Managed Care Organizations ("MCO") for services to its Members.  I was directly responsible for ensuring that health records were maintained in accordance with State requirements and that University Medical Center billed compliantly to Medicare, AHCCCS and commercial payers.  I was on the Compliance Steering Committee and, prior to the appointment of a Compliance Officer, I was the principal point of contact for outside Counsel for compliance-related matters.  During my tenure, I was responsible for a major system upgrade to UMC's Patient Financial Services ("PFS") patient registration, billing and collection system.

As a teaching facility, UMC enjoyed a close relationship with a large practice group, University Physicians, Inc. ("UPI") and the University of Arizona's College of Medicine.  I worked closely with UPI's CEO, department and section chiefs, and directors when the organization prepared for National Committee for Quality Assurance ("NCQA") accreditation, including addressing implementation of the Healthcare Effectiveness Data and Information Set ("HEDIS").  In my capacity, I worked closely with the Department of Psychiatry on a number of projects and was responsible for accurate billing associated with UMC's exempt status psychiatric unit.

Because of my background and experience with regulatory requirements, I was asked to assume responsibility for UMC's Quality Management Department in advance of the Joint Commission on Accreditation of Healthcare Organization ("JCAHO") survey, including its addition of performance improvement ("IOP" or "PI") standards to its survey process.  I was also asked to assume responsibility for Case and Utilization Management, Social Work and development of disease management programs, including programs for the management of diabetes and wound care.  When CMS announced implementation of its Outpatient Prospective Payment System ("OPPS") model, I provided education to thousands of employees at UMC, largely because of my regulatory background and intimate acquaintance with regulatory policy articulated in the OPPS Final Rule in the Federal Register.

During the course of eight years with UMC, I was a point of contact for AHCCCS audits, Condition of Participation ("COP") surveys and JCAHO (now "Joint Commission") surveys.  When UMC acquired several UPI clinics and converted them to provider-based clinics, I was part of the integration team to ensure that compliant coding and billing of facility and professional component fees occurred.  Because UMC was a "teaching facility" with residency programs, I was relied upon for consultation pertaining to supervision standards for attending

**CODING CONTINUUM, INC.**

physicians.  I was also consulted regarding use of nonphysician practitioners ("NPPs") in freestanding and provider-based clinic settings and correct application of "incident to" regulatory requirements.

Since founding CCI, I have worked directly with numerous jurisdictional offices of the DOJ, as well as the DOJ in Washington, DC.  The majority of work I perform is related to civil false claim matters, and in connection with those matters I have worked both with Federal and State governments and with law firms representing relators.  In addition, I have worked with AG offices in several jurisdictions and I am a retained expert in criminal (Medicaid) matters pertaining to the operation of a Suboxone clinic and one pertaining to allegations of improper billing of pharmacologic management in conjunction with individual psychotherapy services.

CCI routinely works on cases that concern claims that have been presented to fee-for-service Medicare, Medicaid and Tricare programs and Medicare Part C program claims. CCI has conducted large audits of Medicare Part C documentation to address proper coding and classification of diagnoses submitted by health plans administering Part C benefit programs.

Our client case load is very diverse and includes work pertaining to outpatient hospital, freestanding clinic, inpatient, Partial Hospitalization Program ("PHP"), home health, hospice, long term acute care ("LTAC"), Durable Medical Equipment ("DME"), Independent Rehabilitation Facility ("IRF"), emergency room, urgent care, freestanding diagnostic, skilled nursing home ("SNF"), and other health care services.  We have evaluated issues related to dual-eligibility and state-funded Medicaid services.  The subject matter varies and is frequently based on alleged violations of specific language contained in the Code of Federal Regulations ("CFR"), state statutes or regulations, Tricare, or commercial payer policies.

In addition to being a retained consultant and expert by DOJ and AG, I work with counsel for defendants who have come under scrutiny by Federal, State or commercial payers.  I have been engaged as an expert by firms that provide services to welfare plans, including preauthorization, claims processing and payment, and special investigations.  Our company has a reputation for independence and providing unvarnished opinions regarding allegations.  I conduct my work impartially and without prejudice.  As an RHIA, CFE and AHFI, it is critical that I maintain the ethical standards of each professional organization that has accorded me credentials.

During the course of my career, I have been asked on numerous occasions to present information regarding coding and billing compliance at national, regional and local seminars.  I have spoken at conferences sponsored by DecisionHealth, HCPro, American Healthcare Radiology Administrators, AHIMA, and AAPC.  I have been interviewed by *Modern Healthcare, Briefings on APCs* and *Radiology News*.  I have provided technical expertise to the American Healthcare Radiology Administrators' *Link Coding Q & A* and have served on the advisory boards of HCPro's *APC Answer Letter* and CCH's *Compliance Edge*.  I have taught the Compliance and Documentation chapters of the AAPC Professional Coders ("PMCC") curriculum.

As I indicated above, I have been asked to provide expert witness services on numerous occasions during the course of the last eighteen years.  I have been retained by counsel for both

providers and payers (including government payers) and have testified regarding coding, accuracy rates, indicia of fraud, payer policies and regulations, and the propriety of clinical documentation.  A list of my deposition and trial testimony within the past four years is attached hereto as Appendix B.

For purposes of this engagement, I personally reviewed Plaintiffs' Sixth Amended Complaint and the Complaint in Intervention of the Commonwealth of Massachusetts, as well as the aforementioned documents and those listed on Appendix A.

CCI's general rate for services in this matter is $215.00 per hour.  Expert testimony is billed at a flat rate of $3,200.00 per day for the first eight hours and $400.00 per hour for every hour thereafter.  Preparation of expert reports is billed at a rate of $400.00 per hour.  CCI's fees are not contingent on the outcome of this lawsuit.  A copy of my resume is attached hereto as Appendix C.

## III.   Background Information

### Medicaid

The Medicaid program was authorized by Title XIX of the Social Security Act, and signed into law in 1965.  The entitlement program is Federal and State-funded and pays for services to low-income individuals or families.  It is the largest funding source of healthcare benefits for America's impoverished populations.  Effective 2014, the Affordable Care Act ("ACA") provided states the option to expand Medicaid coverage, with full Federal funding for three (3) years, to individuals under age 65, in families whose income is below 133% of the Federal Poverty Level ("FPL").[1]

In 1997, the Children's Health Insurance Program ("CHIP") was signed into law.  The Balanced Budget Act ("BBA") of 1997 provided $40 billion in Federal funding to children who would otherwise be uninsured.  States receive Federal matching funds to provide healthcare coverage to children in families with incomes too high to qualify for Medicaid, but for whom private coverage is not affordable.[2]

Unlike the Medicare program, program eligibility is established by individual states. According to a report issued in 2009 by the Office of the Actuary, Centers for Medicare and Medicaid Services ("CMS"), Department of Health and Human Services ("HHS"), "Medicaid policies for eligibility, services, and payment are complex and vary considerably, even among States of similar size or geographic proximity.  Thus, a person who is eligible for Medicaid in one State may not be eligible in another State, and the services provided by one State may differ considerably in amount, duration, or scope from services provided in a similar or neighboring State.  In addition, State legislatures may change Medicaid eligibility, services and/or reimbursement at any time."[3]

---

[1] https://www.healthcare.gov/medicaid-chip/medicaid-expansion-and-you/
[2] *Brief Summaries of Medicare & Medicaid, Title XVIII and Title XIX of the Social Security Act,* as of November 1, 2009, Office of the Actuary, Centers for Medicare and Medicaid Services, Department of Health and Human Services, p. 18
[3] *Ibid*, p. 18

In addition to Medicaid programs, most States have solely State-funded programs to address populations which do not qualify for Medicaid coverage.  These programs do not receive Federal funding.

Since the inception of the Medicaid program, fee-for-service payments have been largely replaced with managed care programs, whose goal is to reduce costs while providing greater access to healthcare for Medicaid enrollees.  In many States, the number of contracted Managed Care Organizations ("MCOs") administering Medicaid programs far exceeds traditional fee-for-service payment.  The proliferation of MCOs creates its own set of challenges for providers who wish to participate in the Medicaid program and MCO health plans.  Customarily, each health plan has its own provider manual, individual and organizational credentialing requirements, clinical, and administrative policies.  In addition, contracts may be terminated, resulting in significant impact on providers and health plan beneficiaries.

The Medicaid program has experienced significant growth in expansion of coverage and expenditure of resources, including in the area of behavioral health.  According to the University of Michigan School of Public Health Behavioral Health Workforce Research Center, as a result of the ACA and the Mental Health Parity and Addiction Equality Act ("MHPAEA") of 2008, "behavioral health benefits have been expanded to approximately 60 million Americans."[4]  In its 2016 report, "Understanding Billing Restrictions for Behavioral Health Providers" it states, "Medicaid is the single largest payer for mental health services".[5]  Moreover, "the Health Resources and Services Administration ("HRSA") reports that more than 7,800 mental health professionals are needed to address the lack of behavioral health services in the nearly 3,700 workforce shortage areas throughout the country."[6]  According to the Center, "nearly 1 in 5 Americans [live] with a behavioral health condition in a given year" and "approximately 1 in 25 adults experience a serious mental illness that substantially interferes with or limits one or more major life activities."[7]

## A.    Relevant Massachusetts Government Agencies and Related Entities

There are a number of Massachusetts agencies and other entities involved in this matter which are addressed in various parts of my report.  A description of those agencies and entities is incorporated below:

### Massachusetts Executive Office of Health and Human Services ("EOHHS")

"The Executive Office of Health and Human Services is the largest secretariat in state government and is comprised of 12 agencies, in addition to 2 soldiers' homes and the MassHealth program.  Our efforts are focused on the health, resilience, and independence of the one in four residents of the Commonwealth we serve.  Our public health programs touch every

---

[4] *Understanding Billing Restrictions for Behavioral Health Providers,* University of Michigan School of Public Health Behavioral Health Workforce Research Center, Megan Dormond, MPH, Sara Afayee, MSW, p. 2
[5] *Ibid*
[6] *Ibid*
[7] *Ibid*

community in the Commonwealth."[8]  According to the website, "HHS provides access to medical and behavioral health care, substance misuse treatment, long term services and support, and nutritional and financial benefits to those with low incomes."[9]  An organizational chart addressing entities associated with this matter is attached hereto as Exhibits 1-2.

### Department of Public Health ("DPH")

According to its website, the Massachusetts Department of Public Health "promotes the health and well-being of all residents by ensuring access to high-quality public health and healthcare services, and by focusing on prevention, wellness and health equity in all people" and "regulates, licenses and provides oversight of a wide range of healthcare-related professions and services."[10]  The DPH reports to EOHHS.

### Division of Medical Assistance ("DMA")

The Division of Medical Assistance is the State agency which administers Title XIX Medicaid and CHIP (now State Children's Health Insurance Program or "SCHIP") programs in the State of Massachusetts.  In Massachusetts, the two programs are combined into one program called MassHealth.  The DMA reports to EOHHS.

### MassHealth

According to the MassHealth website, "Medicaid and the Children's Health Insurance Program (CHIP) are combined into one program called MassHealth."[11]  MassHealth reports to EOHHS.

### Massachusetts Behavioral Health Partnership ("MBHP")

The Massachusetts Behavioral Health Partnership is a behavioral health managed care company which was originally established by ValueOptions, Inc.  The purpose of MBHP was to manage mental health and substance abuse services for members in the DMA Primary Care Clinician plan which is a managed care plan for MassHealth members.

On December 23, 2014, ValueOptions, Inc. merged with Beacon Health Strategies, LLC, rebranding the organization as Beacon Health Options, Inc.  Covered services under the umbrella of MBHP include medical, mental health and substance abuse disorder services for members currently enrolled in eight (8) separate plans.

"The Commonwealth pays MBHP a fixed monthly fee, or capitated premium, for each member enrolled in MBHP.  EOHHS's contract with MBHP specifies the types of service covered and not covered for MassHealth members.  MBHP recruits and oversees networks of third-party direct care providers who assume responsibility for providing a range of covered

---

[8] https://www.mass.gov/orgs/executive-office-of-health-and-human-services
[9] *Ibid*
[10] https://www.mass.gov/orgs/department-of-public-health
[11] https://www.mass.gov/topics/masshealth

behavioral-health care; MBHP pays the providers using the monthly capitated premiums received from the Commonwealth.  Any services not covered by MBHP's contract are paid for directly by MassHealth on a fee-for-service basis."[12]

MBHP manages outpatient mental health services in a variety of settings that include clinics, community health centers, hospital outpatient departments, and others.  Services include individual therapy, group therapy and family/couples therapy.  A comprehensive list of MBHP services is listed on its website and, in addition to outpatient mental health services, includes outpatient substance use disorders services, diversionary services, emergency services, and inpatient services.[13]

## B.      Federal and State Regulatory Language Addressing Supervision

Supervision in the clinic setting is addressed in different Federal and State regulations and other sources of guidance.  The standards often vary and, because I address them in my report and opinions, I have outlined them below for ease of reference.

### Supervision – Centers for Medicare & Medicaid Services, HHS
### Diagnostic Testing   42 CFR §410.32 (10-1-2003; 10-1-2011)

42 CFR 410.32 (b)(3)(i) *General supervision* means the procedure is furnished under the physician's overall direction and control, but the physician's presence is not required during the performance of the procedure.  Under general supervision, the training of the nonphysician personnel who actually perform the diagnostic procedure and the maintenance of necessary equipment and supplies are the continuing responsibility of the physician.

42 CFR 410.32 (b)(3)(ii) *Direct supervision* in the office setting means the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure.  It does not mean that the physician must be present in the room when the procedure is performed.

42 CFR 410.32 (b)(3)(iii) *Personal supervision* means a physician must be in attendance in the room during the performance of the procedure.

### Supervision – Centers for Medicare & Medicaid Services
### *MLN Matters* SE0816 Medicare Payments for Part B Mental Health Services
(Article Release Date 7-29-2008)

"Coverage of services and supplies incident to the professional services of a physician in private practice is limited to situations in which there is direct supervision by a physician or those nonphysician practitioners who may bill for incident to services."[14]

---

[12] "Office of Medicaid (MassHealth) – "Review of Fee-for-Service Payments for Services Covered by the Massachusetts Behavioral Health Partnership For the period July1, 2010 through June 30, 2015", Issued April 3, 2017, pp. 3-4
[13] https://www.masspartnership.com/member/CoveredServices.aspx
[14] *MLN Matters* SE0816 "Medicare Payments for Part B Mental Health Services", Release Date 7-29-08 pp.7 and 8

"The benefit differs for therapists and clinical social workers.  Due to statutory provisions, physical therapists, occupational therapists, and clinical social workers may 1) bill directly for services they personally perform, or, 2) have their services billed incident to the services of a physician/NPP.  However, the benefit for their services does not allow them to bill for the services of staff furnished as incident to the services that they personally provide."[15]

"Direct supervision in the office setting does not mean that the physician must be present in the same room with his or her aide when the service(s) is (are) performed.  However, the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the time the aide is performing service(s)."[16]/[17]

### Supervision – Massachusetts 130 CMR Division of Medical Assistance
### 130 CMR 429.000  Mental Health Center Services

429.424 (C) Social Worker

(2) "Any additional social workers on the staff must provide services under the direct and continuous supervision of an independent clinical social worker."[18]

429.424 (E) Counselor

(1) "All counselors and unlicensed staff included in the center must be under the direct and continuous supervision of a fully qualified professional staff member trained in one of the core disciplines described in 130 CMR 429.424 (A) through (D)."[19]

429.438 (E) Supervision

(1)  "Each staff member must receive supervision appropriate to the person's skills and level of professional development.  Supervision must occur within the context of a formalized relationship providing for frequent and regularly scheduled personal contact with the supervisor. Frequency and extent of supervision must conform to the licensing standards of each discipline's Board of Registration, as cited in CMR 429.424."[20]

### Supervision –Title 105, Department of Public Health
### 140.000 Licensure of Clinics

105 CMR 140.530 Staffing

(E) "Supervision.  All staff members other than those meeting the qualifications set forth in 105 CMR 140.530(C) must be clinically supervised on a regular basis by professional staff

---

[15] *Ibid*
[16] *Ibid*
[17] Medicare Benefit Policy Manual, Chapter 15, 60.1 (B)
[18] 130 CMR Division of Medical Assistance, 429.424 (C), 9/1/98, 130 CMR-415; 12/26/08
[19] 130 CMR Division of Medical Assistance, 429.424 (E), 9/1/98, 130 CMR-416; 12/26/08
[20] 130 CMR Division of Medical Assistance, 429.438 (E), 9/1/98, 130 CMR-420: 12/26/08

members as defined in 105 CMR 140.530(C). The documentation of supervision must be available for review."[21]

### Supervision – MBHP Credentialing Criteria
### Appendix A-8

*"Master's-Level Mental Health Counselors*

1.  Master's degree or above in mental health field (including, but not restricted to, counseling, family therapy, social work, psychology, etc.) from an accredited college or university

2.  Supervised in the provision of services by a Licensed Independent Clinical Social Worker (LICSW), a licensed Psychologist, a Master's-Level Advanced-Practice Registered Nurse, Board-Certified in either Adult or Child and Adolescent Psychiatric Nursing (ARNP-BC), or a licensed Psychiatrist meeting MBHP's credentialing criteria"[22]

### C.     Professional Society Position Statements Regarding Supervision

### Supervision - National Association of Social Workers ("NASW")
### NASW Standards for Clinical Social Work in Social Work Practice
### 2005

"Standard 6.  Supervision and Consultation
**Clinical social workers shall maintain access to professional supervision and/or consultation.**

**Interpretation**
Clinical social workers should ensure that professional social work supervision is available to them in a clinical setting for the first five years of their professional experience (NASW, 2004). If clinical social worker supervisors are not available or accessible, case consultation may be obtained from qualified professionals of other related disciplines.  Those clinical social workers with more than five years of clinical experience shall use consultation on an as-needed, self-determined basis.  Clinical social workers shall adhere to state and federal statutes and regulations regarding supervision and consultation in their states of practice."[23]

### American Mental Health Counselors Association (AMHCA) Standards for the Practice of Clinical Mental Health Counseling (Adopted 1979, Revised 1992, 1993, 1999, 2003, 2011, 2015, 2016)

### "Pre-degree Clinical Mental Health Counseling Field Work Guidelines

- Students' pre-degree clinical experiences meet the minimum training standards of 100 Practicum and 600 Internship hours.

---

[21] 105 CMR Department of Public Health, 140.530 (E)
[22] https://www.masspartnership.com/provider/CredentialingCriteria.aspx
[23] NASW, "NASW Standards for Clinical Social Work in Social Work Practice", 2005, p. 16

- Students receive an hour of clinical supervision by an independently and approved licensed supervisor for every 20 hours of client direct care.  This field work supervision is in addition to the practicum and internship requirements for their academic program.
- Students are individually supervised by a supervisor with no more than 6 (FTE) or 12 total supervisees."[24]

## IV.   Project Scope and Approach

### Project Scope

The scope of my services entailed a review of regulatory language and other documents relative to the above-referenced lawsuit.  Among other things, in response to Plaintiffs' Sixth Amended Complaint filed on February 21, 2018, and the Complaint in Intervention of the Commonwealth of Massachusetts filed on April 10, 2017, I was asked to review relevant regulatory language specific to July 1, 2005 through July 1, 2011.  Regulatory language relied upon by me included time-sensitive (effective July 1, 2005 through July 1, 2011) regulations, as referenced in Section III of this report.  In addition, I reviewed various publications, including several emanating from the National Association of Social Workers (NASW) and the American Mental Health Counselors Association ("AMHCA").  A comprehensive list of sources consulted or relied upon is attached hereto as Appendix A.

### Approach

Pursuant to my receipt and review of the aforementioned Complaints, I requested that Counsel produce MassHealth, DPH and MBHP regulatory language addressing supervision of personnel engaged in providing mental health services, as well as numerous deposition transcripts and associated exhibits.  In addition, I conducted independent regulatory policy data searches for purposes of addressing relevant changes, if any, to regulatory standards during the period encompassing July 1, 2005 through July 1, 2011, and periods thereafter.

## V.   Expert Opinions:  Summary

Based on my expertise, experience and my review of the materials relative to this matter, it is my opinion that:

1. Supervision provided to unlicensed [clinical] staff at Arbour Lawrence was consistent with MassHealth, DPH and MBHP supervision regulations and guidance.

2. Despite investigative and survey findings associated with supervision of unlicensed [clinical] staff providing mental health counseling services, those findings were not significant enough to impact payment decisions of MassHealth, DPH or MBHP.  Moreover, DPH findings had no impact on the licensure status of Arbour Lawrence.

---

[24] "AMHCA Standards for the Practice of Clinical Mental Health Counseling", p. 5

3. While there is no basis for recoupment of payments for claims presented to MassHealth and MBHP for the time period encompassing July 1, 2005 through July 1, 2011, even if there were such a basis, repayment would need to be evaluated claim-by-claim, and in no event would that amount represent anything approaching the total "value" of the claim.  Because the universe of claims includes fee-for-service and capitated payments, the "value" or paid amount, of each claim would have to be calculated based on payer and claim type.

4. Arbour Lawrence was not required to have a designated on-site Medical Director.

## VI.    Basis and Reasoning for Opinions

**1.   Supervision provided to unlicensed [clinical] staff at Arbour Lawrence was consistent with MassHealth, DPH and MBHP supervision regulations and guidance.**

Unlicensed [Clinical] Staff

In the Commonwealth of Massachusetts, individuals who have successfully graduated from a Master's program  (including didactic and clinical practicum and internship) with a degree in Social Work ("MSW") "shall not engage in the practice of social work, perform or offer to perform social work services, use the title "social worker" or any derivative thereof, make any written, oral or electronic representation that he or she is a social worker, or otherwise hold himself or herself out to the public as able to engage in the practice of social work, unless he or she has first obtained a license to practice social work from the Board".[25]

According to Massachusetts General Law, Part I, Title XVI, Chapter 112, Section 164, commencing March 1, 1989, "No individual who is not licensed or exempted from licensure shall engage in practice as a licensed mental health professional.  **This does not prevent individuals not eligible to apply for licensure from advertising and practicing as counselors or therapists, provided such individuals do not advertise or otherwise hold themselves out to the public to be licensed allied mental health professionals.**"[26] (Bolded for emphasis)

According to Section 164, "an employee of an organization which is nonprofit or licensed by the commonwealth, and which is determined by the board to provide adequate supervision while performing those duties constituting employment by such an agency; provided, however, that such individuals are performing those activities solely within the agency or under jurisdiction of the organization"[27] is exempt from the licensure requirement.

130 CMR, Section 429.424 (C) makes no provision for unlicensed [clinical] staff to provide services other than those designated as "social work".  130 CMR, Section 429.424 (E), which addresses counseling services, does.

---

[25] 258 CMR 9.00, Section 9.01, 7/9/2004; 12/29/17
[26] M.G.L., Chapter 112, Section 164
[27] *Ibid*

**CODING CONTINUUM, INC.**

MBHP Credentialing Criteria, Appendix A-8 likewise accommodates unlicensed *"Master's-Level Mental Health Counselors"* as those individuals who possess a "Master's degree or above in a mental health field (including, but not restricted to, counseling, family therapy, social work, psychology, etc.) from an accredited college or university."[28]

Supervision

MassHealth, DPH and MBHP regulatory and policy language addressing supervision of unlicensed [clinical] staff, lacks specificity, uniformity, clarity, and consistency.  Unlike Medicare, which discretely defines supervision as general, direct or personal, the language emanating from the Massachusetts EOHHS, and associated contractors lacks definition, resulting in myriad interpretations by agencies, MCO contractors and entities that employ unlicensed [clinical] staff who provide mental health services to MassHealth and MBHP MCO plans.

The majority of unlicensed [clinical] staff who provided counseling services to MassHealth and MBHP members at Arbour Lawrence possessed graduate degrees (Master's and PhD) and many had more than five (5) years of experience prior to securing a position with Arbour Lawrence. (See Exhibit 3A).

**MassHealth** regulations:

- Specifically address "overall supervision of staff performance"[29] as the responsibility of the Director of Clinical Services;

- Specifically allow an experienced, full time Licensed Independent Clinical Social Worker ("LICSW") to function as the Director of Clinical Services;

- Specifically allow "unlicensed [clinical] staff" to provide counseling services under the "direct and continuous supervision of a fully qualified staff member";[30]

- Specifically allow a Licensed Independent Clinical Social Worker ("LICSW") to provide supervision;

- Specifically state, **"Each staff member must receive supervision appropriate to the person's skills and level of professional development."**[31] (Bolded for emphasis)

**MBHP**'s Credentialing Criteria contain a provision titled, "*Master's-Level Mental Health Counselors*" which allows unlicensed staff to provide services as long as they:

---

[28] https://www.masspartnership.com/provider/CredentialingCriteria.aspx, Bates#HRI0001463
[29] 130 CMR, 429.423 (B)(c), Effective 9/1/98 (130 CMR-414)
[30] 130 CMR, 429.438 (E)(1), Effective 9/1/98
[31] 130 CMR, 429.438 (E)(1), Effective 9/1/98

- Possess a "Master's degree or above in the field of mental health, (including, but not restricted to counseling, family therapy, social work, psychology, etc.) from an accredited college or university" [32] and,
- Are "Supervised in the provision of services by a Licensed Independent Clinical Social Worker (LICSW), a licensed Psychologist, a Master's-Level Advanced-Practice Registered Nurse, Board-Certified in either Adult or Child and Adolescent Psychiatric Nursing (ARNP-BC), or a licensed Psychiatrist meeting MBHP's credentialing criteria".[33]

**DPH** regulations:

- Allow unlicensed [clinical] staff to "be clinically supervised on a regular basis by [delineated categories of] professional staff members". 105 CMR 140.530 (E).

Based on my review of the testimony of Arbour Lawrence personnel, supervision of unlicensed [clinical] staff providing counseling services was the responsibility of the Director of Clinical Services, Edward Keohan. Decisions regarding staff skills and level of professional development were his responsibility. It is my opinion that during the time period encompassing July 1, 2005 through July 1, 2011, Mr. Keohan had a "direct and continuous" reporting relationship with unlicensed [clinical] staff performing counseling services at Arbour Lawrence. Moreover, in addition to the Director of Clinical Services, during the time period encompassing July 1, 2005 through, at least, June 23, 2011 (E. Keohan Deposition, Page 280, Lines 9-20 and Exhibit 20), there were four (4) Licensed Independent Clinical Social Workers who were qualified to provide supervision or consultation to unlicensed [clinical] staff. (See Exhibit 3B)

As deponents testified and, based on my professional experience, supervision and mentoring of clinical staff frequently occurs on an as-needed basis and is not recorded. It may occur via telephone, during clinical rounds, case review, multi-disciplinary team conferences, peer-to-peer review, or during educational presentations.

<u>MassHealth Reference to Department of Professional Licensure Board Standards</u>

429.438 (E) Supervision

(1) "Frequency and extent of supervision must conform to the licensing standards of each discipline's Board of Registration, as cited in 130 CMR 429.424."[34]

According to testimony of Erin Lebel, (the Executive Director to the Board of Allied Mental Health and Human Professionals, the Board of Registration of Social Workers, and the Board of Registration of Psychologists), DPL [does not] "regulate the unlicensed clinician" (Deposition Transcript, May 15, 2018, Page 40, Line 7). Ms. Lebel's testimony supports a position that the reference to board standards in the MassHealth regulation regarding supervision is demonstrably inapplicable to *unlicensed [clinical] staff* who are not pursuing licensure.

---

[32] https://www.masspartnership.com/provider/CredentialingCriteria.aspx
[33] *Ibid*
[34] 130 CMR Division of Medical Assistance, 429.438 (E)(1), 9/1/98, 130 CMR-420: 12/26/08

Correspondingly, MassHealth regulations did not require supervision to be provided in any particular manner, other than one on a direct and continuous basis "appropriate to the [unlicensed] person's skills and level of professional development."[35]  To reiterate, unlike Medicare which discretely defines supervision as general, direct or personal, the language emanating from the Massachusetts EOHHS, and associated contractors lacks definition, resulting in myriad interpretations by agencies, MCO contractors and entities that employ unlicensed [clinical] staff who provide mental health services to MassHealth and MBHP MCO plans.

A review of deposition transcripts reveals that deponents representing agencies of the Commonwealth of Massachusetts, Beacon Health Strategies, Inc. and DPH could not uniformly or discretely define the adjectives addressing supervision, and had varying opinions regarding what, specifically, constitutes supervision in a mental health setting.  Simply put, there is no congruence among the State's agencies and contractors, including their designated deponents, on the subject of supervision and how regulatory adjectives (*e.g.* "direct and continuous", "adequate", "appropriate to the person's skills and level of professional development", "in the context of a formalized relationship providing for frequent and regularly scheduled personal contact with the supervisor", "overall", "regular basis") are, or should be, applied.  The result is a discretionary supervision model which allows supervisors, such as Mr. Keohan, to consider the education, training and experience of unlicensed [clinical] staff.  This is entirely consistent with MassHealth's directive, referenced above, that supervision should be "appropriate to the [unlicensed] person's skills and level of professional development."[36]

It is noteworthy that, in 2013, <u>after the time period associated with this matter</u>, the NASW and the Association of Social Work Boards ("ASWB"), which is the association of jurisdictional boards that regulate social work, jointly published "Best Practice Standards in Social Work Supervision".  The publication's purpose was to "provide a general framework that promotes uniformity and serves as a resource for issues related to supervision in the social work supervisory community."[37]  In its publication, the NASW and ASWB delineate supervision as Administrative, Clinical, Educational, and Supportive.

According to the NASW and ASWB, "There are many models of supervision described in the literature, ranging from traditional, authoritarian models to more collaborative models. Different models of supervision place emphasis, in varying degrees, on the client, the supervisor, the supervisee, or the context in which the supervision takes place.  Ideally, the supervisor and the supervisee use a collaborative process when a supervision model is selected; **however, it is ultimately the responsibility of the supervisor to select the model that works best for the professional development of the supervisee."[38]** (Bolded for emphasis)

---

[35] 130 CMR, 429.438 (E)(1), Effective 9/1/98
[36] *Ibid*
[37]"Best Practice Standards in Social Work Supervision", The National Association of Social Workers, The Association of Social Work Boards, 2013, p.5
[38] Best Practice Standards in Social Work Supervision", The National Association of Social Workers, The Association of Social Work Boards, 2013, pp. 6 & 7

Documentation of Supervision

There are no published regulatory requirements that specify what type of documentation format must be used to memorialize supervision of unlicensed [clinical] staff providing counseling/therapy services in a mental health clinic.

130 CMR Section 429.436 addresses Recordkeeping Requirements for mental health centers. There is no reference to inclusion of supervision "logs" or records of supervision associated with the delivery of patient care.  Of note, Medicare's direct supervision regulations, which allow auxiliary personnel to provide services "incident to" those of a physician in a clinic environment, do not require physicians to co-sign or make clinical record entries to substantiate the delivery of "directly supervised" clinical care.

A review of Massachusetts' Statewide Records Retention Schedule, Schedule Number 06-18, Revised July 2018, addresses record retention for the Executive Office of Health and Human Services, and contains no schedule for retention of supervision records.[39]  Had maintenance of "supervision logs" been considered mandatory, or had it been a priority of the Commonwealth or MBHP, in my opinion and, at the very least, it would be reasonable to expect that a provider bulletin, transmittal or *Alert* regarding documentation of supervision and preservation of logs (or whatever form of documentation the *Alert* required) would have been directed to providers, including Arbour.

In short, during the time period encompassing July 1, 2005 through July 1, 2011, there is no documentation reviewed by me that suggests there were efforts by any agency or contractor to raise the level of provider awareness about the issue of supervision of unlicensed [clinical] personnel or the need to "log" or preserve records of supervision.

In contrast to the Commonwealth of Massachusetts, CMS addressed Part B payments for Mental Health Services via a "Special Edition" of *MLN Matters* on July 2008, in response to an HHS OIG April 2007 report which addressed results of medical reviews and provider interviews it conducted.  HHS OIG recommended that "CMS revise, expand, and reissue its 2003 Program Memorandum on Part B mental health services with an increased emphasis on proper documentation and coding.  In addition, the memorandum should emphasize the requirements for mental health services billed 'incident to'".[40]  (As addressed earlier in this report, auxiliary persons in a clinic setting may provide services "incident to" those of a physician, psychologist or NPP when "directly supervised")

---

[39] As part of my review of this matter, I noted that an on-site survey by DPH of an unrelated facility in Taunton, Massachusetts, on April 6, 2005, revealed that the only supervision documentation that was available was for the month of March 2005.  According to the surveyor, "The Clinic Director stated any previous documentation of clinical supervision was not available for review as it had been shredded." There is nothing in documents reviewed by me that suggests any action was taken against the facility.  Nor is there evidence of a referral for further investigative follow-up to Program Integrity or the Commonwealth's Medicaid Fraud Control Unit ("MFCU").
[40] Department of Health and Human Services Office of Inspector General "Medicare Payments For 2003 Part B Mental Health Services: Medical Necessity, Documentation, and Coding", April 2007, p. ii

Arbour Lawrence policies during the relevant time period required "[p]ersons providing scheduled clinical supervision shall keep a log".[41]  The policies reviewed by me do not address unscheduled clinical supervision.  A revised version of Arbour Lawrence's 2009 policy does provide a list of topics that "Documented supervision will address"[42] but, again, it is limited to scheduled clinical supervision.  In any event, the policies of Arbour Lawrence exceed the requirements of the applicable regulations, none of which required maintenance of supervision "logs".

Furthermore, the term "log" is open to interpretation.  According to Merriam-Webster's definition, a log is "a record of performance, events, or day-to-day activities"[43]  For example, manual or electronic calendar or "daytimer" notations may serve as a log of events and/or scheduled appointments.

Finally, and perhaps most importantly, the absence of a "log" or other document reflecting supervision does not mean that supervision did not occur.

In summary, based on my review of the documents pertaining to the time period encompassing July 1, 2005 through July 1, 2011, I found no indicia that the supervision provided at Arbour Lawrence was inconsistent with regulatory and policy language regarding supervision of  unlicensed [clinical] staff.

> **2. Despite investigative and survey findings associated with supervision of unlicensed [clinical] staff providing mental health counseling services, those findings were not significant enough to impact payment decisions of MassHealth, DPH or MBHP.   Moreover, DPH findings had no impact on the licensure status of Arbour Lawrence.**

The materials I have reviewed make clear that MassHealth and MBHP did not condition payment on compliance with the supervision regulations or guidance addressed in my report.  Moreover, documents reviewed by me show that neither MassHealth nor MBHP viewed such regulations and guidance as relevant to payment.  This is true for the time period before ***and*** after audits and surveys of supervision at Arbour Lawrence.

A review of exhibits used during depositions of DPH, MassHealth and Beacon Health Strategies, Inc. designated personnel does not reveal sanctions, suspension or revocation of any portion of Arbour Lawrence's clinic license during the time period encompassing July 1, 2005 through July 1, 2011.  There is no documentation that supports recoupment or suspension of payments by MassHealth or MBHP for alleged violations of supervision requirements during the time period encompassing July 1, 2005 through July 1, 2011.

Moreover, I found no *Alerts,* transmittals or bulletins directed to providers expressly reiterating regulatory or policy language on the subject of supervision of unlicensed [clinical]

---

[41] HRI0000019; HRI0103665-HRI0103666
[42] HRI0023032
[43] https://www.merriam-webster.com/dictionary/log

staff and associated documentation requirements.  There is no documentation that substantiates concerns regarding supervision that rise to a level of importance that agencies or contractors of the Commonwealth requested involvement of entities such as EOHHS' Compliance Unit, Program Integrity or the MFCU.  Moreover, even after the relators filed a qui tam action and after MassHealth was aware of audits and surveys of supervision at Arbour Lawrence, it continued to pay for services provided by unlicensed [clinical] staff providing mental health services.

The data show that a high volume of unlicensed [clinical] staff provided services in both emergency and clinic settings throughout Massachusetts during the relevant time period and thereafter.  In 2012, at MBHP's request, the Association for Behavioral Healthcare ("ABH") conducted a survey that, according to a ValueOptions representative [Carol Kress], found that "based on 46 clinics responding, approximately 39% of their MS clinicians were unlicensed and 25% of their doctoral level clinicians, as of six months ago.  The most common reason (55%) for not being licensed is that staff have not yet obtained sufficient supervision hours to get licensed."[44]  In a January 10, 2013 exchange of information between DMH, OBH and MBHP referencing the ABH data and respondent reasons for being unlicensed, the following statement is made, ***"This calls into question how much access to regularly scheduled supervision these clinicians have.  Our impression is that supervision may be more consistent in ESPs than in some outpatient clinics."***[45]

In October 2017, the Blue Cross/Blue Shield Foundation of Massachusetts published a report prepared by Abt Associates regarding the outpatient mental health system in Massachusetts. When asked to provide input regarding provider supply and retention, a mental health advocate commented that, "[the] more stringent the credentialing, the worse the access is. [Commercial payers] are trying to use licensure as a proxy for quality – and I get that – but if they would allow lower level licenses [to bill], then they would get better access for their members."[46]  In addition, "[S]takeholders also suggested safety-net organizations' greater reliance on public payers for billing and reimbursement has posed challenges to hiring and retaining mental health providers".[47]  As one stakeholder stated, "It is almost impossible to hire licensed independent clinical social workers", "It is really difficult to hire anyone with a license".[48]

Compounding the issue of supply and retention is the issue of language and its influence on wait times.  According to the report, "clients who need services in languages other than English have longer wait times"[49], that "[a]mong clients with limited English proficiency, Spanish-speaking clients tend to fare the best when attempting to access services in their native language"[50] and "that access for non-English and non-Spanish speakers is especially limited".[51] In 2011, Mr. Keohan requested waivers for two clinicians who had a combined caseload of 132

---

[44] MH007837 (Brown Exhibit 25)
[45] MH007810 (Counihan Exhibit 24)
[46] "Navigating the Outpatient Mental Health System in Massachusetts: Consumer and Stakeholder Perspectives", October 2017, p. 19
[47] *Ibid*, p. 19
[48] *Ibid*, p. 19
[49] *Ibid*, p. 10
[50] *Ibid*, p. 10
[51] *Ibid*, p. 10

patients.  According to Mr. Keohan, "there are limitations of availability of clinicians who can provide services to clients whose principal language is Spanish."[52]  According to Mr. Keohan, both providers were bilingual Spanish speakers and provided "culturally sensitive intervention to our Latino population."[53]  His waiver requests and those submitted by Mr. Gaudet, Arbour's Compliance Officer, were denied.

A review of documents associated with this matter, both during **and** after the relevant time period, validates that, in addition to knowing of supervision findings at Arbour Lawrence, both MassHealth and MBHP made concerted decisions to maintain the "status quo" regarding unlicensed [clinical] staff and supervision (i.e., to rely on Corrective Action Plans, not payment suspension).  The decision by MBHP to forego issuance of an *Alert* to providers regarding licensure was because, "we realize that it is important to pay attention to the very serious concerns that have continued to be expressed by providers and other stakeholders since OBH [Office of Behavioral Health] approved the Alert."[54]  Pursuant to the notification of its decision [by email to OBH] on **February 6, 2013,** there were no efforts by OBH to effect changes in spite of MBHP's decision.

Evidently, Massachusetts stakeholder concerns in the outpatient mental health system continued to exist, as articulated by a stakeholder in 2017 who said, "It is almost impossible to hire licensed independent clinical social workers...[they] quickly get into higher-level roles, or find settings like hospitals that can pay more than community-based providers, or they [move] into private practice.  It is really difficult to hire anyone with a license."[55]

Aforementioned publications by the University of Michigan's School of Public Health, the Blue Cross/Blue Shield Foundation of Massachusetts and a HHS "Report to Congress on the Nation's Substance Abuse and Mental Health Workforce Issues" support Massachusetts' provider concerns, and detail the realities of a challenged mental health system, with a limited workforce, struggling to provide mental health services to an expanding population of patients.[56]

In my opinion, the aforementioned facts belie any notion that MassHealth and MBHP weren't acutely aware of the number of unlicensed [clinical] staff providing care (in Massachusetts' mental health clinics) and its causation, including a dearth of licensed personnel available to provide supervision.  The reason for maintaining the "status quo", including continued payment for services provided by unlicensed [clinical] staff, was, in my opinion, prompted by a number of factors that included:  1) stakeholder concerns; 2) workforce issues, including availability of bilingual speakers and licensed personnel, and 3) that change could significantly impact the delivery of care to an expanding Medicaid population.

---

[52] MH006529
[53] *Ibid*
[54] MH007758
[55] "Navigating the Outpatient Mental Health System in Massachusetts: Consumer and Stakeholder Perspectives", October 2017, p. 19
[56] According to HHS, a 2011 survey found that "Compensation for those working in behavioral health is significantly lower than for other health related or other comparable professions" and that "a licensed professional social worker, requiring a Master's degree and typically 2,000 hours of post-graduate experience, earned less than the manager of a fast food restaurant."

Moreover, had MassHealth wanted to deviate from the "status quo", it could easily have done so.  On *October 13, 2005,* the Auditor of the Commonwealth of Massachusetts issued a report titled, "Independent State Auditor's Report on Certain Activities of the Medicaid Program Administered by MassHealth".  The report detailed numerous "Improvements Needed in Medicaid Fraud and Abuse Detection Efforts" including:  1) "Reinstate re-credentialing of providers in order to ensure they have appropriate credentials for participation in MassHealth"[57]; 2) "Implement the CMS recommendation by instituting more formal coordination of data collection to ensure the most efficient use of all resources and effective communication among them"[58] and,  3) "Better utilize resources of external investigative agencies, such as the Attorney General's [MFCU] and the Office of State Auditor's Bureau of Special Investigations, by increasing referrals of suspected fraud and abuse."[59]

In response to the Auditor's report, 1) "MassHealth agrees that fraud and abuse exist, but it has extensive systems, functions, and operations in place and believes it can improve"[60];  2) "As of July 1, 2005, MassHealth will be resuming the formal process of re-credentialing existing providers; it will verify the credentials of all providers applying to participate in the program"[61] and, 3) "Finally, MassHealth emphasizes aggressive management of its front-end program processes to ensure that services provided are medically necessary and provided by qualified healthcare providers to eligible residents of the Commonwealth, *and that payments are appropriately made*."[62]  (Bolded and italicized for emphasis)

The representations made by MassHealth in response to the audit findings articulate a level of organizational ability at MassHealth to institute and execute strategies that could easily have resulted in identification and enforcement of regulations it considered critical to payment.  This could have occurred at any time during the timeframe encompassing July 1, 2005 through July 1, 2011, *and* the period thereafter, including any related to supervision of unlicensed [clinical] staff.  In addition and, as discussed below, despite having information pertaining to an investigation and audits at Arbour Lawrence *after* the relevant time period, MassHealth elected not to exercise its ability and authority to engage in any activities such as claims data mining or referrals for further investigative follow-up.

Beyond the obvious capabilities MassHealth stated it possessed, both during and *after* the relevant time period, MassHealth and MBHP had knowledge of supervision allegations concerning Arbour Lawrence.  Other clinics, unrelated to Arbour, were cited for supervision as early as *2005 and 2007*, including one that was noted to have shredded supervision logs prior to the surveyor's arrival at the location.  Throughout the relevant time period and thereafter, supervision was addressed by issuing Statements of Deficiency ("SOD") and requesting and accepting Corrective Action Plans ("CAP") in lieu of referrals to other entities for further follow-up.

---

[57] Independent State Auditor's Report on Certain Activities of the Medicaid Program Administered by MassHealth", Auditor of the Commonwealth, No.2004-1374-3S, October 13, 2005, p. iii
[58] *Ibid*
[59] *Ibid*
[60] *Ibid*
[61] *Ibid*, p. iv
[62] *Ibid*, p. iv

This is affirmed by meeting minutes from the MBHP Regional Directors' and Regional Network Managers' Meeting Minutes of **March 3, 2015**, wherein the first topic is "OPPA [Outpatient Provider Practice Analysis] and Supervision logs". The *Decision* section from the meeting states, "Some time ago we reviewed licensing and found there were unlicensed folks treating Member (sic).  A draft alert was prepard (sic) but never sent; our compromise was to make sure that all unlicensed provider staff must have supervision.  *RNMs [Regional Network Managers]* should look at staff rosters and supervision logs at a minimum of once a year for small medium and large providers.  Info to be checked should include clinician's name, date and content, and the signature of the supervisor.  Supervision should be a minimum of monthly for unlicensed staff.  Look at the policy of the provider, *and do a CAP if necessary* (per RD).  Staff have to be license-eligible *(a small group is grandfathered); if staff going on 3-4 years, must have a conversation about how long they intend to continue this way."*[63]

During, and after the relevant time period, outpatient mental health clinic providers in Massachusetts, including Arbour Lawrence, expressed concerns about their inability to hire and retain licensed mental health providers, and that MassHealth and MBHP were aware of those concerns.  The decision to issue Statements of Deficiency ("SOD") regarding supervision, request and accept Corrective Action Plans ("CAP"), and make no referrals for further investigative follow up was, in my opinion, a concerted one.

Moreover, as discussed below, results of internal analyses pursuant to a very public article in the local newspaper about supervision at Arbour Lawrence, resulted in no other action being taken.

According to documents reviewed by me, ***after publication of a Boston Globe article about Arbour Lawrence on June 13, 2013*** (which made reference to the qui tam "suit" filed in federal court on July 1, 2011), OBH Director, Christopher Counihan requested and received a copy of an Arbour Lawrence DPH site survey from 2012 (which addressed supervision) on ***June 20, 2013***. He also sent an email to "all MassHealth MCE BH Directors"[64] on ***June 21, 2013***, requesting detailed information "related to behavioral health services provided by Arbour Counseling Services"[65] for the preceding 24-month period.  His request for information included, "[c]omplaints and [g]rievances from your members or their families"[66] and information regarding "credentialing, re-credentialing, provider profiling or record reviews resulting in Corrective Action"[67] and "[c]laims [r]eviews resulting in recoupments".[68]

Mr. Counihan received replies to his requests, including two from Alexandra Forster, Manager of Quality Operations for MBHP.  On ***June 21, 2013***, she provided information regarding an audit of Arbour Lawrence and informed him that "the waivers that were requested in the CAP response were denied"[69] and on ***June 24, 2013*** she sent him "the additional

---

[63] MBHP001195
[64] MH034894 (Brown Exhibit 15)
[65] *Ibid*
[66] *Ibid*
[67] *Ibid*
[68]*Ibid*
[69] MH006525 (Brown Exhibit 14)

information you requested regarding the issues addressed with Arbour Lawrence"[70] and states "We never referred to the fraud unit because we found no evidence that the therapists were representing themselves as licensed – it was more that Arbour wasn't following our criteria".[71] No payment action was taken.

Documents reviewed by me regarding recoupment include a letter to Arbour Counseling Services dated *October 1, 2010*, regarding an "Initial Notice of Overpayment" from MassHealth's Provider Compliance Unit on a matter unrelated to supervision of unlicensed [clinical] staff.  It reinforces my earlier assertion that MassHealth had capabilities during and after the relevant time period to "mine" claims, including specific fields on the claim, recover improperly made payments and make referrals for further follow up of fraud by entities such as the MCFU.

On *April 10, 2017*, the Commonwealth of Massachusetts filed a Complaint in Intervention in this action.  No action with respect to payment was taken until over a year later, when MassHealth, MBHP and Beacon each suspended payment, for the first time, to Arbour Lawrence.

This timeline, as well as other events identified in materials I reviewed, supports my conclusion that, despite investigative and survey findings associated with supervision of unlicensed [clinical] staff providing counseling services, MassHealth and MBHP did not view these findings as significant enough to suspend or recoup payment to/from Arbour Lawrence.

Furthermore, an objective review of the aforementioned timeline makes it clear that, pursuant to DPH site surveys and associated Statements of Deficiency, Corrective Action Plans were submitted to DPH by Arbour Lawrence.  They were accepted.  While DPH is not a payer of claims, the issue of supervision of unlicensed [clinical] staff apparently did not rise to a level of importance that warranted licensure action by DPH.  DPH regulations address Grounds for Denial, Refusal to Renew or Revocation of a License or Part of a License.  According to regulation 105 CMR 140.131 (D) Violation of any state statute pertaining to clinic licensure shall "in and of itself" "constitute full and adequate grounds on which to deny, revoke, or refuse to renew a license to operate a clinic in whole or in part with respect to a specific service or specific services or a part or parts thereof".[72]  This action does not appear to have been contemplated by State officials.

The issue of supervision of unlicensed [clinical] staff drew public attention as a consequence of a qui tam action filed on July 1, 2011, and an associated article that appeared in the *Boston Globe* on *June 13, 2013*.  This spurred a series of activities during a short period encompassing *June 13, 2013* through *September 4, 2013*, that involved OBH, including a request from the Secretary's Office of EOHHS to provide a narrative description of Arbour Health Systems.

As already discussed, *as early as 2005*, MassHealth stated that it had extensive systems, functions, and operations in place, coupled with aggressive management of its front-end program

---

[70] MH006500 (Brown Exhibit 12)
[71] *Ibid*
[72] 105 CMR 140.131 (D)

processes, to ensure that payments were appropriately made.  Had supervision been a payment consideration, the capabilities could have been used to evaluate supervision of unlicensed [clinical] staff for purposes of educating, clearly communicating and defining expectations to the provider community.  It did not happen.

Based on my evaluation of the facts, including the filing of a qui tam action on July 1, 2011, and information gathered during a period *in 2013*, there was no payment suspension or recoupment of payments related to supervision at Arbour Lawrence.  Had the facts supported such action, I would have expected to see it. There is none.

Moreover, to suggest that the allegations in this lawsuit came to the attention of regulators after the July 1, 2011 time period is not accurate and is inconsistent with my professional experience.  A review of an incident reported to the DPH Complaint Unit on *February 4, 2011*, reveals that the caller contacted the unit several times (*February 4* and *February 7, 2011*) and faxed a letter to the unit.  The caller provided a list of five (5) agencies, including DPH and DMH, "investigating" the matter and requested that Arbour Lawrence have its licensed revoked. The report contains information that confirms involvement by DMH and a Legislative Aide of the State Representative.  Based on my experience working for government programs, "legislative" or "congressional inquiries" receive immediate and highest priority by the entity charged with investigation and resolution.

> **3.  While there is no basis for recoupment of payments for claims presented to MassHealth and MBHP for the time period encompassing July 1, 2005 through July 1, 2011, even if there were such a basis, repayment would need to be evaluated claim-by-claim, and in no event would that amount represent anything approaching the total "value" of the claim.  Because the universe of claims includes fee-for-service and capitated payments, the "value" or paid amount of each claim would have to be calculated based on payer and claim type.**

As set forth above, regulations and guidance emanating from the Commonwealth's agencies regarding unlicensed [clinical] staff, supervision and documentation of supervision were not specific, uniform, clear or consistent.  Moreover, based on my review of documents in this matter, and in my capacity as an Accredited Health Care Fraud Investigator (AHFI) and Certified Fraud Examiner (CFE), I found no indicia that Arbour Lawrence did anything other than reasonably interpret and apply inconsistent regulatory standards.

In my opinion, there is no basis for recoupment of payments and, if there were such a basis, calculation of a repayment would need to be evaluated claim-by-claim.  The universe includes fee-for-service claims and capitated payments, each with its own payment variables and methodology, which are discussed below.

Nonetheless, I have been asked to assign a "value" to affected claims under the hypothetical assumption that a trier of fact finds a violation of supervision requirements associated with unlicensed [clinical] staff.  With that hypothesis in mind, I would opine the following:

The process of assigning a "value" to only affected claims is complicated by the fact that 1) a portion of the claims are fee-for-service and, 2) a great number of the claims are paid based on a capitation model which, according to testimony of Beacon Health Strategies, Inc. representative, Mark Deasy, is complicated to address on a claim-by-claim basis.  It is, in part for this reason that each claim allegedly at issue would need to be individually evaluated on a claim-by-claim basis.  Moreover, it is my understanding that Plaintiffs do not claim that supervision was never provided to unlicensed staff.  For this additional reason, each claim would need to be evaluated to determine whether supervision was, in fact, provided on the date that the service was billed.

As already addressed, the unlicensed [clinical] staff who provided services to MassHealth and MBHP members were graduates of Master's programs which include didactic and clinical training.  A number of them had doctoral degrees.  I understand that Plaintiffs in this case assert that the value of the claims for services provided by such clinicians was "zero", meaning that no portion of the claims "value" or paid amount should be considered.  The suggestion that there was no value in having unlicensed [clinical] staff with Master's degrees or PhDs, most of whom have years of professional experience providing counseling services is, in my opinion, disingenuous and inconsistent with MassHealth's regulations and other sources of guidance.

According to 130 CMR, Section 429.408 (B) <u>Administrative Operations</u> states "Payment by the Division for a mental health service includes payment for administrative operations, and for all aspects of service delivery not explicitly included in 130 CMR 429.000, such as, but not limited to: (1) patient registration; (2) telephone contacts with members or other parties; (3) **supervision or consultation with another staff member** (Bolded for emphasis); (4) information and referral; and (5) recordkeeping"[73].  This section of the manual classifies supervision and consultation as "administrative operations", or what the industry would consider "overhead" associated with administrative operations of a clinic.  It comprises **one of five (5)** referenced functions considered to be administrative aspects of clinical operations.  According to the language of the policy, the list is not limited to the five (5) named functions.  This supports my opinion that supervision is one of many components associated with administration (or what is considered overhead associated with operation of a mental health clinic) and that lack of supervision does not negate the entire value of a claim.

For purposes of assigning a "value" to the American Medical Association ("AMA") Current Procedural Terminology ("CPT®") codes used for payment of professional services, including those provided by Arbour Lawrence staff, HCFA (now CMS) implemented the Resource Based Relative Value Scale ("RBRVS") in 1992.  The system moved away from charge-driven reimbursement by implementing a standardized payment or "fee schedule" for reimbursement of professional services.

With implementation of RBRVS, each code is assigned a relative value which varies by CPT® code.  The three components that drive the reimbursement amount for each CPT® code and determine its relative value are:  1) The physician work component, which accounts for an average of 51% of the total relative value of the service; 2) Practice expense, which accounts for an average of 45% of the total relative value and, 3) Malpractice expense, which accounts for an

---

[73] 130 CMR, Section 429.408 (B) Administrative Operations, 130 CMR-411

average of 4% of the total relative value.  As reflected in the model's design, *work* performed by providers is accorded the highest value in the RBRVS system which is utilized by most payers in the United States.  Medicare pays physicians 100% of the assigned value for CPT® codes and adjusts the rates for other clinicians.  Nonphysician providers ("NPP") such as nurse practitioners and physician assistants who bill independently of the physician are paid 85% of the physician fee.  Social workers who bill independently of the physician are paid 75% of the physician fee.

Medicare's "incident to" payment model is instructive and relies on the RBRVS model and "direct supervision" for services provided by a nonphysician practitioner "incident to" those of a physician (or psychologist).  It assigns a "value" of 100% of the physician fee schedule payment for services performed by a nonphysician provider ("NPP") or auxiliary person "incident to" the physician when the physician (or psychologist) "directly supervises" the provision of such services.

Notably, Medicare's "incident to" regulation does not require a face-to-face encounter with the MD or Clinical Psychologist ("CP") for purposes of meeting the "direct supervision" standard.  In other words, there is no requirement that the MD or CP be physically present in the room with the patient; rather, it requires that the MD or CP be in the office suite when services are provided and that he/she be immediately available, if needed.

The plaintiffs do not assert that face-to-face services were not provided, or that "work" was not performed at Arbour Lawrence by unlicensed [clinical] staff.  In cases where services were provided but the direct supervision or "incident to" standard is not met (and a qualified nonphysician provider or clinical social worker has provided a service), the reduction in "value" of the paid claim would be 15%, and no more than 25%, commensurate with the fee schedule payment for the aforementioned nonphysician clinical practitioners.

It is my opinion that, at most, the reduction in value from any alleged lack of supervision (of unlicensed [clinical] staff who have Master's or PhD degrees, have completed both didactic and clinical training and possess, in many cases, more than five (5) years of experience), would be 15%, and no more than 25%, of the individual paid claim amount for fee-for-service claims.

Assessing a fair reduction in "value" for managed care claims is a far more difficult proposition.  As Mark Deasy, Vice President of Strategy and Development testified, contracts with MassHealth plans are variable.  They may include only capitated payments, capitated payments and additional compensation for administration, inclusion of multiple "risk corridors", and a number of membership categories per plan.  According to Mr. Deasy, "The values of the capitation payments, the ways the risk corridor is structured, the detail within the membership categories all can vary from contract to contract."[74]  (Page 19, Lines 22-25 and Page 20, Line 1)

Accordingly, any reduction in "value" of managed care claims would require a claim-by-claim assessment.

---

[74] Deposition of Mark Deasy, July 31, 2018

### 4. Arbour Lawrence was not required to have a designated on-site Medical Director.

I have reviewed the expert report of Nicole Christian-Brathwaite, MD.  Dr. Christian-Brathwaite states that Arbour Lawrence clinic did not have a Medical Director as she claims is required by MassHealth regulatory language (Expert Report, Sept. 25, 2018, Page 4, Paragraph 8).  She assumes, without regulatory authority, that Arbour Lawrence clinic was an "autonomous satellite program" and, therefore, was required to comply with staff composition requirements as delineated within 130 CMR 429.422-429.423.[75]  Based on her assumption, Dr. Christian-Brathwaite opines that Arbour Lawrence clinic was required by MassHealth to have a designated on-site Medical Director, who worked at the clinic for a minimum of eight hours a week (Expert Report, Sept. 25, 2018, Page 4, Paragraph 10).

MassHealth regulation 130 CMR 429.402 defines the following terms:

- Mental Health Center – "an *entity* [organization[76]] that delivers a comprehensive group of diagnostic and psychotherapeutic treatment services to mentally or emotionally disturbed persons and their families by an interdisciplinary team under the medical direction of a psychiatrist" (Bolded and italicized for emphasis);

- Parent Center – "the *central location* of the *mental health center* [entity], at which most of the administrative, organizational, and clinical services are performed" (Bolded and italicized for emphasis);

- Dependent Satellite Program - "a *mental health center* [entity or central location] *program* in a satellite facility that is under the direct clinical management of the parent center" (Bolded and italicized for emphasis); and

- Autonomous Satellite Program - "a *mental health center* [entity or central location] *program* operated by a satellite facility with sufficient staff and services to substantially assume its own clinical management independent of the parent center" (Bolded and italicized for emphasis).[77]

According to 130 CMR 429.422, *mental health centers* [entities] and *autonomous satellite programs* must employ "the equivalent of at least **three** full-time professional staff members, **two** of whom must be core team [staff] members and meet the qualifications outlined in 130 CMR 429.423 for their respective disciplines" (Bolded for emphasis).[78,79]  MassHealth regulations define core team members as:

- Administrator - responsible for the overall operation and management of the center and for ensuring compliance with MassHealth regulations;

---

[75] 130 CMR, 429.422-423, Effective 9/1/98
[76] https://www.merriam-webster.com/dictionary/entity
[77] 130 CMR 429.402, Effective 9/1/98
[78] 130 CMR 429.422 (C), Effective 9/1/98
[79] 130 CMR 429.422 (F), Effective 9/1/98

- Director of Clinical Services – responsible to the administrator for the direction and control of all professional staff members and services;

- Medical Director – responsible for establishing all medical policies and protocols and for supervising all medical service provided by the staff; and

- Psychiatrist – responsible for the provision of services to members and performance of all relevant duties outlined in 130 CMR 429.423 (D) (2).[80]

According to 130 CMR 429.423 (C), Medical Director is further defined as a psychiatrist who meets the qualifications as outlined in 130 CMR 429.424 (A), designated by the mental health center [entity] to serve, and works a minimum of eight hours a week at the center [entity] (Bolded for emphasis).[81]   Dependent satellite programs must employ "at least two full-time equivalent professional staff members from separate nonphysician core disciplines," i.e., psychologist, social worker, psychiatric nurse, counselor, and occupational therapist.[82],[83]

Dr. Christian-Brathwaite opines that Arbour Lawrence was required by MassHealth regulatory language to select a Medical Director as one of its two core team members, as referenced in 130 CMR 429.422 (C) & (F) (Expert Report, Sept. 25, 2018, Page 4, Paragraph 10).  MassHealth regulations do not mandate specific core team [staff] composition and accord mental health centers [entities or central locations] latitude in their selection of member roles as long as the selection is two of the four core team members.  To reiterate, MassHealth regulations define core team members as Administrator, Director of Clinical Services, Medical Director, and Psychiatrist.[84]  Regardless of its status as a satellite program [dependent or autonomous], regulatory language did not require Arbour Lawrence clinic to employ an on-site Medical Director.

DPH regulatory language and actions further support my opinion.  In December of 2013, DPH "reviewed and approved the relocation of the parent clinic, the relocation of a satellite, and the addition of services to satellites to the license of Arbour Counseling Services of Medford [parent clinic]"[85] (Bolded and italicized for emphsis).  DPH classified Arbour Lawrence clinic as a satellite clinic which provided services under the clinical license of Arbour Counseling of Medford [parent clinic] (S. Lohnes' Deposition Transcript, June 19, 2018, Exhibit 4, Pages 1-4). DPH regulations define the following entities:

- Clinic [Parent or Mental Health Center] – "any entity, however organized, whether conducted for profit or not for profit, which is advertised, announced, established, or maintained for the purpose of providing ambulatory medical, surgical, dental, physical rehabilitation, or mental health services"; and

---

[80] 130 CMR 429.423 (C), Effective 9/1/98
[81] 130 CMR 429.423 (C), Effective 9/1/98
[82] 130 CMR 429.722 (A), Effective 9/1/98
[83] 130 CMR 429.424 (B-F), Effective 9/1/98
[84] 130 CMR 429.423 (C), Effective 9/1/98
[85] S. Lohnes' Deposition Transcript, June 19, 2018, Exhibit 4, Pages 1-4

- Satellite Clinic – "a clinic operation off the premises of a clinic at which health services are provided."[86]

DPH regulation 105 CMR 140.530 (D) (1) states that establishment of medical policies and supervision of all medical services is the responsibility of a clinic-designated psychiatrist or other physician.[87]  DPH regulations do not address whether a satellite clinic is required to have a designated "Medical Director" (with on-site work requirements, as referenced by Dr. Christian-Brathwaite).  Based on DPH site surveys (4/11/12 and 8/1/13), Arbour Lawrence was not cited or issued a SOD regarding the aforementioned regulatory requirements, as referenced in 105 CMR 140.530(D) (1).[88]

In my opinion, there is no regulatory standard that required Arbour Lawrence clinic to have a designated on-site Medical Director.

## VII.    Conclusion

Having examined documents listed in Appendix A, as well as having applied the knowledge and experience I have acquired during my thirty-six (36) years as a healthcare professional, it is my opinion that:

1. Arbour Lawrence reasonably interpreted and applied conflicting regulations and guidance from multiple sources on the subject of supervision of unlicensed [clinical] staff. Moreover, there is no regulatory language that addresses the type, form or content of clinical supervision documentation;

2. Supervision of unlicensed [clinical] staff at Arbour Lawrence was not a factor in the payment decisions of the relevant payers and,

3. There is no basis for recoupment of payments and, if there were such a basis, calculation of a repayment would need to be evaluated claim-by-claim. Under a hypothetical assumption that a trier of fact finds a violation of supervision requirements associated with unlicensed [clinical] staff, it is my opinion that the reduction in value of the services claimed would be 15%, and no more than 25%, of the individual paid claim amount for fee-for-service claims.  Any reduction in "value" of managed care claims would require a claim-by-claim assessment.

4. The Arbour Lawrence clinic was not required to have a designated on-site Medical Director.

---

[86] 105 CMR 140.020
[87] 105 CMR 140.530 (D)(1)
[88] Ibid.

Any new information with respect to this case will be considered and may impact my opinions and analyses.  As such, I reserve the right to amend or supplement my opinions if additional information becomes available.


Christina Melnykovych, BS, RHIA, CFE, AHFI

APPENDIX A

## SOURCES CONSULTED

1. 130 CMR Division of Medical Assistance, 130 CMR 429.000 Mental Health Center Services:  9/1/98; 12/26/08 (Fletcher #11); 1/1/2014
2. Mental Health Center Manual, Subchapter 6, Service Codes and Descriptions, Transmittal Letter MHC-48
3. 105 CMR Department of Public Health, 105 CMR 140.000 Licensure of Clinics:  4/1/94 (DPH #6); from Counsel (date unknown); 12/19/14
4. General Law 2006 Massachusetts Code, Chapter 112, Section 133
5. General Law, Part I, Title XVI, Chapter 112, Section 131
6. General Law, Part I, Title XVI, Chapter 112, Section 134
7. General Law, Part I, Title XVI, Chapter 112, Section 164
8. MBHP, Appendix A-8 Credentialing Criteria; from Counsel (date unknown: HRI0001456-HRI0001479); 9/10/2018
9. MBHP *Alert #45*
10. MBHP *Alert #48*
11. MBHP *Alert #82*
12. MBHP *Alert #97*
13. MBHP *Alert #104*
14. MBHP Archived Alerts; https://www.masspartnership.com/provider/ArchivedAlerts.aspx
15. MBHP Provider Manual, Welcome and Introduction
16. 262 CMR Board of Allied Mental Health and Human Services Professionals, 262 CMR 2.00:  6/5/15
17. 258 CMR Board of Registration of Social Workers, 258 CMR 8.00, 9.00 & 12.00: 12/29/17
18. 258 CMR Board of Registration of Social Workers, 258 CMR 20: 7/9/04
19. Board Policies and Guidelines (Social Workers): 12/6/17; https://www.mass.gov/policy-advisory/board-policies-and-guidelines-social-workers#policy-on-experience-requirement-for-licensure-as-a-licensed-ind..l
20. Medicare Benefit Policy Manual, Chapter 15 – Covered Medical and Other Health Services
21. Medicare Claims Processing Manual, Chapter 12 – Physicians/Nonphysician Practitioners
22. 42 CFR Chapter IV §410.32 (10/1/2003 & 10/1/2011 Editions)
23. National Association of Social Workers, "NASW Standards for Clinical Social Work in Social Work Practice": 2005
24. National Association of Social Workers & Association of Social Work Boards, "Best Practice Standards in Social Work Supervision": 2013
25. American Mental Health Counselors Association, "AMHCA Standards for the Practice of Clinical Mental Health Counseling": Adopted 1979, Revised 1992, 1993, 1999, 2003, 2011, 2015, 2016

26. Department of Health and Human Services Office of Inspector General, "Medicare Payments for 2003 Part B Mental Health Services: Medical Necessity, Documentation, and Coding": April 2007
27. Department of Health and Human Services Office of Inspector General, "Compendium of Unimplemented Office of Inspector General Recommendations": May 2009
28. *MLN Matters®*, Centers for Medicare and Medicaid Services, SE0816, June 2008
29. The Commonwealth of Massachusetts, Auditor of the Commonwealth, No. 2004-1374-3S, "Independent State Auditor's Report on Certain Activities of the Medicaid Program Administered by MassHealth", Official Audit Report: October 13, 2005
30. The Commonwealth of Massachusetts, Auditor of the Commonwealth, No. 2007-1374-3S3, "Independent State Auditor's Report on the Internal Control Plan of MassHealth as of July 19, 2007", Official Audit Report: March 12, 2008
31. Commonwealth of Massachusetts, Office of the State Auditor, "Office of the State Auditor – Annual Report Medicaid Audit Unit, March 15, 2014-March 13, 2015": Issued: March 13, 2015
32. Commonwealth of Massachusetts, Office of the State Auditor, "Office of Medicaid (MassHealth) – Review of Fee-for-Service Payments for Services Covered by Managed-Care Organizations For the period October 1, 2009 through September 30, 2014", Official Audit Report – Issued June 16, 2015
33. Commonwealth of Massachusetts, Office of the State Auditor, "Office of the State Auditor – Annual Report Medicaid Audit Unit, March 14, 2015-March 15, 2016", Issued March 15, 2016
34. Commonwealth of Massachusetts, Office of the State Auditor, "Office of Medicaid (MassHealth) – Review of Fee-for-Service Payments for Services Covered by the Massachusetts Behavioral Health Partnership For the period July 1, 2010 through June 30, 2015", Official Audit Report – Issued April 3, 2017
35. "Navigating the Outpatient Mental Health System in Massachusetts: Consumer and Stakeholder Perspectives", Prepared for the Blue Cross Blue Shield of Massachusetts Foundation by Abt Associates, October 2017
36. "Understanding Billing Restrictions for Behavioral Health Providers", School of Public Health, University of Michigan, Behavioral Health Workforce Research Center, November 2016
37. U.S. Department of Health and Human Services Substance Abuse and Mental Health Services Administration "Report to Congress on the Nation's Substance Abuse and Mental Health Workforce Issues", January 24, 2013
38. Department of Health and Human Services Centers for Medicare and Medicaid Services, *Medicare Learning Network*, "Mental Health Services", January 2015
39. https://www.supremecourt.gov/opinions/15pdf/15-7_a074.pdf
40. Proposed Sixth Amended Complaint (Filed 2/21/18) *United States of America and Commonwealth of Massachusetts ex rel. Julio Escobar and Carmen Correa, Administratrix of the Estate of Yarushka Rivera v. Universal Health Services, Inc., UHS of Delaware, Inc., and HRI Clinics, Inc.* 11-CV-11170-DPW

41. Complaint in Intervention of the Commonwealth of Massachusetts (Filed 4/10/17) *United States of America and Commonwealth of Massachusetts ex rel. Julio Escobar and Carmen Correa, Administratrix of the Estate of Yarushka Rivera v. Universal Health Services, Inc., UHS of Delaware, Inc., and HRI Clinics, Inc.* 11-CV-1170-DPW

42. https://www.bostonglobe.com/lifestyle/health-wellness/2013/06/19/arbour-mental-health-clinics-cited-for-unlicensed-and-improperly-supervised-therapi...

43. https://www.bostonglobe.com/business/2018/09/06/lawrence-clinic-sues-state-officials-over-suspension-medicaid-payments/bv5YpX576Y5BO8bEXCz...

44. https://www.beckershospitalreview.com/finance/masshealth-made-193m-improper-or-questionable-payments-for-behavioral-health-services-audit-finds...

45. Deposition Transcript of Edward J. Keohan, Jr. (July 26, 2018); Exhibits #1-#33

46. Deposition Transcript of John D. Fletcher (July 23, 2018); Exhibits #1-#30

47. Deposition Transcript of Michael Gaudet (August 1, 2018); Exhibits #1-#17

48. Deposition Transcript of Mark Deasy (July 31, 2018); Exhibits #1-#3

49. Deposition of Julie I. Fine (September 13, 2018); Exhibits #1-#4

50. Deposition Transcript of Erin Lebel (May 15, 2018); Exhibits #19-#21

51. Deposition Transcript of Joel Teeven (June 19, 2018); Exhibits DPH #1-#18

52. Deposition Transcript of Sherman Lohnes (June 19, 2018); Exhibits DPH #1-#18

53. Deposition Transcript of Christopher Counihan (July 16, 2018); Exhibits #1-#25

54. Deposition Transcript of Stephanie Jordan Brown (July 30, 2018); Exhibits #1-#30

55. https://www.healthcare.gov/medicaid-chip/medicaid-expansion-and-you/

56. *Brief Summaries of Medicare & Medicaid, Title XVIII and Title XIX of the Social Security Act,* Office of the Actuary, Centers for Medicare and Medicaid Services, Department of Health and Human Services, November 1, 2009

57. https://www.mass.gov/orgs/executive-office-of-health-and-human-services

58. https://www.mass.gov/orgs/department-of-public-health

59. https://www.mass.gov/topics/masshealth

60. https://www.mass.gov/service-details/masshealth-coverage-types-for-individuals-and-families

61. https://www.masspartnership.com/provider/CredentialingCriteria.aspx

62. https://www.masspartnership.com/member/CoveredServices.aspx

63. https://myemail.constantcontact.com/Breaking-Beacon-Audit-Activity-Suspended-Effective-Immediately.html?

64. https://www.naswma.org/page/SupervisionFAQs

65. https://www.mamhca.org/breaking-beacon-audit-activity-suspended-effective-immediately

66. Current Procedural Terminology, Professional Edition, Years 2005-2011

67. HCPCS Level II, Expert Version, Years 2005-2011

68. U.S. Department of Health and Human Services CMS Financial Report for Fiscal Year 2007

69. U.S. Department of Health and Human Services Fiscal Year 2010 Office of Inspector General *Justification of Estimates for Appropriations Committees, Medicare Integrity Section*

70. www.cms.gov A/B MAC Jurisdictional Maps
71. Department of Health and Human Services Office of Inspector General Collection Status of Medicare Overpayments Identified by Program Safeguard Contractors; May 2010
72. http://www.namfcu.net/mfcu-information.php
73. http://www.mass.gov/ago/bureaus/hcfc/the-medicaid-fraud-division/
74. https://www.merriam-webster.com/dictionary/log
75. MassHealth Billing Guide for the CMS-1500, Executive Office of Health and Human Services, MassHealth, June 2016
76. https://www.mass.gov/auditor/lists/all-audit
77. https://www.medicaid.gov/about-us/program-history/index.html
78. http://help.workworldapp.com/wwwebhelp/medical_assistance_in_massachusetts_overvie..
79. https://www.mass.gov/topics/executive-branch
80. Beacon Health Options, "Merger/Rebranding Provider Frequently Asked Questions", Revised 4/28/2016
81. www.masspartnership.com (Value Options)
82. https://www.masspartnership.com/About/index.aspx
83. https://www.nhcaa.org
84. "Massachusetts Statewide Records Retention Schedule", Quick Guide, Schedule Number 06-18 (Updated from the Massachusetts Statewide Agency Records Retention Schedule Database, June 2018, Revised July 2018
85. Federal Register, Volume 76, No. 22, February 2, 2011, Part II, Department of Health and Human Services, Centers for Medicare & Medicaid Services
86. U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, "Report to Congress on the Nation's Substance Abuse and Mental Health Workforce Issues", January 24, 2013
87. Commonwealth of Massachusetts Executive Office of Health and Human Services Department of Mental Health, "Resource Guide to Emergency Services Programs", May 2013
88. Centers for Medicare and Medicaid Services, *MLN Matters#*SE0441
89. *Practice Perspectives,* "Incident to Billing for Clinical Social Workers", National Association of Social Workers, Spring Issue 2018
90. Centers for Medicare and Medicaid Services, Medicare Learning Network, ICN 901623, October 2016
91. Expert Report of Dr. Nicole Christian-Brathwaite, MD, Dated September 25, 2018, Signed October (23rd or 25th), 2018

# APPENDIX B

**Christina Melnykovych, BS, RHIA, CFE, AHFI**
**Expert Testimony Within Past Four Years**

*USA ex rel. Thomas v. Chun* (Case No.:8:11-cv-583-T-23-TBM) (D. Florida 2013)
Deposition

*Roderick J. Sawyer, M.D. vs. St. Vincent Medical Group, Inc. and The Care Group Heart Hospital* (Cause No:  49D03-1208-PL-032513) (Indiana) (2015/2016)
Deposition & Trial

*United States ex rel. Anita C. Salters v. American Family Care, Inc.* (5:10-CV-2843-LSC) (Northern District of Alabama 2017)
Deposition

*Nix Community General Hospital, LLC, et al. v. Community General Hospital of Dilly, Texas, Inc. et al.* (Cause No. 2015CI02459) (37th Judicial District, Bexar County, Texas 2017)
Deposition

*Lorena Armijo et al. v. ILWU-PMA Welfare Plan et al.* (Case No. 2:15-cv-1403) (United States District Court Central District of California – Western Division 2017)
Deposition

# APPENDIX C

**CHRISTINA M. MELNYKOVYCH, BS, RHIA, CFE, AHFI**
7320 N. La Cholla Boulevard, Suite 154-306
Tucson, AZ  85741
520-219-0602 (work)
ChristinaM@codingcontinuum.com
_____

**EXPERIENCE:**

CODING CONTINUUM, INC., Tucson, AZ                                               2000-
**President & CEO**

UNIVERSITY MEDICAL CENTER, Tucson, Arizona                      1992 - 2000
**Director, Health Information & Outcomes Management**
Directed operations of Health Information, Patient Financial Services, Quality Improvement, Case and Disease Management departments in 365-bed university affiliated teaching facility with associated outpatient clinics.  Management of 130 FTEs, including program director, six managers, coding compliance staff.  Areas of responsibility included Patient Financial Services, Transcription Services, Coding & Abstracting, Files, Cancer Registry, Quality Improvement, Data Management, Utilization Review, Case Management, Disease Management and Social Services.

- Developed Coding Compliance Program to address coding in following venues:  Inpatient coding, outpatient services and hospital-based physician office practices
- Active member of APC Steering Committee and Chairman of UB-92 Committee designed to address organizational data flow from point of patient entry into system to billing and receipt of payment
- Member of Corporate Compliance Committee.  Designated point of contact for Health Services Advisory Group and Hospital Liaison for 6th Scope of Work/PEPP program
- Developed denial management program to address claims edits/denials
- Met or exceeded JCAHO and other regulatory requirements during 1993, 1996, and 1999 surveys. Center of Excellence designation for Improving Organizational Performance
- Prepared and administered annual operating and capital budgets totaling $5 million
- Actively participated in continuous improvement teams reviewing organizational information systems and patient assessment standards
- Member Quality Review Committee
- Project leader and coordinator for DRG Options program

KING COUNTY MEDICAL BLUE SHIELD, Seattle, WA                  1990 - 1992
**Vice President, Medicare**
Administered Part B Medicare contract for Washington State, including processing of 8.6 million claims. Directed activities of 250+ FTEs, including five directors and Medical Director.  Oversight of nine subcontractor locations and shared system maintenance and processing contract with State of Montana. Areas of responsibility included Claims Processing, Program Integrity (Fraud & Abuse), Appeals, Fair Hearings, Provider Relations, Medicare Secondary Payer, Adjustments, Medical/Utilization Review, Coverage and Medicare IT.

- Assumed prime contractor responsibilities from previous contractor with no cessation of services statewide
- Developed organizational structure and processes, resulting in improved performance as first year contractor.  Received letter of commendation from HCFA (CMS) regarding first year contractor transition success

# APPENDIX C

**CHRISTINA M. MELNYKOVYCH**
**EXPERIENCE cont'**
King County Medical Blue Shield
Vice President, Medicare
Page 2

- Prepared and administered Medicare and corporate budgets of $17.3 million, including $1.7 million in productivity investment monies
- Improved administrative and operational performance as first year contractor, resulting in contract renewal for FY '92 and FY '93
- Dissolved six subcontractor sites, successfully transferring responsibilities to prime contractor location during 90 day period

VALLEY MEDICAL CENTER, Renton, Washington                                    1987 - 1990
**Director, Medical Records and Patient Accounts**
Directed operations of Medical Records and Patient Accounting departments in 303-bed acute care facility.  Managed 90 staff, including five supervisors, seven leads and quality control manager.

- Met or exceeded JCAHO and other regulatory requirements
- Negotiated and administered contract for Emergency Department transcription services
- Negotiated acquisition and installation of automated systems, including PC-based release of information system, Medicus encoder, abstractor and ad hoc reporter with successful interfaces to ADT, Casemix and HFC/AMEX systems; Learned Mahn; Lanier VoiceWriter dictation system
- Prepared and administered operating budgets totaling $2 million
- Reduced A/R from 93 to 72 days
- Disseminated DRG and practice pattern information to medical staff, administration and ancillary departments
- Served as primary/designated contact for PRO for all DRG and billing-related audits

V.A. MEDICAL CENTER, Seattle, WA                                    1984 - 1987
**Chief, Medical Information Section**
Directed operation of Medical Information Section in 488-bed university affiliated teaching facility with associated 60-bed SNF and outpatient clinics.  Managed 53 FTEs, including assistant chief, staff RRA and two supervisors.

**EDUCATION:**

University of Kansas
Bachelor of Science
Health Information Management
1982

Rockhurst College
Bachelor of Arts
Political Science/History
1978

Current Certifications:  Registered Health Information Administrator (1982-present)
                                     Certified Fraud Examiner (2015)
                                     Accredited Healthcare Fraud Investigator (2016)

# APPENDIX C

**CHRISTINA M. MELNYKOVYCH**
**RESUME cont'**
Page 3

**PROFESSIONAL AFFILIATIONS:**

American Health Information Management Association
Arizona Health Information Management Association
American Academy of Professional Coders
Health Care Compliance Association
Association of Certified Fraud Examiners
National Health Care Anti-Fraud Association
WBL (Women Business Leaders in Health Care)
American Association of Healthcare Administrative Management

**PUBLICATIONS:**

<u>Modern Healthcare</u>:  Interview
<u>Briefings on APCs</u>
<u>Radiology News</u>
American Healthcare Radiology Administrators <u>Link</u> Coding Q&A
HcPRO <u>APC Answer Letter</u> Advisory Board Member/Contributor

**AWARDS:**

Mentorship Award, 2000:  Arizona Health Information Management Association
Certificate of Excellence, 2000:  Health Services Advisory Group

**OTHER:**

Speaker: Emergency Conference on APCs, Washington, DC; PPS & APCs; Chicago, Ill. ; APC
Conference, Las Vegas, Nevada & St. Petersburg, Florida; American Healthcare Radiology Administrators
(AHRA) Changing Workforce conference, Phoenix, Arizona; California Coalition of Nurse Practitioners,
San Diego, California;  HFMA San Diego Chapter Conference, San Diego, California

**EXHIBIT 1**

## Office of the Secretary of Health and Human Services

Executive Office of Health and Human Services

Office of the Secretary of Health and Human Services

| Department of Veterans' Services | Executive Office of Elder Affairs | Office of Children, Youth, and Family Services | Office of Disabilities and Community Services | Office of Health Services | Office of Medicaid *(Division of Medical Assistance)* |
|---|---|---|---|---|---|
| | | Department of Social Services | Department of Mental Retardation | Department of Mental Health | MassHealth |
| | | Department of Transitional Assistance | Massachusetts Commission for the Blind | Department of Public Health | |
| | | Department of Youth Services | Massachusetts Commission for the Deaf and Hard of Hearing | Division of Health Care Finance and Policy | |
| | | Office of Refugees and Immigrants | Massachusetts Rehabilitation Commission | | |
| | | | Soldier's Home in Chelsea | | |
| | | | Soldier's Home in Holyke | | |

MassHealth Health Plans

Massachusetts Behavioral Health Partnership (MBHP)

Managed Care Organization Plans (MCO)

Accountable Care Partnership Plan (ACO)

Primary Care Clinician (PCC) Plan

Primary Care ACO Plan

Data Sources:
http://budget.digital.mass.gov/bb/h1/fy10h1/brec10/dpt/hcehs.htm
https://www.mass.gov/orgs/masshealth
https://www.sec.state.ma.us

**CODING CONTINUUM, INC.**

EXHIBIT 2

## Office of the Secretary of Housing and Economic Development

Executive Office of Housing and Economic Development

Office of the Secretary of Housing and Economic Development

| Department of Housing and Community Development | Massachusetts Office of Business Development | Office of Consumer Affairs and Business Regulation | Mass Permit Regulatory Office | Office of Policy and Planning | Massachusetts Marketing Partnership | Department of Telecommunications and Cable | Division of Banks | Division of Insurance | Division of Standards |

Division of Professional Licensure

Data Sources:
http://budget.digital.mass.gov/bb/h1/fy18h1/brec_18/dpt_18/hceed.htm
https://www.mass.gov/orgs/division-of-professional-licensure

**CODING CONTINUUM, INC.**

Consolidated Provider Information

EXHIBIT 3A

Relevant Time Frame: 7/1/2005 to 7/1/2011

Data Sources*:

Attachment A (J. Fletcher Exhibit 3)

Clinicians who were mentioned in E. Keohan Exhibit 20 (MH006531)

Clinicians who were mentioned in E. Keohan Exhibit 18 (HRI0024514)

Clinicians with **less than 5 years** of experience (according to Attachment A).

| Name (First, Last) | | Dates of Employment[1] (Start, End) | | Job Title (Interrogatory) | Job Title (E. Keohan Exh. 20) | Degree/Yr. Obtained | | License Type | License Start Date | License End Date | Work Status PT/FT/PD/UNK (Interr.) | Work Status PT/FT/PD/UNK (E.K. Exh. 20) | Bilingual | Clinical Experience Prior (Yrs.) | Clinical Experience Arbour[2] | Clinical Experience Combined[3] | License information/Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| E. | Keo. | 1/9/2001 | 12/31/2011 | Center Director Clinician | Clinic Director/Supervisor | MSW | 1991 | LCSW LICSW | Unk. 5/3/1994 | 10/1/1994 Present | Unk. | FT | | 10y | 10y, 11m | 20y, 11m | Licensed Certified Social Worker Unk. - 10/1/1994 / LICSW 5/3/1994 - Present |

**Licensed Clinicians - LICSW**

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D. | Amo. | 10/1/2008 | 12/31/2011 | Clinical Therapist | Family & Adult Counseling | MSW | 1977 | LICSW | 12/20/1982 | Present | FT | PT | >20 Hr. | 31y | 3y, 2m | 34y, 2m | LICSW 12/20/1982 - Present |
| A. | Cab. | 6/13/1994 | 6/23/2011 | Clinical Social Worker | Adult & Group Counseling | MSW | 1975/1977 | LICSW | 8/25/1980 | Present | FT | | Y | 14y | 7y, 0m | 31y | LICSW 08/25/1980 - Present |
| R. | Cho. | 12/5/1994 | 4/19/2006 | Clinical Social Worker | | MSW | 1979 | LICSW | 10/20/1982 | 10/1/2012 | PT | | | 15y | 11y, 4m | 36y, 4m | |
| N. | Gin. | 8/3/1992 | 6/23/2011 | Clinician | | MSW | 1975 | LICSW | 6/8/1981 | Present | Unk. | | | 16y | 18y, 10m | 34y,10m | LICSW 6/8/1981 - Present |
| E. | Kah. | 1993 | 6/23/2011 | Clinical Therapist | Adult Counseling | BSW 1984 MSW 1988 | | LSW LCSW LICSW | 1/2/1985 12/13/1998 2/9/1994 | 10/1/1990 10/1/2016 10/1/2016 | PT | PT | >10 Hr. | 9y | 17y, 5m | 26y, 5m | LSW 1/2/1985 - 10/1/1990 / Licensed Certified Social Worker 12/13/1998 - 10/1/1994 / LICSW 2/9/1994 - 10/1/2016 |
| J. | San. | 9/20/2005 | 6/23/2011 | Clinical Therapist | Adult Counseling | MSW | 1983 | LICSW (CA) LCSW | 9/8/1986 10/29/1997 | 10/1/2016 6/30/2015 | Unk | PT | >20 Hr. | 18y | 5y, 9m | 23y 9m | LICSW 9/8/1986 - 10/1/2016 / (CA) Licensed Clinical Social Worker 10/29/1997 - 6/30/2015 |
| D. | Sch. | 11/16/1987 | 12/31/2011 | Clinical Therapist | Adult Counseling | MSW | 1966 | LICSW | 8/11/1987 | Present | PT | PT | >10 Hr. | 20y | 24y, 1m | 44y, 1m | LICSW 8/11/1987 - Present |

**Licensed Clinicians - LCSW/LSWA**

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| B. | God. (O-Bri) | 6/9/2008 | 6/23/2011 | Clinician | Child, Adult & Family Counseling | MSW | 1994 | LCSW | 3/21/1995 | Present | Unk. | FT | Y | Unk. | 3y, 0m | 3y | Licensed Certified Social Worker 3/21/1995 - Present |
| K. | Lou. | 9/6/2006 | 7/2011 | Unk. | | MSW | 2007 | LCSW LICSW RN | 4/3/2013 3/28/2017 6/29/2016 | 3/28/2017 Present Present | Unk. | | | 9y | 4y, 9m | 13y, 9m | Licensed Certified Social Worker 4/3/2013 - 3/28/2017 / LICSW 3/28/2017 - Present / RN 6/29/2016 - Present |
| J. | Kar. | 3/26/2008 | 12/31/2011 | Intern Clinical Social Worker | Child & Adult Counseling | MS 1990 MPA 2002 MSW 2009 | | LCSW | 8/21/2009 | Present | PT | PT | >10 Hr. | 9m. (Internship) | 3y, 9m | 4y, 6m | Licensed Certified Social Worker 8/21/2009 - Present |
| AM. | Mar. | 2/1/1991 | 12/31/2011 | Unk. | | MSW | 1984/1985 | LCSW | 3/8/1982 | Present | Unk. | | | | 20y, 10m | 20y, 4m | Licensed Certified Social Worker 3/8/1982 - Present |
| L. | Lev. | 10/21/2004 | 12/31/2011 | Clinician | | BSW 1998 MS 2003/2004 | | LSWA | 5/18/1999 | Present | Unk. | | | 6y | 7y, 2m | 12y, 8m | LSWA 5/18/1999 - Present |
| N. | Cru. | 1/1/2005 | 12/31/2009 | Unk. | | M.Ed. | 2004 | LSWA | 2/20/2009 | 10/1/2010 | Unk. | | | Unk. | 4y, 11m | 4y, 11m | LSWA 2/20/2009 - 10/1/2010 |

**Licensed Mental Health Counselors**

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A. | Bor. | Unk. | 12/31/2011 | Clinical Therapist | | MA | 1993 | LMHC | 10/6/1997 | Present | PT | | | 6y | Unk. | 6y | LMHC 10/06/1997 - Present |
| L. | Cof. | 12/9/2002 | 12/31/2011 | Intern Counselor | | MA | 2000 | LMHC | 3/24/2006 | Present | PT | | | 3y | 9y, 0m | 12y | LMHC 03/24/2006 - Present |
| E. | Pau. | 6/2002 9/15/2008 | 9/15/2008 12/31/2011 | Intern Clinician Clinical Supervisor | | MA | 2002 | LMHC (NH) LCMHC | 10/26/2005 10/15/2004 | Present Present | Unk. Unk. | | | 2y 8y, 3m | 6y, 3m 3y, 3m | 8y, 3m 11y, 6m | LMHC 10/26/2005 - Present / (NH) LCMHC 10/15/2004 - Present |
| C. | Sta. | Unk. | Unk. | Clinician | | MA 1983 M.Ed. 1996 CAGS 1998 | | LMHC | 4/28/2006 | Unk. | Unk. | | | 5y | Unk. | 5y | LMHC 4/28/2006 |

CODING CONTINUUM, INC.

Consolidated Provider Information

Relevant Time Frame: 7/1/2005 to 7/1/2011

Data Sources*:   Attachment A (J. Fletcher Exhibit 3)

Clinicians who were mentioned in E. Keohan Exhibit 20 (MH006531)

Clinicians who were mentioned in E. Keohan Exhibit 18 (HRI0024514)

Clinicians with less than 5 years of experience (according to Attachment A).

| Name (First, Last) | | Dates of Employment[1] (Start, End) | | Job Title (Interrogatory) | Job Title (E. Keohan Exh. 20) | Degree/Yr. Obtained | | Type | License Start Date | End Date | Work Status PT/FT/PD/UNK (Interr.) | PT/FT/PD/UNK (E.K. Exh. 20) | | Bilingual | Clinical Experience (Yrs.) Prior (Yrs.) | Arbour[2] | Combined[3] | License information/Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| C. | Sut. | 2/1998 | 12/31/2011 | Outpatient Clinical Therapist | Adolescent & Adult Counseling | MS | 1989 | LSW LMHC | 10/15/1996 5/1/1997 | Present Present | Unk | PT | >10 Hr. | | 11y | 13y, 10m | 24y, 10m | LSW 10/15/1996 - Present LMHC 5/1/1997 - Present |
| B. | Lop.*** | 2/1998 | 12/31/2011 | Intern Clinical Therapist | Adolescent & Adult Counseling | M.Ed. | 2007 | LMHC | 7/16/2009 | Present | FT | FT | | Y | 9 mon. (Internship) | 13y, 9m | 14y, 6m | LMHC 7/16/2009 - Present |
| D. | Bor.** | *1994 | 12/31/2011 | Outpatient Clinician | Adult Family Counseling | M.Ed. | 1992 | LMHC | 4/24/1997 | Present | PT | PT | >10 Hr. | Y | 3y | 16y, 11m | 19y, 11m | LMHC 04/24/1997 - Present MA: School SW/School Adjustment Counselor #375459 Eff. 12/27/2017 |

## Licensed Clinicians - Psychologists

| Name (First, Last) | | Dates of Employment[1] (Start, End) | | Job Title (Interrogatory) | Job Title (E. Keohan Exh. 20) | Degree/Yr. Obtained | | Type | License Start Date | End Date | Work Status PT/FT/PD/UNK (Interr.) | PT/FT/PD/UNK (E.K. Exh. 20) | | Bilingual | Prior (Yrs.) | Arbour[2] | Combined[3] | License information/Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M. | Bor.** | 1995 | 10/6/2010 | Unk. | | Ph.D. | 2000 | (CA) Psychologist | 8/31/2009 | Present | Unk. | | | | 11y | 14y, 9m | 25y, 9m | (CA) Licensed Psychologist 8/31/2009 - Present |
| SK. | Yar. | Unk. | Unk. | Psychologist HSP | | Ph.D. | Unk. | Psychologist | 1/2/1991 | Present | Unk. | | | | Unk. | Unk. | Unk. | Psychologist 1/2/1991 - Present |
| EM. | Sha. | 1/1/1997 | 6/23/2017 | Clinical Therapist | Adult Counseling | M.Ed. Ph.D. | 1973 1982 | Psychologist | 1/5/1993 | Present | PT | PT | >20 Hr. | | 26y | 14y, 5m | 40y, 5m | Psychologist 1/5/1993 - Present |

## Licensed Clinicians - Nurses and Physicians

| Name (First, Last) | | Dates of Employment[1] (Start, End) | | Job Title (Interrogatory) | Job Title (E. Keohan Exh. 20) | Degree/Yr. Obtained | | Type | License Start Date | End Date | Work Status PT/FT/PD/UNK (Interr.) | PT/FT/PD/UNK (E.K. Exh. 20) | | Bilingual | Prior (Yrs.) | Arbour[2] | Combined[3] | License information/Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M. | Gat. | 3/17/2008 | 12/31/2011 | Psychiatrist | | MD | 1964 | Physician | 7/3/1975 | Present | Unk. | | | | 37y | 3y, 9m | 40y, 9m | Physician 7/3/1975 - Present (NH) Physician 6/13/1977 - Present (VA) Physician 8/12/1974 - Present |
| M. | Har. | 3/17/2008 | 12/31/2011 | Psychiatrist | | MD | 1959 | Physician | 7/18/1990 | Present | Unk. | | | | 41y | 3y, 9m | 44y, 9m | Physician 7/18/1990 - Present (NY) Physician 7/29/1960 - Present Board Cert. in Adult Psychiatry & Neurology 1969 General Cert. in Psychiatry & Subspecialty in Child & Adolescent Psychiatry 1973 |
| N. | Sid. | 3/17/2008 | 12/31/2011 | Psychiatrist | | MD | 1953 | Physician | 9/18/1958 | 5/28/2015 | Unk | | | | Unk. | 3y, 9m | 3y, 9m | Physician 9/18/1958- 5/28/2015 Board Cert. in Psychiatry certified on 3/30/1960 |
| P. | Hil. | Unk. | Unk. | Unk. | | MD | 1972 | Physician | 8/7/1981 | Present | Unk. | | | | Unk. | Unk. | Unk. | Physician 8/7/1981 - Present Board Cert. in Psychiatry & Neurology & General Cert. in Psychiatry 1992 |
| E. | Pet. | 12/1996 | 12/31/2011 | NP | | BSN MSN | 1982 1984 | RN PCNS | 12/31/1959 12/31/1959 | 6/22/2016 6/22/2016 | Unk. | | | | 22y | 15y, 0m | 27y | RN 12/31/1959 - 6/22/2016 PCNS 12/31/1959 - 6/22/2016 (NH) RN  2/16/1996 - 6/22/1997 |
| R. | Lov. | 6/15/2011 | 12/31/2011 | NP | | MA MD CAGS BSN/MS | 1980 1986 2004 2009 | LMHC RN CNP | 6/20/2006 2/6/2008 12/28/2009 | Present Present Present | Unk | | | | 17y | 6m | 17y, 6m | (MI) Lic/Reg. Masters Ltd. Psychologist  10/1/1980 - 8/31/2012 (NH) RN 11/23/2010 - Present (RI) RN-Temp 11/17/2010 - 2/15/2011 (RI) RN 1/10/2011 - 3/1/2014 (RI) NP 12/15/2011 - 3/1/2013 |
| T. | Fer. | 7/31/2009 | 12/31/2011 | NP | | BS BS MS | 1988 1993 2008 | RN CNP | 10/1/1993 11/20/2008 | Present Present | PT | | | | Unk. | 2y, 5m | 2y, 5m | RN 10/1/1993 - Present CNP 11/20/2008 - Present |
| M. | Ort. | 2/26/2007 | 1/24/2013 | RN/NP | | BS MSN | 1991 2005 | RN CNP | 7/26/1994 7/26/1994 | Present Present | | | | | 6y | 5y, 10m | 11y, 10m | (NH) RN 1/17/2001 - 10/31/2006 Cert. Nurse Aide  7/26/2001 - Present Cert. Nurse Aide 11/23/2015 - 11/23/2017 |

2

CODING CONTINUUM, INC.

Consolidated Provider Information

Relevant Time Frame: 7/1/2005 to 7/1/2011

Data Sources*:  Attachment A (J. Fletcher Exhibit 3)

Clinicians who were mentioned in E. Keohan Exhibit 20 (MH006531)

Clinicians who were mentioned in E. Keohan Exhibit 18 (HRI0024514)

Clinicians with **less than 5 years** of experience (according to Attachment A).

| Name (First, Last) | Dates of Employment[1] (Start, End) | | Job Title (Interrogatory) | Job Title (E. Keohan Exh. 20) | Degree/Yr. Obtained | | License | | | Work Status | | | | Clinical Experience (Yrs.) | | | License information/Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Type | Start Date | End Date | PT/FT/PD/UNK (Interr.) | PT/FT/PD/UNK (E.K. Exh. 20) | Bilingual | | Prior (Yrs.) | Arbour[2] | Combined[3] | |

**Masters Level Clinicians**

| Name | Start | End | Job Title (Interrogatory) | Job Title (Exh 20) | Degree | Yr | Type | Start | End | Interr | E.K. | Biling | | Prior | Arbour | Combined | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 9/2009 | 5/2010 | Intern | | | | | | | | | | | 6y | 0y, 7m | 6y, 7m | |
| M.   Rai-Q*** | 5/2010 | 12/31/2011 | Clinician | | MA | 2010 | None | | | Unk. | | | | 6y, 7m | 1y, 6m | 8y, 1m | Waiver requested by E. Keohan or M. Gaudet |
| B.   Pol. | Unk. | 6/10/2011 | Clinician | | MS | 2010 | None | | | Unk. | | | | 6y | Unk. | 6y | |

**Masters Level Clinicians - Full Time**

| Name | Start | End | Job Title (Interrogatory) | Job Title (Exh 20) | Degree | Yr | Type | Start | End | Interr | E.K. | Biling | | Prior | Arbour | Combined | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D.   Flo. | 11/1/2010 | 12/31/2011 | Outpatient Clinical Therapist | Adult & Family Counseling | MS Ph.D. | 1997 2003 | None | N/A | N/A | PT | FT | | Y | 10y | 1y, 1m | 11y, 1m | |
| A.   Fuc. | 11/24/2008 | 12/31/2011 | Clinician | Child & Adult Counseling | MS Ph.D. | 1999 2003 | LSWA | 9/29/1998 | 10/1/2002 | FT | FT | | Y | 9y | 3y, 1m | 12y, 1m | LSWA 9/29/1998 - 10/1/2002 Waiver requested by E. Keohan or M. Gaudet |
| R.   Bet. | 4/4/2011 | 12/31/2011 | Clinical Therapist | Adult Counseling | MSW | 2009 | PR-MSW | 7/10/2007 | 7/9/2011 | FT | FT | | Y | 6y | 0y, 8m | 6y, 8m | PR Trabajador Social Provisional 07/10/2007 - 07/09/2011 |
| Y.   Coo. (Rig.) | 5/14/2008 | 12/31/2011 | Clinical Therapist | Child, Adult & Family Counseling | MSW | 2007 | None | N/A | N/A | FT | FT | | Y | 3y | 3y, 7m | 6y, 7m | |
| C.   Guz.[4] | 10/29/2007 | 6/26/2009 | Clinical Therapist | Adult Counseling | MSW | 1999 | PR-MSW | 11/9/2004 | Unk. | Unk. | FT | | Y | 9y | 1y, 7m | 10y, 7m | PR Trabajador Social Permanente 11/9/2004 |
| M.   Per. | 8/4/2004 | 12/31/2011 | Intern Clinical Therapist | Child, Adult & Group Counseling | MSW | 2005 | None | N/A | N/A | Unk. | FT | | Y | 1y (Internship) | 7y, 4m | 8y, 4m | |
| S.   Bir. (Bur.) | 5/19/2008 | 3/1/2011 | Intake Coordinator | | | | | | | | | | | Unk. | 2y, 9m | **2y, 9m** | |
| | 3/1/2011 | 12/31/2011 | Clinical Therapist | Adolescent & Adult Counseling | MA | 2008 | None | N/A | N/A | FT | FT | | | 2y, 9m | 0y, 9m | **3y, 6m** | |
| L.   DiN. | 9/1/2007 | 12/31/2011 | Intern Outpatient Clinical Therapist | Adolescent & Adult Counseling | MA | 2009 | LMHC | 7/17/2018 | Present | PT | FT | | | 4y | 4y, 3m | 8y, 3m | LMHC 7/17/2018 - Present |
| M.   Gon. | 8/19/2008 | 6/23/2011 | Intern Clinician | Adult Counseling | MA | 2005 | None | N/A | N/A | Unk. | FT | | Y | 1y | 2y, 10m | **3y, 10m** | BA from University of Puerto Rico (1980) MA University of Phoenix (2005) Waiver requested by E. Keohan or M. Gaudet |
| N.   Fon.** (Fon. Zab.) (Fon. Zeb.) | 1994 | 8/22/2011 | Clinical Therapist | Adult, Family & Group Counseling | M.Ed. Ph.D. Can. | 1986 Unk. | None | N/A | N/A | FT | FT | | Y | 15y | 16y, 7m | 31y, 7m | Ph.D. Candidate (Boston University) |
| G.   Joh.* | 8/1/2009 | 6/23/2011 | Clinical Therapist | Adolescent & Adult Counseling | M.Ed. | 2009 | None | N/A | N/A | Unk. | FT | | | 15m (Internship) | 1y, 10m | **3y, 1m** | |
| D.   Tow.**** (L.) | 7/29/2003 | 10/3/2004 | FFS Clinician | | | | | | | | | | | 20y | 1y, 2m | 21y, 2m | |
| | 10/4/2004 | Unk. | Program Coordinator | | | | | | | | FT PT | | | | | | |
| | Unk. | 7/29/2011 | Outpatient Clinician | | M.Ed. CAGS | 8/2/1987 1989 | None | N/A | N/A | FT PT PD | FT | | Y | 21y, 2m | 6y, 9m | 27y, 11m | |
| | 7/30/2011 | 12/31/2011 | PHP Clinician | | | | | | | | | | | 27y, 11m | 0y, 5m | 28y, 4m | |

**Part Time Master's Level Clinicians**

| Name | Start | End | Job Title (Interrogatory) | Job Title (Exh 20) | Degree | Yr | Type | Start | End | Interr | E.K. | Biling | | Prior | Arbour | Combined | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S.   Adi. | 9/5/2005 | 12/31/2011 | Intern Clinical Therapist | Adolescent & Adult Counseling | MSW | 2006 | None | N/A | N/A | PT | PT | >10 Hr. | | 3y | 6y, 3m | 9y, 3m | |
| R.   Cab. | 3/19/2007 | 12/31/2011 | Intern PHP Director | Adult Counseling | M.Ed. | 2008 | LMHC | 10/21/2011 | Present | Unk. | PT | >10 Hr. | Y | 5y | 4y, 9m | 9y, 9m | LMHC 10/21/2011 - Present |
| R.   Cru. | 3/10/2008 | 12/31/2011 | Intern Clinical Therapist | Adult Counseling | M.Ed. | 2008 | LSWA | 5/31/2016 | Present | PT | PT | >10 Hr. | Y | 11y | 3y, 9m | 14y, 9m | LSWA 5/31/2016 - Present |
| J.   Esp.* | 1/1/2009 | 12/31/2011 | Adolescent & Adult Counselor | Adult & Family Outreach Counseling | MSW | 1996/1997 | None | N/A | N/A | PT | PT | >10 Hr. | Y | 10y | 2y, 11m | 12y, 11m | |

3

Relevant Time Frame: 7/1/2005 to 7/1/2011

Data Sources*:
- Attachment A (J. Fletcher Exhibit 3)
- Clinicians who were mentioned in E. Keohan Exhibit 20 (MH006531)
- Clinicians who were mentioned in E. Keohan Exhibit 18 (HRI0024514)

Clinicians with **less than 5 years** of experience (according to Attachment A).

| Name (First, Last) | Dates of Employment[1] (Start) | (End) | Job Title (Interrogatory) | Job Title (E. Keohan Exh. 20) | Degree/Yr. Obtained | | License Type | Start Date | End Date | Work Status PT/FT/PD/UNK (Interr.) | PT/FT/PD/UNK (E.K. Exh. 20) | Bilingual | Clinical Experience (Yrs.) Prior (Yrs.) | Arbour[2] | Combined[3] | License information/Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A. Nin. | 10/1993 | 7/18/2011 | Clinician | Adult Counseling | M.Ed. MA Ph.D. | 1970 1970 1977 | None | N/A | N/A | Unk. | PT | >20 Hr. | Y | 12y | 17y, 8m | 29y, 8m | |
| N. Ort. | 3/2010 | 12/31/2011 | Psychotherapist | Child & Family Outreach Counseling | M.Ed. | 1996 | None | N/A | N/A | Unk. | PT | >20 Hr. | Y | 5y | 1y, 8m | 6y, 8m | |
| J. Rig.* | 11/4/2004 | 6/23/2017 | Clinical Therapist | Adolescent & Adult Counseling | MS | 2002 | None | N/A | N/A | Unk. | PT | >20 Hr. | Y | 10y | 6y, 7m | 16y, 7m | |
| **Masters Degree Graduates within 24 Months** | | | | | | | | | | | | | | | | |
| J. Gon. | 2/12/2010 | 6/23/2017 | Intern Clinical Therapist | Masters Degree Grad. Within 24m | MS | 2011 | LMHC | 4/2/2015 | Present | FT | FT | | Y | 5y | 1y, 4m | 6y, 4m | LMHC 4/2/2015 - Present |
| N. Mer. | 10/16/2009 | 6/23/2017 | Intern | Masters Degree Grad. Within 24m Adult Counseling | MS | 2010/2011 | None | N/A | N/A | Unk. | PT | >10 Hr. | | 9y | 1y, 8m | 10y 8m | MS - Licensed Mental Health Counseling [sic] |
| **2nd Year Masters Degree Interns** | | | | | | | | | | | | | | | | |
| S. Her.-L. | 7/18/2011 | 12/31/2011 | Intern | 2nd Year Masters Degree Intern | BA MA Can. | 2004 Unk. | None | N/A | N/A | Unk. | | | Y | 1y | 0y, 5m | 1y, 5m | MA (Candidate) |
| E. Hid.**** | 7/11/2011 | 12/31/2011 | Intern | 2nd Year Masters Degree Intern | M.Ed. CAGS | 2004 Unk. | None | N/A | N/A | Unk. | | | Y | 10y | 0y, 5m | 10y 5m | New Hampshire Experienced Educator Certificate 5/6/2016 - 7/1/2019 New Hampshire School Counselor Endorsement 5/6/2016 - 7/1/2019 |
| E. Loo. | 11/25/2009 | 12/31/2011 | Intern | 2nd Year Masters Degree Intern | M.Ed. Can. | 2011 | None | N/A | N/A | Unk. | | | | 2y | 2y, 1m | 4y, 1m | M.Ed. (Candidate) |
| M. Lop. | 9/20/2010 | 12/31/2011 | Intern Masters Level Counselor | 2nd Year Masters Degree Intern | M.Ed. | Unk. | None | N/A | N/A | Unk. | | | Y | Unk | 1y, 3m | 1y, 3m | |
| E. (H.) Mat. | Unk. | Unk. | Intern Clinical Therapist | 2nd Year Masters Degree Intern | MA | 2011 | None | N/A | N/A | Unk. | | | Y | Unk. | Unk. | Unk. | E. Keohan Exhibit 20 denotes this intern is graduating in 8/2011. |
| J. Nun. | 3/23/2011 | 12/31/2011 | Intern Counselor | 2nd Year Masters Degree Intern | MS | 2012 | LMHC | 9/30/2014 | Present | Unk | | | Y | 10y | 0y, 9m | 10y, 9m | Obtained License after employment at Arbour |
| **Interns** | | | | | | | | | | | | | | | | |
| J. Ort-B. | Unk. | Unk. | Intern | | MSW | Unk. | LCSW | 9/11/1995 | 10/1/1998 | Unk. | | | | Unk. | Unk. | Unk. | Licensed Certified Social Worker 9/11/1995 - 10/1/1998 |
| C. Tre. | Unk. | Unk. | Intern | | MSW | 2005 | None | | | Unk. | | | | Unk. | Unk. | Unk. | |
| RE. (E.) Wit. | 8/2006 | Unk. | Intern | | MSW | 2007 | None | | | Unk. | | | | Unk. | Unk. | Unk. | Last date (11/19/2007) on Exhibit 67 of J. Fletcher Exhibit 3. Attachment A. |
| D. Cas. | 1/1/2005 | 12/31/2009 | Intern | | MA | Unk. | LSWA | 5/24/1999 | 10/1/2000 | Unk. | | | | Unk. | 4y, 11m | 4y, 11m | |
| M. Wis. | Unk. | Unk. | MA Intern | | MA Intern | Unk. | Unk. | | | Unk. | | | | Unk. | Unk. | Unk. | |
| A. Rou. | Unk. | Unk. | Intern | | M.Ed. | 2010 | LMHC | 3/29/2013 | Present | Unk. | | | | Unk. | Unk. | Unk. | LMHC 3/29/2013 - Present |
| E. Cas. | 1/1/2005 | 12/31/2009 | Intern | | M.Ed. MS | 1990 2008 | LMHC | 7/7/2010 | Present | Unk. | | | | Unk. | 4y, 11m | 4y, 11m | LMHC 07/07/2010 - Present (After Employment at Arbour) |
| M. Kni. | Unk. | 7/15/2009 | Intern | | Masters | Unk | None | | | Unk. | | | | Unk. | Unk. | Unk. | |

Consolidated Provider Information

Relevant Time Frame: 7/1/2005 to 7/1/2011

Data Sources*:  Attachment A (J. Fletcher Exhibit 3)

Clinicians who were mentioned in E. Keohan Exhibit 20 (MH006531)

Clinicians who were mentioned in E. Keohan Exhibit 18 (HRI0024514)

Clinicians with **less than 5 years** of experience (according to Attachment A).

| Name (First, Last) | Dates of Employment[1] (Start, End) | | Job Title (Interrogatory) | Job Title (E. Keohan Exh. 20) | Degree/Yr. Obtained | | Type | License Start Date | End Date | Work Status PT/FT/PD/UNK (Interr.) | PT/FT/PD/UNK (E.K. Exh. 20) | Bilingual | Clinical Experience (Yrs.) Prior (Yrs.) | Arbour[2] | Combined[3] | License information/Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **After Relevant Time Period (> 07/01/2011)** | | | | | | | | | | | | | | | | |
| C.   Guz.[4] | 7/25/2011 | 12/31/2011 | Clinical Therapist | Adult Counseling | MSW | 1999 | PR-MSW | 11/10/2004 | | FT | FT | Y | 10y, 7m | 0y, 5m | 11y | PR Trabajador Social Permanente 11/9/2004 |
| P.   Gor.**** | 8/22/2011 | 12/31/2011 | Clinical Therapist | | M.Ed. MSW | 1974/1978 1989 | LCSW LICSW | 7/19/1990 6/15/1992 | 10/1/1992 Present | Unk. | | | Unk | 0y, 4m | 4m | Licensed Certified Social Worker 7/19/1990 - 10/1/1992 LICSW 6/15/1992 - Present |
| | 9/6/2011 | 5/20/2012 | MSW Intern | | | | | | | PD | | | 4m (Internship) | 0y, 8m | 1y, 5m | |
| C.   Sou. | 5/20/2012 | 11/29/2012 | Outpatient Therapist | | MSW | 5/19/2012 | None | | | PT FT | | | 1y, 5m | 0y, 6m | 1y, 11m | |
| **Licensed Clinicians   (Unknown Time Period)** | | | | | | | | | | | | | | | | |
| R.   Ruiz | Unk. | Unk. | Clinical Therapist | | MSW | 1978 | LICSW | 7/8/1986 | 10/1/2016 | Unk. | | | Unk. | Unk. | Unk. | LICSW 7/8/1986 - 10/1/2016 |
| L.   Hab. | Unk. | Unk. | Intern | | MA | Unk. | (NH) ICSW | 11/17/2008 | Present | Unk. | | | Unk. | Unk. | Unk. | (NH) ICSW (New. Hamp.) 11/17/2008 - Present |
| L.   Mil. | Unk. | Unk. | Intern | | Unk. | Unk. | (ME) LMSW-C (ME) LC | 2/2/2009 11/15/2011 | 11/15/2011 Present | Unk | | | Unk. | Unk. | Unk. | (ME) LMSW-C 2/2/2009 - 11/15/2011 (ME) LC 11/15/2011 - Present |
| **Licensed Mental Health Counselors  (Unknown Time Period)** | | | | | | | | | | | | | | | | |
| A.   Dil. | Unk. | Unk. | Intern | | MA M.Ed. | Unk. Unk. | LMHC | 11/2/2007 | Present | PT | | | Unk. | Unk. | Unk. | LMHC 11/2/2007 - Present |
| **Unknown** | | | | | | | | | | | | | | | | |
| E.   Mic. | 10/7/2010 | Unk. | Unk. | | M.Ed. | 2006 | LMHC | 6/8/2012 | Present | Unk. | | | Unk. | Unk. | Unk. | LMHC 6/8/2012 - Present |
| R.   Hod. | Unk. | Unk. | Intern | | MA | Unk. | None | | | Unk. | | | Unk. | Unk. | Unk. | |
| **Clinicians that billed one claim at Lawrence but are not employed by Lawrence. (Please see **** footnote)** | | | | | | | | | | | | | | | | |
| L.   Coh. | 11/30/2005 | Unk. | Therapist | | MA MSW | 2010 2010 | LICSW | 1/12/1987 | Present | Unk | | | Unk. | Unk. | Unk. | LICSW 1/12/1987 - Present |
| J.   Dzi. | 2/1/2007 | 12/31/2011 | Intern Outpatient Clinical Therapist Family Stabilization Therapist In-Home Therapist Clinician | | MSW | 2008 | LCSW LICSW | 10/8/2008 4/8/2011 | 10/1/2012 Present | FT | | | Unk. | 4y, 10m | 4y, 10m | Licensed Clinical Social Worker 10/8/2008 - 10/1/2012 LICSW 4/8/2011 - Present |
| K.   Ezi. | Unk. | Unk. | Unk. | | MSW | Unk. | LCSW LICSW | 7/31/1990 12/23/1991 | 10/1/1992 10/1/2018 | Unk. | | | Unk. | Unk. | Unk. | Licensed Certified Social Worker 7/31/1990 - 10/1/1992 LICSW 12/23/1991 - 10/1/2018 |
| K.   Fen. | 8/18/2003 | Unk. | Clinic Director in Haverhill | | Unk. | Unk | LICSW | 12/14/1999 | 10/1/2008 | Unk. | | | Unk. | Unk. | Unk. | LICSW 12/14/1999 - 10/1/2008 |
| T.   Fra. | Unk. | Unk. | Unk. | | MSW | 2001 | LCSW LICSW | 9/28/2001 9/2/2004 | 10/1/2006 Present | Unk. | | | Unk. | Unk. | Unk. | Licensed Certified Social Worker 9/28/2001 - 10/1/2006 LICSW 9/2/2004 - Present |
| E.   Mar. | Unk. | 5/2009 | Unk. | | Unk. | Unk. | LICSW | 2/1/1990 | 10/1/2012 | Unk. | | | Unk. | Unk. | Unk. | LICSW 2/1/1990 - 10/1/2012 |
| L.   Per. | 9/2009 | Unk. | Intern Clinician | | MSW | 2010 | LCSW LICSW | 11/12/2010 4/16/2013 | 10/1/2014 Present | Unk. | | | Unk. | Unk. | Unk. | Licensed Certified Social Worker  11/12/2010 - 10/1/2014 LICSW 4/16/2013 - Present |

5

CODING CONTINUUM, INC.

Consolidated Provider Information

Relevant Time Frame: 7/1/2005 to 7/1/2011

Data Sources*:  Attachment A (J. Fletcher Exhibit 3)

Clinicians who were mentioned in E. Keohan Exhibit 20 (MH006531)

Clinicians who were mentioned in E. Keohan Exhibit 18 (HRI0024514)

Clinicians with **less than 5 years** of experience (according to Attachment A).

| Name (First, Last) | Dates of Employment[1] (Start, End) | | Job Title (Interrogatory) | Job Title (E. Keohan Exh. 20) | Degree/Yr. Obtained | | License Type | Start Date | End Date | Work Status PT/FT/PD/UNK (Interr.) | PT/FT/PD/UNK (E.K. Exh. 20) | Bilingual | Clinical Experience (Yrs.) Prior (Yrs.) | Arbour[2] | Combined[3] | License information/Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| K.    Tig. | 9/2/2003 | 8/23/2006 | Director, School Program | | MSW | 5/2003 | LCSW LICSW | 11/14/2003 7/10/2006 | 10/1/2006 Present | FT | | | 18m (Internship) | 2y, 11m | 3y, 5m | Licensed Certified Social Worker 11/14/2003 - 10/1/2006 LICSW 7/10/2006 - Present |
| | 8/24/2006 | Unk. | FFS Clinician | | | | | | | | | | 3y, 5m | Unk. | Unk. | |
| M.    Hig. | Unk. | Unk. | Unk. | | MA | 2005 | LSWA LSW | 5/22/1995 6/10/1996 | 10/1/1996 Present | Unk. | | | Unk. | Unk. | Unk. | LSWA 5/22/1995 - 10/1/1996 LSW 6/10/1996 - Present |
| L.    Sha. | 4/1/2009 | Unk. | Therapist | | MA | 2005 | None | | | Unk. | | | Unk. | Unk. | Unk. | |
| A.    Ham. | 9/28/2009 | Unk. | Unk. | | M.Ed. Can. | 2007 | None | | | Unk. | | | Unk. | Unk. | Unk. | M.Ed. (Candidate) |
| D.    Dep. | Unk. | Unk. | Unk. | | Unk. | Unk. | LMHC | 1/17/2008 | Present | Unk. | | | Unk. | Unk. | Unk. | LMHC 1/17/2008 - Present |
| J.    McB-G. | Unk. | Unk. | Unk. | | MA | Unk. | LMHC LMFT | 5/14/1993 7/12/1993 | 12/31/2015 12/31/2003 | Unk. | | | Unk. | Unk. | Unk. | LMHC 5/14/1993 - 12/31/2015 Marriage & Family Therapist 7/12/1993 - 12/31/2003 |
| W.    Mil. | Unk. | Unk. | Unk. | | M.Ed. | | LMHC | 2/16/2005 | Present | Unk. | | | Unk. | Unk. | Unk. | LMHC 2/16/2005 - Present |
| T.    Bru. | Unk. | Unk. | Nurse Clinician | | MA | Unk. | RN PCNS | 4/18/1975 4/18/1975 | Present Present | Unk. | | | Unk. | Unk. | Unk. | RN 4/18/1975 - Present PCNS 4/18/1975 - Present |
| M.    Fra. | Unk. | Unk. | Unk. | | BA MA Ed.D. | 1976 1985 Unk. | None | | | Unk. | | | Unk. | Unk. | Unk. | |
| G.    Jac. | 4/1/2005 | Unk. | Unk. | | MA | 2001 | None | | | Unk. | | | Unk. | Unk. | Unk. | |
| K.    O'Co. | Unk. | Unk. | Unk. | | MA | Unk. | None | | | Unk. | | | Unk. | Unk. | Unk. | |
| J.    Rhe. | 9/1/2007 | Unk. | Unk. | | Unk. | Unk. | None | | | Unk. | | | Unk. | Unk. | Unk. | |
| V.    Val.*** | 10/2008 | 2009 | Unk. | | MA | Unk. | None | | | Unk. | | | Unk. | 1y, 2m | 1y, 2m | |

[1] Denotes changing of end date from Interrogatory listing of "Unk" to 6/23/2011 based on E. Keohan Exhibit 20.

[2] Denotes the Arbour Clinical experience was calculated by the employee's start and end date.

[3] Denotes the combined time of Prior Clinical Exp. and Arbour Clinical Experience

[4] Denotes the employee C. Guz that was employed at Arbour during the time period and after the time period

* Denotes Clinicians that were 1099 independent contractors at their employment start date (please refer to Attachment A Page 1)

** Denotes changing of start date from Interrogatory listing of calendar year to a start date of the next year, i.e. 1998 changes to 1/1/1999.

*** Denotes changing of start date from Interrogatory listing of calendar month to a start date as the beginning of the next month, i.e. 2/1998 changes to 3/1/1998.

**** Denotes changing of end date from Interrogatory listing of "unable to locate" to 12/31/2011 based on Attachment A footnote 2.

CODING CONTINUUM, INC.

Relevant Time Frame: 7/1/2005 to 7/1/2011

Data Sources*:

Attachment A (J. Fletcher Exhibit 3)

Clinicians who were mentioned in E. Keohan Exhibit 20 (MH006531)

| Name (First, Last) | Dates of Employment[1] (Start, End) | | Job Title (Interrogatory) | Job Title (E. Keohan Exh. 20) | Degree/Yr. Obtained | | Type | Start Date | End Date | PT/FT/PD/UNK (Interr.) | PT/FT/PD/UNK (E.K Exh. 20) | Bilingual | Prior (Yrs.) | Arbour[2] | Combined[3] | License Information/Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | License | | | Work Status | | | Clinical Experience (Yrs.) | | | |

**Clinicians Qualified to Provide Supervision**
Time Frame: 7/1/2005 to 7/1/2011 (Available during the entire time period)
Licensed Clinicians - LICSW

| Name | Start | End | Job Title (Interr.) | Job Title (E.K.) | Degree | Yr. | Type | Start Date | End Date | PT/FT/PD/UNK (Interr.) | PT/FT/PD/UNK (E.K.) | Bilingual | Prior (Yrs.) | Arbour | Combined | License Information/Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A.  Cab. | 6/13/1994 | 6/23/2011 | Clinical Social Worker | Adult & Group Counseling | MSW | 1975/1977 | LICSW | 8/25/1980 | Present | Unk. | FT | | Y | 14y | 17y, 0m | 31y | LICSW 08/25/1980 - Present |
| E.  Kah. | 1993 | 6/23/2011 | Clinical Therapist | Adult Counseling | BSW MSW | 1984 1988 | LSW LCSW LICSW | 1/2/1985 12/13/1998 2/9/1994 | 10/1/1990 10/1/1994 10/1/2016 | PT | PT | >10 Hr. | | 9y | 17y, 5m | 26y, 5m | LSW 1/2/1985 - 10/1/1990  Licensed Certified Social Worker 12/13/1998 - 10/1/1994  LICSW 2/9/1994 - 10/1/2016 |
| J.  San. | 9/20/2005 | 6/23/2011 | Clinical Therapist | Adult Counseling | MSW | 1983 | LICSW (CA) LCSW | 9/8/1986 10/29/1997 | 10/1/2016 6/30/2015 | Unk | PT | >20 Hr. | | 18y | 5y, 9m | 23y 9m | LICSW 9/8/1986 - 10/1/2016  (CA) Licensed Clinical Social Worker  10/29/1997 - 6/30/2015 |
| D.  Sch. | 11/16/1987 | 12/31/2011 | Clinical Therapist | Adult Counseling | MSW | 1966 | LICSW | 8/11/1987 | Present | PT | PT | >10 Hr. | | 20y | 24y, 1m | 44y, 1m | LICSW 8/11/1987 - Present |
| | | | | | | | | | **Total:** | **4** | | | | | | |

Licensed Clinician

| Name | Start | End | Job Title | | Degree | Yr. | Type | Start Date | End Date | Interr. | E.K. | | Prior | Arbour | Combined | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EM.  Sha. | 1/1/1997 | 6/23/2011 | Clinical Therapist | Adult Counseling | M.Ed. Ph.D. | 1973 1982 | Psychologist | 1/5/1993 | Present | PT | PT | >20 Hr. | | 2y | 14y, 5m | 40y, 5m | Psychologist 1/5/1993 - Present |
| | | | | | | | | | **Total:** | **1** | | | | | | |

**Other Licensed Clinicians**
Time Frame: 7/1/2005 to 7/1/2011 (Available during a portion of the time period)

Licensed Clinicians - LICSW

| Name | Start | End | Job Title | | Degree | Yr. | Type | Start Date | End Date | Interr. | E.K. | | Prior | Arbour | Combined | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D.  Amo. | 10/1/2008 | 12/31/2011 | Clinical Therapist | Family & Adult Counseling | MSW | 1977 | LICSW | 12/20/1982 | Present | FT | PT | >20 Hr. | | 31y | 3y, 2m | 34y, 2m | LICSW 12/20/1982 - Present |
| R.  Cho. | 12/5/1994 | 4/19/2006 | Clinical Social Worker | | MSW | 1979 | LICSW | 10/20/1982 | 10/1/2012 | PT | | | | 15y | 11y, 4m | 36y, 4m | |
| N.  Gin. | 8/3/1992 | 6/23/2011 | Clinician | | MSW | 1975 | LICSW | 6/8/1981 | Present | Unk. | | | | 16y | 18y, 10m | 34y,10m | LICSW 6/8/1981 - Present |

Licensed Clinicians

| Name | Start | End | Job Title | | Degree | Yr. | Type | Start Date | End Date | Interr. | E.K. | | Prior | Arbour | Combined | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| L.  Cof. | 12/9/2002 | 12/31/2011 | Intern Counselor | | MA | 2000 | LMHC | 3/24/2006 | Present | PT | | | | 3y | 9y, 0m | 12y | LMHC 03/24/2006 - Present |
| E.  Pau. | 6/2002 9/15/2004 | 9/15/2008 12/31/2011 | Intern Clinician Clinical Supervisor | | MA | 2002 | LMHC (NH) LCMHC | 10/26/2005 10/15/2004 | Present Present | Unk. Unk. | | | | 2y 8y, 3m | 6y, 3m 3y, 3m | 8y, 3m 11y, 6m | LMHC 10/26/2005 - Present  (NH) LCMHC 10/15/2004 - Present |
| C.  Sut. | 02/1998 | 12/31/2011 | Outpatient Clinical Therapist | Adolescent & Adult Counseling | MS | 1989 | LSW LMHC | 10/15/1996 5/1/1997 | Present Present | Unk | PT | >10 Hr. | | 11y | 13y, 10m | 24y, 10m | LSW 10/15/1996 - Present  LMHC 5/1/1997 - Present |
| D.  Bor.** | *1994 | 12/31/2011 | Outpatient Clinician | Adult Family Counseling | M.Ed. | 1992 | LMHC | 4/24/1997 | Present | PT | PT | >10 Hr. | Y | 3y | 16y, 11m | 19y, 11m | LMHC 04/24/1997 - Present  MA: School SW/School Adjustment Counselor #375459 Eff. 12/27/2017 |
| M.  Gat. | 3/17/2008 | 12/31/2011 | Psychiatrist | | MD | 1964 | Physician | 7/3/1975 | Present | Unk. | | | | 37y | 3y, 9m | 40y, 3m | Physician 7/3/1975 - Present  (NH) Physician 6/13/1977 - Present  (VA) Physician 8/12/1974 - Present |
| M.  Har. | 3/17/2008 | 12/31/2011 | Psychiatrist | | MD | 1959 | Physician | 7/18/1990 | Present | Unk. | | | | 41y | 3y, 4m | 44y, 9m | Physician 7/18/1990 - Present  (NY) Physician 7/29/1960 - Present  Board Cert. in Adult Psychiatry & Neurology 1969  General Cert. in Psychiatry & Subspecialty in Child & Adolescent Psychiatry 1973 |
| N.  Sid. | 3/17/2008 | 12/31/2011 | Psychiatrist | | MD | 1953 | Physician | 9/18/1958 | 5/28/2015 | Unk | | | | Unk. | 3y, 9m | 3y, 9m | Physician 9/18/1958- 5/28/2015  Board Cert. in Psychiatry certified on 3/30/1960 |
| E.  Pet. | 12/1996 | 12/31/2011 | NP | | BSN MSN | 1982 1984 | RN PCNS | 12/31/1959 12/31/1959 | 6/22/2016 6/22/2016 | Unk. | | | | 22y | 15y, 0m | 27y | RN 12/31/1959 - 6/22/2016  PCNS 12/31/1959 - 6/22/2016  (NH) RN 2/16/1996 - 6/22/1997 |
| | | | | | | | | | **Total:** | **11** | | | | | | |

CODING CONTINUUM, INC.

EXHIBIT 3B

Relevant Time Frame: 7/1/2005 to 7/1/2011

Data Sources*:   Attachment A (J. Fletcher Exhibit 3)

Clinicians who were mentioned in E. Keohan Exhibit 20 (MH006531)

| Name (First, Last) | Dates of Employment[1] (Start, End) | Job Title (Interrogatory) | Job Title (E. Keohan Exh. 20) | Degree/Yr. Obtained | License | | | Work Status | | | Clinical Experience (Yrs.) | | | License information/Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Type | Start Date | End Date | PT/FT/PD/UNK (Interr.) | PT/FT/PD/UNK (E.K Exh. 20) | Bilingual | Prior (Yrs.) | Arbour[2] | Combined[3] | |

[1] Denotes changing of end date from Interrogatory listing of "Unk" to 6/23/2011 based of E. Keohan Exhibit 20.
[2] Denotes the Arbour Clinical experience was calculated by the employee's start and end date.
[3] Denotes the combined time of Prior Clinical Exp. and Arbour Clinical Experience
[4] Denotes the employee C. Guz that was employed at Arbour during the time period and after the time period

* Denotes Clinicians that were 1099 independent contractors at their employment start date (please refer to Attachment A Page 1)
** Denotes changing of start date from Interrogatory listing of calendar year to a start date of the next year, i.e. 1998 changes to 1/1/1999.
*** Denotes changing of start date from Interrogatory listing of calendar month to a start date as the beginning of the next month, i.e. 2/1998 changes to 3/1/1998.
**** Denotes changing of end date from Interrogatory listing of "unable to locate" to 12/31/2011 based on Attachment A footnote 2.

2

CODING CONTINUUM, INC.